UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,          :

        Plaintiff,          :

    - v. -          :

POKERSTARS; FULL TILT POKER;          :
ABSOLUTE BET; ULTIMATE BET;
OLDFORD GROUP LTD.; RATIONAL          :
ENTERTAINMENT ENTERPRISES LTD.;
PYR SOFTWARE LTD.; STELEKRAM LTD.; :
SPHENE INTERNATIONAL LTD.;
TILTWARE LLC; KOLYMA CORPORATION   :
A.V.V.; POCKET KINGS LTD.; POCKET
KINGS CONSULTING LTD.; FILCO LTD.; :
VANTAGE LTD.; RANSTON LTD.; MAIL
MEDIA LTD.; FULL TILT POKER LTD.;     :
SGS SYSTEMS INC.; TRUST SERVICES
LTD; FIDUCIA EXCHANGE LTD.; BLUE    :
WATER SERVICES LTD.; ABSOLUTE
ENTERTAINMENT, S.A.; and BLANCA    :
GAMES, INC. OF ANTIGUA;

                :

        Defendants;          :

ALL RIGHT, TITLE AND INTEREST IN    :
THE ASSETS OF POKERSTARS; FULL
TILT POKER; ABSOLUTE POKER;          :
ULTIMATE BET; OLDFORD GROUP LTD.;
RATIONAL ENTERTAINMENT ENTERPRISES :
LTD.; PYR SOFTWARE LTD.; STELEKRAM :
LTD.; SPHENE INTERNATIONAL LTD.;
TILTWARE LLC; KOLYMA CORPORATION   :
A.V.V.; POCKET KINGS LTD.; POCKET
KINGS CONSULTING LTD.; FILCO LTD.; :
VANTAGE LTD.; RANSTON LTD.; MAIL
MEDIA LTD.; FULL TILT POKER LTD.;     :
SGS SYSTEMS INC.; TRUST SERVICES
LTD; FIDUCIA EXCHANGE LTD.; BLUE    :
WATER SERVICES LTD.; ABSOLUTE
ENTERTAINMENT, S.A.; and BLANCA    :
GAMES, INC. OF ANTIGUA; INCLUDING
BUT NOT LIMITED TO THE PROPERTIES   :
LISTED IN SCHEDULE A, SUCH AS BUT
NOT LIMITED TO THE DOMAIN NAMES    :
POKERSTARS.COM; FULLTILTPOKER.COM;
ABSOLUTEPOKER.COM;          :

JUDGE SAND

VERIFIED COMPLAINT

11 Civ. CIV 2564



RECEIVED
APR 14 2011
U.S.D.C. S.D. N.Y.
CASHIERS

```
ULTIMATEBET.COM; and UB.COM; and     :
ALL RIGHT, TITLE, AND INTEREST IN
THE PROPERTIES LISTED IN SCHEDULE    :
B;
                                     :
            Defendants-in-rem.
- - - - - - - - - - - - - - - - - -x
```

Plaintiff United States of America, by its attorney,

Preet Bharara, United States Attorney for the Southern District

of New York, for its complaint, upon information and belief,

alleges as follows:

## I.   INTRODUCTION

1.   From at least in or about November 2006, and

continuing through in or about April 2011, the three leading

internet poker companies doing business in the United States were

PokerStars, Full Tilt Poker and Absolute Poker/Ultimate Bet

(collectively the "Poker Companies").  Because United States

banks were largely unwilling to process payments for an illegal

activity such as internet gambling, the three Poker Companies

used fraudulent methods to avoid these restrictions and to

receive billions of dollars from United States residents who

gambled through the Poker Companies.

2.   The principals of the Poker Companies, including

Isai Scheinberg ("Scheinberg") and Paul Tate ("Tate") of

PokerStars, Scott Tom ("Tom") and Brent Beckley ("Beckley") of

Absolute Poker, and Raymond Bitar ("Bitar") and Nelson Burtnick

("Burtnick") of Full Tilt Poker; and others working in concert

with the Poker Companies and on their behalf, deceived or
directed others to deceive United States banks and financial
institutions into processing billions of dollars in payments for
the Poker Companies, by, among other things, arranging for the
money received from United States gamblers to be disguised as
payments to hundreds of non-existent online merchants and other
non-gambling businesses.

     3.    To accomplish this deceit, Scheinberg, Bitar,
Beckley, Burtnick, and Tate relied on highly compensated third
party payment processors (the "Poker Processors") who lied to
United States banks about the nature of the financial
transactions they were processing and covered up those lies
through the creation of phony corporations and websites to
disguise payments to the Poker Companies.  These Poker Processors
included, among others, Ryan Lang ("Lang"), Bradley Franzen
("Franzen"), Ira Rubin ("Rubin"), and Chad Elie ("Elie"), who, at
various times relevant to this Complaint, processed and helped
disguise payments to each of the three Poker Companies.

     4.    Working together, the Poker Companies and Poker
Processors deceived United States banks and financial
institutions – including banks insured by the Federal Deposit
Insurance Corporation – into processing billions of dollars in
gambling transactions for the Poker Companies.  Approximately
one-third or more of the funds deposited by gamblers went

3

directly to the Poker Companies as revenue through the "rake" the Poker Companies charged players on almost every poker hand played online.

5.    On or about March 10, 2011, a Grand Jury sitting in the Southern District of New York returned a nine-count Superseding Indictment, S3 10 Cr. 336 (LAK) (the "Indictment") charging Scheinberg, Bitar, Tom, Beckley, Burtnick, Tate, Lang, Franzen, Rubin, Elie, and John Campos ("Campos") with conspiring to violate the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5363 and 5366, in violation of Title 18, United States Code, Section 371 (Count One); violating UIGEA, Title 31, United States Code, Sections 5363 and 5366 (Counts Two, Three, and Four); conducting illegal gambling businesses, in violation of Title 18, United States Code, Section 1955 (Counts Five, Six, and Seven); conspiring to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349 (Count Eight); and conspiring to launder money, in violation of Title 18, United States Code, Section 1956(h) (Count Nine).  A true and correct copy of the Indictment is attached hereto as Exhibit A and is incorporated by reference as if fully set forth herein.

6.    In the instant civil money laundering action and in rem forfeiture action, the United States of America seeks civil monetary penalties for money laundering against Pokerstars;

Full Tilt Poker; Absolute Poker; Ultimate Bet; Oldford Group
Ltd.; Rational Entertainment Enterprises Ltd.; Pyr Software Ltd.;
Stelekram Ltd.; Sphene International Ltd.; Tiltware LLC; Kolyma
Corporation A.V.V.; Pocket Kings Ltd.; Pocket Kings Consulting
Ltd.; Filco Ltd.; Vantage Ltd.; Ranston Ltd.; Mail Media Ltd.;
Full Tilt Poker Ltd.; SGS Systems Inc.; Trust Services Ltd.;
Fiducia Exchange Ltd.; Blue Water Services Ltd.; Absolute
Entertainment, S.A.; and Blanca Games, Inc. of Antigua (the
"Defendants").

    7.   The United States of America further seeks the
forfeiture of all right, title and interest in the assets of the
Defendants, including but not limited to the properties set forth
in Schedule A to this Complaint, such as but not limited to the
domain names pokerstars.com, fulltiltpoker.com,
absolutepoker.com, ultimatebet.com, and ub.com, as well as the
properties set forth in Schedule B to this Complaint, consisting
of accounts used by payment processors for the Poker Companies
and accounts into which proceeds were transferred from the
payment processor accounts (collectively, the "Defendant
Properties").  The Defendant Properties are subject to
forfeiture, (1) pursuant to Title 18, United States Code, Section
1955(d), as properties used in violation of the provisions of
Section 1955; (2) pursuant to Title 18, United States Code,
Section 981(a)(1)(C), as properties constituting or derived from

proceeds traceable to violations of Section 1955; (3) pursuant to Title 18, United States Code, Section 981(a)(1)(C), as properties constituting or derived from proceeds traceable to a conspiracy to commit wire fraud and bank fraud; and (4) pursuant to Title 18, United States Code, Section 981(a)(1)(A), as properties involved in transactions and attempted transactions in violation of Sections 1956 and 1957, or property traceable to such property.

8.   The Defendants are further subject to civil penalties, pursuant to Title 18, United States Code, Section 1956(b), of the value of the property, funds, and monetary instruments involved in transactions the Defendants conducted and attempted to conduct in violation of Section 1956(a)(1) and (a)(3) and section 1957, and transmissions and transfers the defendants conducted and attempted to conduct in violation of Section 1956(a)(2).

9.   On or about March 21, 2011, the Honorable Lewis A. Kaplan, United States District Judge, Southern District of New York, issued a restraining order with respect to several of the Defendant Properties finding probable cause that these properties are subject to forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), 982(a)(2)(A), and 1955(d) and Title 28, United States Code, Section 2461(c).  A true and correct copy of the Declaration of Special Agent Rosemary Karaka

of the Federal Bureau of Investigation ("FBI") (the "Karaka Decl.") submitted in support of the Government's application for the restraining order is annexed hereto as <u>Exhibit B</u> and is incorporated by reference as if fully set forth herein.

## II.   JURISDICTION AND VENUE

10.   This Court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345 and 1355.

11.   Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

12.   Venue is further proper pursuant to Title 28, United States Code, Section 1395(a) because the cause of action accrued in the Southern District of New York.

13.   Venue is further proper pursuant to Title 18, United States Code, Section 1956(i) because the financial or monetary transactions were conducted in part in the Southern District of New York; because a prosecution for the underlying specified unlawful activity could be brought in the Southern District of New York and the Defendants participated in the transfer of the proceeds of the specified unlawful activity from this District to districts where financial and monetary transactions were conducted; and because the Defendants conspired to violate Section 1956 and venue for the completed offense lies

in the Southern District of New York and acts in furtherance of the conspiracy took place in the Southern District of New York.

### III.   THE PARTIES

14.   At all times relevant to this Complaint, Scheinberg was a founder, owner, and principal decision-maker for PokerStars, an internet poker company founded in or about 2001 with headquarters in the Isle of Mann.   Through its website, pokerstars.com, PokerStars provided real-money gambling on internet poker games to United States customers.   At various times relevant to this Complaint, PokerStars did business through several privately held corporations and other entities, including but not limited to Oldford Group Ltd., Rational Entertainment Enterprises Ltd., Pyr Software Ltd., Stelekram Ltd. and Sphene International Ltd. (collectively, "Pokerstars").

15.   At all times relevant to this Complaint, Bitar was a founder, owner, and principal decision-maker for Full Tilt Poker, an internet poker company founded in or about 2004 with headquarters in Ireland.   Through its website, fulltiltpoker.com, Full Tilt Poker provided real-money gambling on internet poker games to United States customers.   At various times relevant to this Complaint, Full Tilt Poker did business through several privately held corporations and other entities, including but not limited to Tiltware LLC, Kolyma Corporation A.V.V., Pocket Kings Ltd., Pocket Kings Consulting Ltd., Filco Ltd., Vantage Ltd.,

8

Ranston Ltd., Mail Media Ltd., and Full Tilt Poker Ltd. (collectively, "Full Tilt Poker").  As of March 2011, Full Tilt Poker was the second-largest poker operator offering gambling on poker games to United States residents.

16.  At certain times relevant to this Complaint, Tom and his step-brother Beckley were founders and/or principal decision-makers for Absolute Poker, an internet poker company founded in or about 2003 with its headquarters in Costa Rica. Through its websites, absolutepoker.com, ultimatebet.com, and ub.com, Absolute Poker provided real-money gambling on internet poker games to United States customers.  At various times relevant to this Complaint, Absolute Poker did business through several privately held corporations and other entities, including but not limited to SGS Systems Inc., Trust Services Ltd, Fiducia Exchange Ltd., Blue Water Services Ltd., and Absolute Entertainment, S.A.  In or around October 2006, Tokwiro Enterprises was identified as the owner of record of Absolute Poker and a companion poker and blackjack gambling website, Ultimate Bet.  In around August 2010, ownership of Absolute Poker and Ultimate Bet was transferred to Blanca Games, Inc. of Antigua (collectively, these entities are "Absolute Poker").

17.  At certain times relevant to this Complaint, Burtnick was an executive in the payment processing departments of PokerStars and Full Tilt Poker.  From in or about October 2006

9

through in or about November 2008 Burtnick was an employee in the payment processing department of PokerStars, where he ultimately served as the head of payment processing. From in or about January 2009 up to and including in or about March 2011, Burtnick served as head of the payment processing department for Full Tilt Poker.

18. From at least in or about the summer of 2006 up to and including in or about March 2011, Tate was an employee of PokerStars, including in the payment processing department. From in or about early 2009, up to and including in or about March 2011, Tate served as the head of the payment processing department for PokerStars.

19. From at least in or about October 2006, up to and including at least in or about the spring of 2010, Lang worked with the Poker Companies to identify Poker Processors willing to process payments for the Poker Companies, including through deceptive means. In this capacity, Lang acted as an intermediary between principals of the Poker Companies, including defendants Scheinberg, Bitar, Beckley, Burtnick and Tate, and the Poker Processors.

20. From at least in or about 2007, up to and including on or about March 2011, Franzen worked with internet gambling companies including the Poker Companies, to identify Poker Processors willing to process payments for the Poker

Companies, including through deceptive means.  In this capacity,
Franzen acted as an intermediary between principals of the Poker
Companies, including defendants Beckley and Burtnick, and the
Poker Processors.

21.  From at least in or about 2007, up to and
including in or about March 2011, Rubin processed payments for
various internet gambling companies, including each of the Poker
Companies, by disguising the payments as payments to dozens of
phony internet merchants.

22.  From at least in or about the summer of 2008, up
to and including in or about March 2011, Elie together with
others, opened bank accounts in the United States, including
through deceptive means, through which each of the Poker
Companies received payments from United States-based gamblers.

23.  From at least in or about September 2009, up to
and including in or about March 2011, Campos was the Vice
Chairman of the Board of Directors and part owner of SunFirst
Bank in St. George, Utah, which processed payments for PokerStars
and Full Tilt Poker.

### IV.   FACTUAL ALLEGATIONS

### The Enactment of the UIGEA

24.  On or about October 13, 2006, the United States
enacted the Unlawful Internet Gambling Enforcement Act ("UIGEA"),
making it a federal crime for gambling businesses to "knowingly

accept" most forms of payment "in connection with the participation of another person in unlawful Internet gambling." Following the passage of the UIGEA, leading internet gambling businesses – including the leading internet poker company doing business in the United States at that time – terminated their United States operations.

25.  On various dates in October 2006, notwithstanding the passage of the UIGEA, the Poker Companies issued public statements indicating that they intended to continue offering gambling on internet poker in the United States.  For example, in an October 16, 2006 press release, Absolute Poker – whose United States citizen founders had relocated to Costa Rica – noted that Absolute Poker was a "privately held operation, which gives our business model more flexibility and creativity in operating." Absolute Poker also claimed that its payment transactions were done "within the framework of the international banking system, which the U.S. Congress has no control over."

### The Scheme to Defraud

26.  As set forth more fully below, at most times relevant to this Complaint, because internet gambling businesses such as those operated by the Poker Companies were illegal under United States law, internet gambling companies, including the Poker Companies, were not permitted by United States banks to open bank accounts in the United States to receive proceeds from

12

United States gamblers.  Instead, both prior to and particularly after the passage of the UIGEA, the principals of the Poker Companies, including Scheinberg, Bitar, Tom, Beckley, Burtnick and Tate, operated through various deceptive means designed to trick United States banks and financial institutions into processing gambling transactions on the Poker Companies' behalf.

### Fraudulent Credit Card Processing

27.  Beginning in or about 2001, credit card companies Visa and MasterCard introduced regulations requiring member banks that processed credit card transactions for merchants (so-called "acquiring banks") to apply a particular transaction code to internet gambling transactions.  Thereafter, certain U.S. banks that issued credit cards to U.S. consumers (so-called "issuing banks") elected not to extend credit to customers for internet gambling purposes and as a matter of policy automatically declined transactions bearing that internet gambling transaction code.  The number of U.S. issuing banks declining such transactions increased significantly over time such that, even prior to the passage of the UIGEA in October 2006, most United States banks blocked transactions containing the internet gambling code.

28.  In order to circumvent the Visa and MasterCard regulations and trick U.S. banks into authorizing their internet gambling transactions, Scheinberg, Bitar, Beckley, Burtnick and

Tate, worked with and directed others to apply incorrect transaction codes to their respective Poker Companies' internet gambling transactions in order to disguise the nature of those transactions and create the false appearance that the transactions were completely unrelated to internet gambling.

29.   One method used by the members of the conspiracy to trick the United States banks into approving internet gambling charges involved the creation of phony non-gambling companies that the Poker Companies used to initiate the credit card charges.  At various times alleged in this Complaint, Bitar, Beckley, and Burtnick worked with other members of the conspiracy to create such fictitious companies – including phony online flower shops and pet supply stores – that established Visa and MasterCard merchant processing accounts with offshore banks. When Full Tilt Poker and Absolute Poker processed a transaction through one of these phony companies without applying a gambling code to the transaction, the United States issuing bank would be tricked into approving the gambling transaction even if its policy was to not allow the extension of credit for internet gambling.  Because the credit card networks were often able to detect the fraudulent nature of these phony merchants after a period of time and to shut down processing for those phony merchants, Bitar, Beckley and Burtnick, and their co-conspirators, arranged for a supply of stand-by phony merchants

14

to be used when a particular phony merchant was discovered.  For example, an Absolute Poker document from in or around the fall of 2007 identifies approximately twenty phony internet shopping companies then being used by Absolute Poker to disguise credit card transactions, including, among others, www.petfoodstore.biz and www.bedding-superstore.tv.

30.  A second method used by the members of the conspiracy to trick United States banks involved the use of certain pre-paid credit cards.  At various times alleged in this Complaint, the Poker Companies, through, among others, Scheinberg, Bitar, Beckley, Burtnick, and Tate, and their co-conspirators, developed so-called "stored value cards" – such as pre-paid debit cards or even pre-paid "phone" cards – that could be "loaded" with funds from a U.S. customer's credit card without using a gambling transaction code.  Once "loaded" in this way, the stored value cards were used by gamblers almost exclusively to transfer funds to Poker Companies and other gambling companies.  To avoid detection, Scheinberg, Bitar, Beckley, Burtnick, and Tate, and their co-conspirators, arranged for fake internet web sites and phony consumer "reviews" of the stored value cards so that it would appear that the stored value cards had some other legitimate purpose.

## Fraudulent E-Check Processing

31.  Because Visa and MasterCard sought to identify and block attempts to circumvent their rules requiring internet gambling transactions to be correctly identified – so that banks could decline to accept them if they wished – the Poker Companies were unable to process credit card transactions consistently, even through their use of fraudulent means.  Accordingly, Scheinberg, Bitar, Beckley, Burtnick, and Tate, and others, worked with and directed others to develop yet another method of deceiving United States banks and financial institutions into processing their respective Poker Companies' internet gambling transactions, through fraudulent e-check processing.

32.  At all times relevant to this Complaint, the Automated Clearinghouse (or "ACH") system was an electronic network, administered by the Federal Reserve, that allowed for electronic fund transfers to and from United States bank accounts through "e-checks" or "electronic checks."  At various times relevant to this Complaint, the Poker Companies, through among others Scheinberg, Bitar, Beckley, Burtnick, and Tate, increasingly focused their payment systems on e-checks.

33.  A principal difficulty for the Poker Companies in e-check processing was that the ACH system required the merchant to open a processing account at a United States-based Originating Depository Financial Institution (or "ODFI").  Because the Poker

Companies were not legally able to offer gambling in the United
States, the Poker Companies could not – and did not – seek to
open bank accounts for e-check processing in the names of their
businesses.  Instead, the Poker Companies found third parties –
the Poker Processors – willing to open the bank accounts and
process these e-check transactions on behalf of the Poker
Companies using the names of phony companies.

      34.  In furtherance of this aspect of the scheme,
Scheinberg, Bitar, Beckley, Burtnick, and Tate, among others,
relied on various middlemen, including Lang and Franzen, to
connect their respective Poker Companies with payment processors
willing to handle internet poker e-check transactions.  Following
these introductions, Scheinberg, Bitar, Beckley, Burtnick, and
Tate entered into processing agreements with certain of the e-
check processors.  The agreements provided the e-check processors
with fees for processing each e-check transaction that were
substantially higher than fees paid for standard e-check
processing for legitimate, non-gambling merchants.  The Poker
Companies, including through Scheinberg, Bitar, Beckley,
Burtnick, and Tate, then worked with the e-check processors and
other co-conspirators to disguise the Poker Companies' receipt of
gambling payments so that the transactions would falsely appear
to United States banks as non-gambling transactions.

35.  At all times relevant to this Complaint, the Poker Companies, through Scheinberg, Bitar, Beckley, Burtnick, and Tate, and others, and the e-check processors, typically accomplished fraudulent e-check processing as follows:

a.   First, the e-check processors - sometimes directly, and sometimes through third parties - opened bank accounts at United States-based ODFI banks in order to process the Poker Companies' e-check transactions through the ACH system. The e-check processors typically lied to the ODFI bank about the purpose of the account, falsely claiming that the account would be used to process e-checks for a wide variety of lawful e-commerce merchants without disclosing that, in fact, they would be used to process internet gambling transactions.  In some cases, the e-check processors offered specific lies about the identity of these purported e-commerce merchants.  In several cases, for example, the e-check processors falsely told the banks that the transactions were for particular purported internet shopping sites, such as an online store selling watches, when, in reality, as the e-check processors well knew, the transactions were for the Poker Companies.

b.   Second, the e-check processors worked with the Poker Companies, including with Scheinberg, Bitar, Beckley, Burtnick, and Tate, in the creation of dozens of phony corporations and corresponding websites so that the money debited

18

from U.S. customer's banks would falsely appear to United States banks to be consumer payments to non-gambling related businesses. For example, in or about mid-2008, Rubin, together with co-conspirators, created dozens of phony e-commerce websites purporting to sell everything from clothing to jewelry to golf clubs to bicycles which, in reality, and as Rubin and his co-conspirators well knew, would in fact be used to disguise PokerStars's gambling transactions.  In another example, in or around June 2009, Franzen, the defendant, working with multiple co-conspirators, created a phony business called "Green2YourGreen" to be used to disguise payments from U.S. gamblers destined for each of the Poker Companies.  Franzen's co-conspirators falsely told multiple United States banks insured by the FDIC, including Citibank and Wells Fargo Bank, among others, that "Green2YourGreen" was a "direct sales" business that allowed consumers to buy environmentally friendly household products and sell them to other consumers in return for commissions.  Indeed, the phony Green2YourGreen website that Franzen's co-conspirators created to disguise the gambling transactions listed numerous products that were purportedly for sale and contained "testimonials" about the benefits of green living.

c.   The development and selection of phony merchants and websites to serve as cover for the poker processing was conducted in close coordination with the Poker Companies

themselves, including with Scheinberg, Bitar, Beckley, Burtnick, and Tate.  When a U.S. gambler entered his or her checking account information on one of the Poker Company's websites, the e-check transaction was submitted through the ACH system using the name of one of the phony businesses rather than the name of the Poker Company, and the charge appeared on the customer's bank account under this phony name.  The e-check processors' computer systems communicated with the computer systems of the Poker Companies so that when a gambler entered e-check information on one of the Poker Operator's websites, the gambler and Poker Operator received notice of the name of the phony merchant that would appear on the customer's bank account statement, in lieu of the name of the Poker Company, as having initiated the charge. For example, for a time PokerStars used "oneshopcenter" and "mygolflocations" to appear as the party initiating the charges on gamblers' bank statements.  At the time, "oneshopcenter.com" and "mygolflocation.com" were purported internet merchants that falsely claimed to sell clothing and jewelry (for oneshopcenter.com) and golf clubs (for mygolflocation.com).

　　　　d.　　Similarly, the Poker Companies worked with the Poker Processors to coordinate responses to customer inquiries to the phony merchants, including the complaints of gamblers confused by the phony merchant name appearing on their checking account statement.  For example, in or around March 2009, Gambler

1 and Gambler 2 sent e-mails to purported customer service addresses listed by oneshopcenter.com and mygolflocation.com regarding attempts to purchase particular items.  Gambler 1 and Gambler 2 received responses not from these websites, but from individuals identifying themselves as customer service employees of PokerStars replying from e-mail addresses associated with PokerStars.

      e.   Tracking all of the phony merchants used to disguise gambling transactions created administrative and technical difficulties for the Poker Companies.  For example, a PokerStars document from in or about May 2009 provided as follows:

> It's not unusual for PokerStars to have their transactions identified by 30+ descriptors [the name of the merchant appearing on the consumer's credit card or checking account] at any point in time.  The purpose of a descriptor is to help the customer identify the source of the transaction, be it credit card or electronic funds transfer. Unfortunately PokerStars does not have this luxury; relying on whatever descriptor the processor can get approved by the bank. These descriptors are diverse, often vague and rarely reflect the nature of the transaction in any way.  In fact most descriptors strongly imply the transaction has nothing to do with PokerStars (i.e. BICYCLEBIGSHOP.COM, GOLFSHOPCENTER.COM, VENTURESHOPPING.COM etc). Whilst some players read confirmation emails and understand the process, many do not and it is all too easy for a player to say to their bank "I've never made a purchase at BICYCLEBIGSHOP.COM". As a result chargebacks (Not Auth & Stop Payments) are increasing which in turn jeopardizes the

relationship with the processor and their
banks.

To address the issue, PokerStars modified its software so, where
possible, a consistent phony descriptor would appear on the bank
statements of a given U.S. customer.

36. Scheinberg, Bitar, Beckley, Burtnick, and Tate,
worked with multiple e-check processors introduced to them by
defendants Lang, Franzen, and others, many of which the Poker
Companies used simultaneously.  These e-check providers included
the following:

a.  <u>Intabill</u>.  In or around the spring of 2007, Lang
introduced Scheinberg, Bitar, and Beckley to a method of e-check
processing offered by Intabill, an Australia-based payment
processing company.  Because Intabill did not have direct access
to United States ACH processing accounts, Intabill "sub-
contracted" its processing to various United States-based e-check
processors.  With the knowledge and approval of Scheinberg,
Bitar, Beckley, Burtnick and Tate, Intabill disguised the
gambling transactions as the transactions of dozens of phony
financial services merchants.  Intabill processed at least
$543,210,092 of transactions for the Poker Companies from mid-
2007 through March 2009.  In or around March 2009, the Poker
Companies ceased processing through Intabill, in part because

Intabill owed them tens of millions of dollars for past
processing.

      b.  <u>Chad Elie</u>.  In 2008 and 2009, Elie had worked with
Intabill to establish processing accounts for internet gambling
that were disguised as accounts set up to process repayments of
so-called "payday loans," which were high-interest, high-risk
loans unrelated to gambling transactions.  In or about August and
September 2009, working with Franzen, Elie processed transactions
on behalf of Full Tilt Poker.  Also in or about August and
September 2009, working with Beckley, Elie processed transactions
on behalf of Absolute Poker through a bank account at Fifth Third
Bank that Elie told the bank was an account to be used for
internet marketing transactions.  Elie's deceptive processing
through Fifth Third Bank terminated in September 2009 when the
bank froze the funds, which were subsequently seized by U.S. law
enforcement through a judicial warrant.

      c.  <u>Intabill's U.S. Representative</u>.  In or around
March 2009, Intabill's former U.S.-based representative, Andrew
Thornhill, began seeking to process transactions for the Poker
Companies himself, communicating at various times with
Scheinberg, Tate, Franzen, and Elie, among others, about
potential processing.  In or around June 2009, Thornhill and
Franzen began processing e-checks for each of the Poker Companies
disguised as payments to the phony "Green2YourGreen"

environmentally friendly household products company described in paragraph 25(b) of this Complaint.  The Green2YourGreen processing lasted only a few months, until approximately August 2009, when Citibank and Wells Fargo Bank, among others, discovered that the transactions were, in fact, for internet gambling and terminated the accounts.  At that time, the proceeds of these accounts were then seized by U.S. law enforcement pursuant to a judicial warrant.

d.   <u>The Arizona Processor</u>.  In or around December 2008, after learning that Intabill was unlikely to continue processing, Scheinberg, Bitar, Beckley, Burtnick and Tate began processing payments through an Arizona payment processor (the "Arizona Processor"), which was assisted at times by a company operated by Lang.  From in or about December 2008 through on or about June 1, 2009, the Arizona Processor processed more than $100 million in payments primarily from U.S. gamblers to each of the Poker Companies; all of these transactions were processed using the names of phony merchants so as falsely to appear unrelated to internet gambling.  On or about June 1, 2009, the Arizona Processor ceased processing transactions for the Poker Companies following the seizure of its bank accounts by U.S. law enforcement pursuant to a judicial warrant.

e.   <u>Ira Rubin</u>.  At various times relevant to this Complaint, each of the Poker Companies employed Rubin, his

company E-Triton, and various of Rubin's associates, including an e-check processor in California (the "California Processor"), to process their internet gambling transactions disguised as legitimate online merchant transactions, in order to trick U.S. banks into authorizing the transactions.  For example, in or about mid-2008, Scheinberg and Burtnick hired Rubin's company E-Triton to process PokerStars transactions disguised as payments to dozens of phony web stores, including oneshopcenter.com and mygolflocation.com, which Rubin sub-contracted to the Arizona Processor.  In another example, in or about June 2009, following the Arizona Processor's termination of its processing activities, Burtnick and Franzen arranged for two of Rubin's associates to process payments for Full Tilt Poker disguised as payments to a medical billing company, until accounts related to that processing were seized by judicial order in or about September 2009.  In a final example, at various times from approximately 2008 up to and including in or about March 2011, Beckley hired Rubin to process e-checks for Absolute Poker disguised as, among other things, payroll processing, affiliate marketing, and online electronics merchants.

### "Transparent Processing"

37.  In or around late 2009, following the collapse of multiple e-check processing operations used by the Poker Companies and the judicially ordered seizure of funds, Scheinberg

and Bitar, begin exploring a new payment processing strategy –
so-called "transparent processing" – and directed the heads of
their payment processing departments, Tate and Burtnick, to find,
at least where possible, processing solutions that did not
involve lies to banks.  Despite their expressed desire for
"transparent" processing, PokerStars and Full Tilt Poker
continued to rely on processors who disguised the poker
transactions.

    38.  In order to find "transparent" processors,
Scheinberg, Bitar, Burtnick and Tate, turned to processors who
had worked with the Poker Companies before, including defendants
Ryan Lang, Bradley Franzen, and Chad Elie.  The Poker Companies
had previously sued Elie for allegedly stealing $4 million of the
Poker Companies' money.  Elie was accepted as a source for
"transparent" processing following a conversation between Elie
and Scheinberg in or about the fall of 2009 in which Elie agree
to repay some of this money.

    39.  Because it was illegal to process their internet
gambling transactions, the Poker Companies had difficulty in
identifying "transparent" processors.  Elie and his associates
were, however, able to persuade the principals of certain small,
local banks that were facing financial difficulties to engage in
such processing.  In exchange for this agreement to process
gambling transactions, the banks received sizeable fee income

from processing poker transactions as well as promises of multi-million dollar investments in the banks from Elie and his associates. In at least one case, a payment to a bank official who approved the processing was made as well.

40. For example, in or around September 2009, Elie, together with Andrew Thornhill and a partner of Elie's ("Elie's Partner") approached Campos, the defendant, the Vice Chairman of the Board and part-owner of SunFirst Bank, a small, private bank based in Saint George, Utah. Campos, while expressing "trepidations" about gambling processing, proposed in a September 23, 2009 e-mail to accept such processing in return for a $10 million investment in SunFirst by Elie and Elie's Partner, which would give Elie and Elie's Partner more than 30% ownership of the bank. Elie and Elie's Partner made an initial investment in SunFirst Bank of approximately $3.4 million in approximately December 2009. On or about November 29, 2009, Andrew Thornhill told an associate "things are going well with the bank we purchased in Utah and my colleagues and I are looking to purchase another bank for the purpose of repeating our business plan. We probably could do this for a grand total of 3 or 4 banks."

41. On or about December 14, 2009, SunFirst Bank began processing payments for Pokerstars and FullTilt Poker. On or about April 8, 2010, Campos, the defendant, sent an "invoice" to Elie's Partner requesting that $20,000 be paid to a corporate

entity that Campos controlled as a "bonus" for "Check and Credit Card Processing Consulting."  SunFirst Bank processed over $200 million of payments for PokerStars and Full Tilt Poker through on or about November 9, 2010, when, at the direction of the FDIC, it ceased third party payment processing.  SunFirst Bank earned approximately $1.6 million in fees for this processing.

42.  In furtherance of the conspiracy described above and to effect the illegal object thereof, Scheinberg, Bitar, Tom, Beckley, Burtnick, Tate, Lang, Franzen, Rubin, Elie, and Campos, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.  On or about October 20, 2008, Lang sent an e-mail to principals of Intabill, reminding them that Burtnick would soon leave PokerStars and that they had promised to "kick him back" 5 cents for every dollar on Intabill's processing revenue from PokerStars.

b.  On or about January 20, 2009, PokerStars, Full Tilt Poker, and Absolute Poker each received an electronic transfer of funds from a gambler located in the Southern District of New York.

c.  On or about February 11, 2009, Beckley sent an e-mail to a co-conspirator not named as a defendant herein requesting that the co-conspirator obtain e-check and credit card processing for Absolute Poker.

d.   On or about April 2, 2009, Scheinberg sent an e-mail to a co-conspirator not named as a defendant in the Indictment about a PokerStars processing account shut down by a United States bank.

e.   On or about April 3, 2009, Lang, Burtnick, and Bitar met in Nevada with a co-conspirator not named as a defendant in the Indictment about processing payments through tribal banks.

f.   On or about June 4, 2009, Franzen sent an e-mail to a co-conspirator not named as a defendant in the Indictment and asked for a "payout company ID" for Full Tilt Poker consisting of "something on the shelf with a basic web presence."

g.   On or about June 23, 2009, an unidentified individual at Full Tilt Poker sent an e-mail to Franzen that included comments on a call center script used by a payment processor that discussed the importance of not mentioning online poker to anyone calling customer service about a charge on a bank statement.

h.   On or about September 22, 2009, Elie forwarded to Beckley and Franzen an e-mail from a bank representative stating that funds in an account opened by Elie for processing internet marketing payments were being frozen by the bank as gambling funds.

i.   On or about September 29, 2009, Campos sent an e-mail to an attorney in which Campos called the attorney a "wet

29

blanket" for cautioning Campos about processing gambling payments.

        j.   On or about October 15, 2009, Rubin sent an e-mail to Tate about processing PokerStars transactions through a Bank of America account opened in the name of a supposed internet shop selling electronics and other items.

        k.   On or about July 20, 2010, Campos flew from New York to Ireland to a meeting regarding processing of poker transactions.

        l.   In or around August 2007, Full Tilt Poker processed credit card payments for gambling transactions under the name "PS3SHOP," using a non-gambling credit card code for the transactions, through a credit card network with headquarters in the Southern District of New York.

### The Poker Company Domain Names

        43.   The Poker Companies utilized websites as on-line portals for players to deposit and withdraw money to play online poker, and to actually play online poker.  In relation to these websites, the Poker Companies utilized the following domains:

        POKERSTARS.COM,

        FULLTILTPOKER.COM,

        ABSOLUTEPOKER.COM,

        ULTIMATEBET.COM, and

        UB.COM

(the "Subject Domain Names").

44.   Domain names operate as follows:

a.   A domain name is a simple, easy-to-remember way for people to identify computers on the Internet.  For example, "www.google.com" and "www.yahoo.com" are domain names.

b.   The Domain Name System ("DNS") is, among other things, a hierarchical convention for domain names.  Domain names are composed of one or more parts, or "labels," that are delimited by periods, such as "www.example.com."  The hierarchy of domains descends from right to left; each label to the left specifies a subdivision, or subdomain, of the domain on the right.  The right-most label conveys the "top-level" domain.  For example, the domain name "www.example.com" means that the computer assigned that name is in the ".com" top-level domain and the "example" second-level domain, and is a web server (denoted by the "www").

c.   DNS servers are computers connected to the Internet that convert domain names that are easy for people to remember into Internet Protocol ("IP") addresses, which are unique machine-readable numeric addresses that computers use to identify each other on the Internet.  An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178).  Every computer connection to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source

31

to its destination.   DNS servers can be said to "resolve" or "translate" domain names into IP addresses.

d.   For each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address.   For example, the registry for the ".tv," ".net," and ".com" top-level domains is VeriSign, Inc.

e.   If an individual or business wants to purchase a domain name, they buy it through a company called a "registrar." Network Solutions LLC ("Network Solutions") and GoDaddy.com Inc. ("GoDaddy") are two well-known examples of registrars, although there are hundreds of registrars on the Internet.   The registrar, in turn, communicates this purchase to the relevant registry.   The individual or business who purchases, or registers, a domain name is called a "registrant."

f.   Registrants control the IP address, and thus the computer, to which the domain name resolves.   Thus, a registrant may easily move a domain name to another computer anywhere in the world simply by changing the IP address at the registry.

g.   Registries and/or registrars maintain additional information about domain names, including the name and contact information of the registrant.

44.   On March 5, 2011, a federal law enforcement agent visited the sites affiliated with the Subject Domain Names and took numerous "screen shots" of the sites, capturing what the websites looked like to one visiting the site on the Internet at that time.   Additionally, during the course of this investigation, an individual cooperating with law enforcement (the "CW") visited three of the websites discussed herein.   As detailed below for each of these three websites, the CW, through the websites, deposited real money into accounts maintained by the Poker Companies for playing poker online with real-money bets and withdrew money as well.

### THE POKERSTARS.COM WEBSITE

### Content of the Pokerstars.com Website

45.   Pokerstars.com is an online platform for playing poker with real-money bets.   The site consists of numerous webpages that feature information relating to playing poker through the website, including for "Real Money."   As captured by the March 5, 2011 screen shots, the homepage states:   "Welcome to the World's Largest Poker Site."   It states there is a $600 "First Deposit Bonus" available to visitors of the site.   The homepage includes tabs which can be pressed to link to other pages within the site, including links entitled "Real Money" and "Poker Tournaments."   There is also tab for downloading Poker software. Lower on the homepage, it states:   "Welcome to PokerStars, where

33

you'll find more tournaments and games than any other poker site, with 24/7 support, secure deposits, fast cashouts and award-winning software.  This is where champions are born and you could be next.  Start playing for free now."  Under a section entitled "Pokerstars Blog News," it states that an individual with a particular username won "$671,093.81 & Lamborghini."

46.  From this homepage, a visitor can link to another webpage within the site that contains general information "About PokerStars."  On that page, it states: "Making a deposit in to your PokerStars account is also quick and easy, with a range of payment options available."  You can also take advantage of fast cashouts if you decide to withdraw money from your bank roll."  That page also contains a section entitled "Fully licensed and regulated."  Under that section, the page reads, in part: "PokerStars is a licensed and registered legal business located on the Isle of Man in the British isles, and abides by all laws and regulations where it does business."

47.  From the homepage, a visitor can also link to another page within the site that deals with "Playing with Real Money."  This page states, in part:

> Ready to play poker with real money at
> PokerStars?  Download [indicating a link]
> our exciting online poker software and
> you'll be playing at our fast-paced
> tables in no time!

48.   This page also explains that "Real money deposits into your poker account are accepted in several ways," and provides a drop-down menu list of countries "to view a list of payment and cashout methods available."   The United States is included on that list.   This page states:

> PokerStars players' poker money and account balances are held in segregated accounts and not used for any of PokerStars' operational expenses.   These segregated accounts are managed by a leading European Bank.

49.   The page also lists a number of poker games and tournaments "available for real money play at PokerStars[.]" These include: Texas Holdem, Omaha High Low, Omaha High, Seven Card Stud High Low, Seven Card Stud, Razz, HORSE/HOSE, and a reference to Tournaments.

50.   This page also includes a section on "Cashing Out Your Poker Winnings."   That portion explains: "To cash out, click on the 'Cashier' button in the lobby and then select the 'Cash Out' button.   You will then be prompted for a cashout amount; please enter the amount and click 'Submit.'"   The page contains information stating that a player can play without depositing real money at a "play money table."

51.   Screen shots were also taken of a page within the website that explains how to "Fund Your Account."   "Step 1" explains that a visitor should "Log into your PokerStars account and click the 'Cashier' button located at the bottom left hand

corner of your game lobby."  "Step 2" then directs the visitor to "Click 'Buy Chips' and choose a funding option, and click 'Deposit.'"  The listed deposit options include Instant eChecks, and links to credit cards such as Visa and Diners Club International.

<u>Gambling Deposits and Withdrawals on Pokerstars.com</u>

52.  On or about the dates listed in the chart below, the CW made the following deposits to a PokerStars online gambling account through the pokerstars.com website from a bank account held in Manhattan, New York:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 06/10/10 | eCheck | $10.00 | $ 10.00 |
| 8/7/10 | Check21 | $150.00 | $150.00 |
| 9/13/10 | Check21 | $20.00 | $ 20.00 |
| 1/23/11 | ACH | $23.00 | Reversed/Not Processed |

53.  On or about the dates listed in the chart below, the CW requested withdrawals from a PokerStars online gambling account through the pokerstars.com website:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 8/4/2010 | Paper Check | $35.00 | $35.00 |
| 8/19/2010 | Paper Check | $100.00 | $100.00 |
| 11/29/2010 | Paper Check | $25.00 | $25.00 |

54.    Rather than being issued from accounts in the name of PokerStars, the checks were issued from accounts in the names of entities with no seeming connection to gambling.  For example, the checks issued on August 4, 2010 and August 19, 2010 came from an account in the name of TLC Global.  The November 29, 2011 check came from an account in the name of Lancore Merchant Services.

### The Pokerstars.com Domain

55.    In regard to pokerstars.com, registration for this domain was most recently updated on or about March 14, 2011, reflecting the registrar Nom IQ LTD (D.B.A. Com Laude), located in the United Kingdom.  Approximately twenty-seven foreign language sites are affiliated with pokerstars.com.  Most of these are simply pages within the website affiliated with the pokerstars.com domain, such as "pokerstars.com/de/," "pokerstars.com/gr/," and "pokerstars.com/it/."  These pages are accessible to visitors in the United States.

56.    PokerStars also operates several foreign-language affiliate websites that are not part of the pokerstars.com domain, such as "pokerstars.ee," "pokerstars.es," and "pokerstars.si."

### THE FULLTILT.COM WEBSITE

### Content of the Fulltilt.com Website

57.    Similar to the pokerstars.com website, the fulltilt.com website is an online platform for playing poker with real-money bets.  It consists of numerous webpages that feature information relating to playing poker through the website,

including for "Real Money."  At the time of the screen shot, the
homepage indicated that 109,664 players were presently on line,
with 34,255 active tables, and 4,619 tournaments.  The homepage
also advertised a "100% First Deposit Bonus," explaining: "Make
you first deposit at Full Tilt Poker and we'll automatically match
your initial deposit with a 100% bonus up to $600!".  A link was
also included to play free poker.  The homepage announced:
"Online poker at the Fastest Growing Online Poker Room."  It
stated:

> Full Tilt Poker offers the best in <u>online</u>
> <u>poker</u> [indicating link]: world famous pros, a
> huge bonus, real or play money.  <u>Play poker</u>
> <u>online</u> [indicating link] now, it's free to
> download.  Try our free online poker game 24
> hours a day on state-of-the-art online poker
> software.  Play for real money or for free in
> tournaments or ring games.  Full Tilt Poker's
> online poker room was designed by world class
> poker professionals, and offers you the
> ability to learn, chat, and <u>play online poker</u>
> [indicating link] with the pros.
>
> Full Tilt Poker offers a wide variety of
> online poker games including No Limit Texas
> Holdem, Pot Limit Texas Hold Em, and Fixed
> Limit Texas Holdem [sic] as well as varieties
> of Omaha, Stud, and Razz.  We have ring games,
> Sit and Go tournaments, and multi-table
> tournaments.  If you can find it in a poker
> room, you can probably find it at Full Tilt
> Poker.

58.  One of the pages within the Full Tilt website deals
with "Playing For Real Money[.]" This page states:

> If you're looking to get the most out of your
> online poker experience, Full Tilt Poker
> offers a wide selection of real money ring

games and tournaments for your enjoyment.
What's more, Full Tilt Poker works hard to
ensure that playing for real money is easy,
safe and secure by:

- Providing a variety of safe and secure
  payment processors [indicating link] to
  make depositing money fast and easy.

- Ensuring any money you have on deposit
  with Full Tilt Poker is completely safe
  and secure [indicating link].

- Protecting your valuable personal
  information [indicating link].

- Processing withdrawals [indicating link]
  quickly and efficiently.

59.  This page also explains to visitors how to make
their first deposit.  This page goes on to state:

Every time you play for real money you'll
earn Full Tilt Poker points [indicating
link] that can be redeemed for tournament
entries and exclusive Full Tilt Poker
gear [indicating link].  You can earn
Full Tilt Poker points by playing in any
of our raked [indicating link] real money
ring games or tournaments . . . .

60.  Another page within the site deals with depositing
"real money."  This page lists Quick Deposit, credit cards, and
cash transfers as methods by which a visitor could deposit real
money into their Full Tilt Poker account.

61.  On another page within the website, which deals
with "Security," it states:

Full Tilt Poker conducts their banking and
financial affairs in accordance with generally
accepted standards of internationally
recognized banking institutions.  Full Tilt

Poker follows and adheres to applicable laws pertaining to transaction reporting and anti-money laundering laws and regulations.

62.   The website also includes a page entitled End User License Agreement.   That page sets out Terms and Conditions pertaining to "persons situated in North America" in regard to the website accessible from the domain name "www.FullTiltPoker.com." It states that the terms and conditions on this page constitute a binding agreement between the website visitor and the corporate entity Vantage Limited, which is registered Alderney in the Channel Islands.   This page states that:

Adult users of all skill levels who are situated in North America can download the proprietary gaming software needed to participate in poker tournaments and to play online interactive games of poker for real money at www.FullTiltPoker.com.

63.   The website also includes a page explaining to players how they can withdraw funds from their Full Tilt Poker accounts.   This page states that "[a]t Full Tilt Poker, we believe our players should be able to withdraw funds from their accounts as easily as they can make deposits."   It then lists the steps for players to execute a withdrawal.   These steps consist generally of logging on to the website, clicking the "Cashier" button, clicking on the "Withdrawal" button, selecting a withdrawal method, entering the amount you wish to withdrawal along with other required account information, confirming that amount and account