UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,                    :

                Plaintiff,             :     <u>VERIFIED FIRST AMENDED</u>
<u>COMPLAINT</u>

           - v. -                      :     11 Civ. 2564 (LBS)

POKERSTARS; FULL TILT POKER;                 :
ABSOLUTE POKER; ULTIMATE BET;
OLDFORD GROUP LTD.; RATIONAL                 :
ENTERTAINMENT ENTERPRISES LTD.;
PYR SOFTWARE LTD.; STELEKRAM LTD.; :
SPHENE INTERNATIONAL LTD.;
TILTWARE LLC; KOLYMA CORPORATION             :
A.V.V.; POCKET KINGS LTD.; POCKET
KINGS CONSULTING LTD.; FILCO LTD.; :
VANTAGE LTD.; RANSTON LTD.; MAIL
MEDIA LTD.; FULL TILT POKER LTD.;            :
SGS SYSTEMS INC.; TRUST SERVICES
LTD; FIDUCIA EXCHANGE LTD.; BLUE             :
WATER SERVICES LTD.; ABSOLUTE
ENTERTAINMENT, S.A.; and BLANCA              :
GAMES, INC. OF ANTIGUA; RAYMOND
BITAR; HOWARD LEDERER; CHRISTOPHER :
FERGUSON, a/k/a "JESUS;" and
RAFAEL FURST.                                :

              Defendants;            :

ALL RIGHT, TITLE AND INTEREST IN             :
THE ASSETS OF POKERSTARS; FULL
TILT POKER; ABSOLUTE POKER;                  :
ULTIMATE BET; OLDFORD GROUP LTD.;
RATIONAL ENTERTAINMENT ENTERPRISES :
LTD.; PYR SOFTWARE LTD.; STELEKRAM
LTD.; SPHENE INTERNATIONAL LTD.;             :
TILTWARE LLC; KOLYMA CORPORATION
A.V.V.; POCKET KINGS LTD.; POCKET            :
KINGS CONSULTING LTD.; FILCO LTD.;
VANTAGE LTD.; RANSTON LTD.; MAIL             :
MEDIA LTD.; FULL TILT POKER LTD.;
SGS SYSTEMS INC.; TRUST SERVICES             :
LTD; FIDUCIA EXCHANGE LTD.; BLUE
WATER SERVICES LTD.; ABSOLUTE                :
ENTERTAINMENT, S.A.; and BLANCA
GAMES, INC. OF ANTIGUA; INCLUDING :
BUT NOT LIMITED TO THE PROPERTIES
LISTED IN SCHEDULE A, SUCH AS BUT            :

```
NOT LIMITED TO THE DOMAIN NAMES    :
POKERSTARS.COM; FULLTILTPOKER.COM;
ABSOLUTEPOKER.COM;                 :
ULTIMATEBET.COM; and UB.COM;
ALL RIGHT, TITLE, AND INTEREST IN  :
THE PROPERTIES LISTED IN SCHEDULE
B; and ALL RIGHT, TITLE, AND       :
INTEREST IN THE PROPERTIES LISTED
IN SCHEDULE C                      :

            Defendants-in-rem.  :
- - - - - - - - - - - - - - - - - - -x
```

I.     **INTRODUCTION**. . . . . . . . . . . . . . . . . . . .    3

II.    **JURISDICTION AND VENUE**. . . . . . . . . . . . . . .   11

III.   **THE PARTIES**. . . . . . . . . . . . . . . . . . . .   12

IV.    **FACTUAL ALLEGATIONS**. . . . . . . . . . . . . . . .   17
       **The Enactment of the UIGEA**. . . . . . . . . . . .   17
       **The Scheme to Defraud**. . . . . . . . . . . . . . .   18
       **Fraudulent Credit Card Processing**. . . . . . . . .   18
       **Fraudulent E-Check Processing**. . . . . . . . . . .   21
       **"Transparent Processing"**. . . . . . . . . . . . . .   31
       **The Poker Company Domain Names**. . . . . . . . . . .   36
              The Pokerstars.com Website. . . . . . . . . .   38
              The Fulltilt.com Website. . . . . . . . . . .   43
              The Absolutepoker.com Website. . . . . . . . .   51
              The Ultimatebet.com Website. . . . . . . . . .   55
       **Prior Seizures of Poker Processing Accounts**. . . . .   58

V.     **FULL TILT POKER'S AND THE FTP INSIDER DEFENDANTS'**
       **THEFT OF PLAYER FUNDS**. . . . . . . . . . . . . . .   63
       **Full Tilt Poker's Assurances To Players About the Security**
           **of Deposits Made to Online Gambling Accounts**. . . .   64
       **Full Tilt Poker's Insolvency As a Result**
           **of Paying Owners From Player Funds and**
           **Its Inability To Collect Deposits from U.S. Players**.   71
       **Continuing Fraud Against Players After April 15, 2011**. .   75

VI.    **PROBABLE CAUSE FOR FORFEITURE**. . . . . . . . . . .   76
       **The Poker Companies**. . . . . . . . . . . . . . . .   77
       **The Poker Company Domain Names**. . . . . . . . . . .   77
       **The Poker Company Accounts**. . . . . . . . . . . . .   77
       **The Poker Processor Accounts**. . . . . . . . . . . .   78

**The FTP Insider Accounts**.. . . . . . . . . . . . . . . 78

VII. CLAIMS FOR FORFEITURE. . . . . . . . . . . . . . . . . 80
     **FIRST CLAIM FOR RELIEF**.. . . . . . . . . . . . . . . 80
     **SECOND CLAIM FOR RELIEF**. . . . . . . . . . . . . . . 81
     **THIRD CLAIM FOR RELIEF**.. . . . . . . . . . . . . . . 83
     **FOURTH CLAIM FOR RELIEF**. . . . . . . . . . . . . . . 85

VIII. CIVIL MONEY LAUNDERING PENALTIES. . . . . . . . . . . 86

Plaintiff United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, for its amended complaint, upon information and belief, alleges as follows:

## I.   INTRODUCTION

1.   From at least in or about November 2006, and continuing through in or about April 2011, the three leading internet poker companies doing business in the United States were PokerStars, Full Tilt Poker and Absolute Poker/Ultimate Bet (collectively the "Poker Companies").  Because United States banks were largely unwilling to process payments for an illegal activity such as internet gambling, the three Poker Companies used fraudulent methods to avoid these restrictions and to receive billions of dollars from United States residents who gambled through the Poker Companies.

2.   The principals of the Poker Companies, including Isai Scheinberg ("Scheinberg") and Paul Tate ("Tate") of PokerStars, Scott Tom ("Tom") and Brent Beckley ("Beckley") of Absolute Poker, and Raymond Bitar ("Bitar") and Nelson Burtnick

("Burtnick") of Full Tilt Poker; and others working in concert with the Poker Companies and on their behalf, deceived or directed others to deceive United States banks and financial institutions into processing billions of dollars in payments for the Poker Companies, by, among other things, arranging for the money received from United States gamblers to be disguised as payments to hundreds of non-existent online merchants and other non-gambling businesses.

3.    To accomplish this deceit, Scheinberg, Bitar, Beckley, Burtnick, and Tate relied on highly compensated third party payment processors (the "Poker Processors") who lied to United States banks about the nature of the financial transactions they were processing and covered up those lies through the creation of phony corporations and websites to disguise payments to the Poker Companies.  These Poker Processors included, among others, Ryan Lang ("Lang"), Bradley Franzen ("Franzen"), Ira Rubin ("Rubin"), and Chad Elie ("Elie"), who, at various times relevant to this Complaint, processed and helped disguise payments to each of the three Poker Companies.

4.    Working together, the Poker Companies and Poker Processors deceived United States banks and financial institutions – including banks insured by the Federal Deposit Insurance Corporation – into processing billions of dollars in gambling transactions for the Poker Companies.  Approximately

one-third or more of the funds deposited by gamblers went directly to the Poker Companies as revenue through the "rake" the Poker Companies charged players on almost every poker hand played online.

5.    As described more fully below, one of the Poker Companies, Full Tilt Poker, not only engaged in the operation of an unlawful gambling business, bank fraud, wire fraud, and money laundering as alleged in the Complaint, but also defrauded its poker players by misrepresenting to players that funds deposited into their online player accounts were secure and segregated from operating funds, while at the same time using player funds to pay out hundreds of millions of dollars to Full Tilt Poker owners. Full Tilt Poker was able to accomplish this massive fraud, in part, because it illegally conducted business in the United States but maintained its personnel, operations, assets, and accounts principally overseas.

6.    As described more fully below, in or about the summer of 2010, Full Tilt Poker's payment processing channels were so disrupted that the company faced increasing difficulty attempting to collect funds from players in the United States. Rather than disclose this fact, Full Tilt Poker simply credited players' online gambling accounts with money that had never actually been collected from the players' bank accounts.  Full Tilt Poker allowed players to gamble with -- and lose to other

players -- this phantom money that Full Tilt Poker never actually collected or possessed.  When other players won these phantom funds, their accounts were credited with money that Full Tilt Poker did not actually possess, but now nevertheless owed to these players.  As a result, Full Tilt Poker soon developed a massive shortfall between the money owed to United States players and the money actually collected from United States players, with Full Tilt Poker having credited approximately $130 million in phantom money to U.S. players' online accounts that was never actually collected from players' bank accounts.  Full Tilt Poker never disclosed this shortfall to the public.

7.   As of March 31, 2011, Full Tilt Poker owed approximately $390 million to players around the world, including approximately $150 million owed to players in the United States. At that time Full Tilt Poker had only approximately $60 million on deposit in its bank accounts.  As of the filing of this Amended Complaint, Full Tilt Poker still owes players over $300 million.

8.   Meanwhile, from approximately April 2007 until April 2011, Full Tilt Poker, and its Board of Directors, Bitar, Howard Lederer ("Lederer"), Christopher Ferguson, a/k/a "Jesus" ("Ferguson"), and Rafael Furst ("Furst"), all owners of Full Tilt Poker, distributed approximately $443,860,529.89 to themselves

and other owners of the company.  Payments to the Full Tilt Poker owners stopped only after April 15, 2011.

9.   On or about March 10, 2011, a Grand Jury sitting in the Southern District of New York returned a sealed nine-count Superseding Indictment, S3 10 Cr. 336 (LAK) (the "Indictment") charging Scheinberg, Bitar, Tom, Beckley, Burtnick, Tate, Lang, Franzen, Rubin, Elie, and John Campos ("Campos") with conspiring to violate the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5363 and 5366, in violation of Title 18, United States Code, Section 371 (Count One); violating UIGEA, Title 31, United States Code, Sections 5363 and 5366 (Counts Two, Three, and Four); conducting illegal gambling businesses, in violation of Title 18, United States Code, Section 1955 (Counts Five, Six, and Seven); conspiring to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349 (Count Eight); and conspiring to launder money, in violation of Title 18, United States Code, Section 1956(h) (Count Nine).  A true and correct copy of the Indictment is attached hereto as Exhibit A and is incorporated by reference as if fully set forth herein.

10.   On or about April 14, 2011, this action was commenced by the filing of a sealed in rem forfeiture and civil money laundering complaint ("the Complaint").  The Complaint sought civil monetary penalties for money laundering against the

Poker Companies and the entities that operated those companies: Pokerstars, Full Tilt Poker, Absolute Poker, Ultimate Bet, Oldford Group Ltd., Rational Entertainment Enterprises Ltd., Pyr Software Ltd., Stelekram Ltd., Sphene International Ltd., Tiltware LLC, Kolyma Corporation A.V.V., Pocket Kings Ltd., Pocket Kings Consulting Ltd., Filco Ltd., Vantage Ltd., Ranston Ltd., Mail Media Ltd., Full Tilt Poker Ltd., SGS Systems Inc., Trust Services Ltd., Fiducia Exchange Ltd., Blue Water Services Ltd., Absolute Entertainment, S.A., and Blanca Games, Inc. of Antigua ("the Poker Company Defendants").

      11.  The Complaint further sought the forfeiture of all right, title and interest in the assets of the Poker Company Defendants, including but not limited to the properties set forth in Schedule A, including the domain names pokerstars.com, fulltiltpoker.com, absolutepoker.com, ultimatebet.com, and ub.com (the "Poker Company Properties"); as well as the properties set forth in Schedule B, consisting of accounts used by payment processors for the Poker Companies and accounts into which proceeds were transferred from the payment processor accounts (the "Processor Properties").  The Poker Company Properties and the Processor Properties are subject to forfeiture (1) pursuant to Title 18, United States Code, Section 1955(d), as properties used in violation of the provisions of Section 1955; (2) pursuant to Title 18, United States Code, Section 981(a)(1)(C), as

properties constituting or derived from proceeds traceable to violations of Section 1955; (3) pursuant to Title 18, United States Code, Section 981(a)(1)(C), as properties constituting or derived from proceeds traceable to a conspiracy to commit wire fraud and bank fraud; and (4) pursuant to Title 18, United States Code, Section 981(a)(1)(A), as properties involved in transactions and attempted transactions in violation of Sections 1956 and 1957, or property traceable to such property.

12.  On or about April 15, 2011, the Honorable Lewis A. Kaplan, United States District Judge, Southern District of New York, issued a restraining order ("the Restraining Order") with respect to several of the Poker Company Properties and the Processor Properties, finding probable cause that these properties are subject to forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), 982(a)(2)(A), and 1955(d) and Title 28, United States Code, Section 2461(c).  A true and correct copy of the Declaration of Special Agent Rosemary Karaka of the Federal Bureau of Investigation ("FBI") (the "Karaka Decl.") submitted in support of the Government's application for the Restraining Order is annexed hereto as Exhibit B and is incorporated by reference as if fully set forth herein.

13.  On or about April 15, 2011, the Honorable Robert W. Sweet, United States District Judge, Southern District of New

9

York, issued an Arrest Warrant In Rem for the Poker Companies'
domain names.

14.   On or about April 15, 2011, the Indictment, the
Restraining Order, and the Complaint were unsealed.

15.   On or about April 20, 2011, the United States
entered into an agreement with Full Tilt Poker, a true and
correct copy of which is attached as Exhibit J, authorizing Full
Tilt Poker to use its domain name, which had been seized pursuant
to the Arrest Warrant In Rem, for the purpose of allowing
internet poker in foreign countries where, Full Tilt Poker
maintained, it operated lawfully; and for the purpose of
facilitating Full Tilt Poker's repayment of funds to United
States players with funds on deposit with Full Tilt Poker (the
"Full Tilt Poker Domain Use Agreement").

16.   In this civil money laundering and in rem
forfeiture action, the United States of America seeks, in
addition to the penalties and forfeiture sought in the Complaint,
civil monetary penalties for money laundering against Bitar,
Lederer, Ferguson, and Furst (collectively the "FTP Insider
Defendants") pursuant to Title 18, United States Code, Section
1956(b), of the value of the property, funds, and monetary
instruments involved in transactions the FTP Insider Defendants
conducted and attempted to conduct in violation of Section
1956(a)(1) and (a)(3) and section 1957, and transmissions and

transfers the FTP Insider Defendants conducted in violation of
Section 1956(a)(2).  The United States of America also seeks the
forfeiture of all right, title and interest in the contents of
accounts set forth in Schedule C to this Complaint and all
property traceable thereto, consisting of payments received by
the FTP Insider Defendants (collectively, the "FTP Insider
Accounts").[1]  The FTP Insider Accounts are subject to forfeiture
(1) pursuant to Title 18, United States Code, Section
981(a)(1)(C), as properties constituting or derived from proceeds
traceable to violations of Section 1955; (2) pursuant to Title
18, United States Code, Section 981(a)(1)(C), as properties
constituting or derived from proceeds traceable to a conspiracy
to commit wire fraud and bank fraud; (3) pursuant to Title 18,
United States Code, Section 981(a)(1)(A), as properties involved
in transactions and attempted transactions in violation of
Sections 1956 and 1957, or property traceable to such property;
and (4) pursuant to Title 18, United States Code, Section
981(a)(1)(C), as properties constituting or derived from proceeds
traceable to wire fraud and conspiracy to commit wire fraud.

## II.  JURISDICTION AND VENUE

17.  This Court has jurisdiction over this action
pursuant to Title 28, United States Code, Sections 1345 and 1355.

[1] The Poker Company Properties, Processor Properties, and FTP
Insider Accounts are referred to collectively as "the Defendant
Properties."

11

18.   Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

19.   Venue is further proper pursuant to Title 28, United States Code, Section 1395(a) because the cause of action accrued in the Southern District of New York.

20.   Venue is further proper pursuant to Title 18, United States Code, Section 1956(i) because the financial or monetary transactions were conducted in part in the Southern District of New York; because a prosecution for the underlying specified unlawful activity could be brought in the Southern District of New York and the Defendants participated in the transfer of the proceeds of the specified unlawful activity from this District to districts where financial and monetary transactions were conducted; and because the Defendants conspired to violate Section 1956 and venue for the completed offense lies in the Southern District of New York and acts in furtherance of the conspiracy took place in the Southern District of New York.

### III. THE PARTIES

21.   At all times relevant to this Amended Complaint, Scheinberg was a founder, owner, and principal decision-maker for PokerStars, an internet poker company founded in or about 2001 with headquarters in the Isle of Mann.  Through its website,

12

pokerstars.com, PokerStars provided real-money gambling on
internet poker games to United States customers.  At various
times relevant to this Amended Complaint, PokerStars did business
through several privately held corporations and other entities,
including but not limited to Oldford Group Ltd., Rational
Entertainment Enterprises Ltd., Pyr Software Ltd., Stelekram Ltd.
and Sphene International Ltd. (collectively, "Pokerstars").

22.  At all times relevant to the Amended Complaint,
Full Tilt Poker was an internet poker company founded in or about
2004 with headquarters in Ireland.  Through its website,
fulltiltpoker.com, Full Tilt Poker provided real-money gambling
on internet poker games to United States customers.  At various
times relevant to this Amended Complaint, Full Tilt Poker did
business through several privately held corporations and other
entities, including but not limited to Tiltware LLC, Kolyma
Corporation A.V.V., Pocket Kings Ltd., Pocket Kings Consulting
Ltd., Filco Ltd., Vantage Ltd., Ranston Ltd., Mail Media Ltd.,
and Full Tilt Poker Ltd. (collectively, "Full Tilt Poker").  As
of March 2011, Full Tilt Poker was the second-largest poker
operator offering gambling on poker games to United States
residents.

23.  At all times relevant to the Amended Complaint,
Bitar, Lederer, Ferguson, and Furst were among the founders of
Full Tilt Poker, as well as part-owners of Tiltware, LLC, a

California Limited Liability Company that was the beneficial owner of all other Full Tilt Poker entities.  In total, approximately 23 individuals owned shares in Full Tilt Poker. The FTP Insider Defendants specifically owned the following approximate percentages of Tiltware LLC:  Bitar (7.8%), Lederer (8.6%), Ferguson (19.2%), and Furst (2.6%).  The FTP Insider Defendants were also, at all relevant times, members of the Board of Directors of Tiltware LLC, and Ferguson was Chairman of the Board of Directors.  At all times relevant to the Amended Complaint Bitar and Lederer were the two managing members of Tiltware LLC and Bitar was the CEO of Full Tilt Poker.  At certain times relevant to the Amended Complaint, Lederer was the President of Full Tilt Poker.  Lederer, Bitar and Ferguson were also widely known professional poker players, as were many of the other part-owners of Tiltware LLC.

24.  At certain times relevant to this Amended Complaint, Tom and his step-brother Beckley were founders and/or principal decision-makers for Absolute Poker, an internet poker company founded in or about 2003 with its headquarters in Costa Rica.  Through its websites, absolutepoker.com, ultimatebet.com, and ub.com, Absolute Poker provided real-money gambling on internet poker games to United States customers.  At various times relevant to this Amended Complaint, Absolute Poker did business through several privately held corporations and other

14

entities, including but not limited to SGS Systems Inc., Trust Services Ltd, Fiducia Exchange Ltd., Blue Water Services Ltd., and Absolute Entertainment, S.A.  In or around October 2006, Tokwiro Enterprises was identified as the owner of record of Absolute Poker and a companion poker and blackjack gambling website, Ultimate Bet.  In around August 2010, ownership of Absolute Poker and Ultimate Bet was transferred to Blanca Games, Inc. of Antigua (collectively, these entities are "Absolute Poker").

25.  At certain times relevant to this Amended Complaint, Burtnick was an executive in the payment processing departments of PokerStars and Full Tilt Poker.  From in or about October 2006 through in or about November 2008 Burtnick was an employee in the payment processing department of PokerStars, where he ultimately served as the head of payment processing. From in or about January 2009 up to and including in or about March 2011, Burtnick served as head of the payment processing department for Full Tilt Poker.

26.  From at least in or about the summer of 2006 up to and including in or about March 2011, Tate was an employee of PokerStars, including in the payment processing department.  From in or about early 2009, up to and including in or about March 2011, Tate served as the head of the payment processing department for PokerStars.

15

27.  From at least in or about October 2006, up to and
including at least in or about the spring of 2010, Lang worked
with the Poker Companies to identify Poker Processors willing to
process payments for the Poker Companies, including through
deceptive means.  In this capacity, Lang acted as an intermediary
between principals of the Poker Companies, including defendants
Scheinberg, Bitar, Beckley, Burtnick and Tate, and the Poker
Processors.

28.  From at least in or about 2007, up to and
including on or about March 2011, Franzen worked with internet
gambling companies including the Poker Companies, to identify
Poker Processors willing to process payments for the Poker
Companies, including through deceptive means.  In this capacity,
Franzen acted as an intermediary between principals of the Poker
Companies, including defendants Beckley and Burtnick, and the
Poker Processors.

29.  From at least in or about 2007, up to and
including in or about March 2011, Rubin processed payments for
various internet gambling companies, including each of the Poker
Companies, by disguising the payments as payments to dozens of
phony internet merchants.

30.  From at least in or about the summer of 2008, up
to and including in or about March 2011, Elie together with
others, opened bank accounts in the United States, including

16

through deceptive means, through which each of the Poker Companies received payments from United States-based gamblers.

31.   From at least in or about September 2009, up to and including in or about March 2011, Campos was the Vice Chairman of the Board of Directors and part owner of SunFirst Bank in St. George, Utah, which processed payments for PokerStars and Full Tilt Poker.

## IV.   FACTUAL ALLEGATIONS

### The Enactment of the UIGEA

32.   On or about October 13, 2006, the United States enacted the Unlawful Internet Gambling Enforcement Act ("UIGEA"), making it a federal crime for gambling businesses to "knowingly accept" most forms of payment "in connection with the participation of another person in unlawful Internet gambling." Following the passage of the UIGEA, leading internet gambling businesses – including the leading internet poker company doing business in the United States at that time – terminated their United States operations.

33.   On various dates in October 2006, notwithstanding the passage of the UIGEA, the Poker Companies issued public statements indicating that they intended to continue offering gambling on internet poker in the United States.  For example, in an October 16, 2006 press release, Absolute Poker – whose United States citizen founders had relocated to Costa Rica – noted that

17

Absolute Poker was a "privately held operation, which gives our business model more flexibility and creativity in operating." Absolute Poker also claimed that its payment transactions were done "within the framework of the international banking system, which the U.S. Congress has no control over."

## The Scheme to Defraud

34.   As set forth more fully below, at most times relevant to this Amended Complaint, because internet gambling businesses such as those operated by the Poker Companies were illegal under United States law, internet gambling companies, including the Poker Companies, were not permitted by United States banks to open bank accounts in the United States to receive proceeds from United States gamblers.  Instead, both prior to and particularly after the passage of the UIGEA, the principals of the Poker Companies, including Scheinberg, Bitar, Tom, Beckley, Burtnick and Tate, operated through various deceptive means designed to trick United States banks and financial institutions into processing gambling transactions on the Poker Companies' behalf.

## Fraudulent Credit Card Processing

35.   Beginning in or about 2001, credit card companies Visa and MasterCard introduced regulations requiring member banks that processed credit card transactions for merchants (so-called "acquiring banks") to apply a particular transaction code to

internet gambling transactions.  Thereafter, certain U.S. banks
that issued credit cards to U.S. consumers (so-called "issuing
banks") elected not to extend credit to customers for internet
gambling purposes and as a matter of policy automatically
declined transactions bearing that internet gambling transaction
code.  The number of U.S. issuing banks declining such
transactions increased significantly over time such that, even
prior to the passage of the UIGEA in October 2006, most United
States banks blocked transactions containing the internet
gambling code.

36.  In order to circumvent the Visa and MasterCard
regulations and trick U.S. banks into authorizing their internet
gambling transactions, Scheinberg, Bitar, Beckley, Burtnick and
Tate, worked with and directed others to apply incorrect
transaction codes to their respective Poker Companies' internet
gambling transactions in order to disguise the nature of those
transactions and create the false appearance that the
transactions were completely unrelated to internet gambling.

37.  One method used by the members of the conspiracy
to trick the United States banks into approving internet gambling
charges involved the creation of phony non-gambling companies
that the Poker Companies used to initiate the credit card
charges.  At various times alleged in this Amended Complaint,
Bitar, Beckley, and Burtnick worked with other members of the

19

conspiracy to create such fictitious companies – including phony online flower shops and pet supply stores – that established Visa and MasterCard merchant processing accounts with offshore banks. When Full Tilt Poker and Absolute Poker processed a transaction through one of these phony companies without applying a gambling code to the transaction, the United States issuing bank would be tricked into approving the gambling transaction even if its policy was to not allow the extension of credit for internet gambling.  Because the credit card networks were often able to detect the fraudulent nature of these phony merchants after a period of time and to shut down processing for those phony merchants, Bitar, Beckley and Burtnick, and their co-conspirators, arranged for a supply of stand-by phony merchants to be used when a particular phony merchant was discovered.  For example, an Absolute Poker document from in or around the fall of 2007 identifies approximately twenty phony internet shopping companies then being used by Absolute Poker to disguise credit card transactions, including, among others, www.petfoodstore.biz and www.bedding-superstore.tv.

    38.  A second method used by the members of the conspiracy to trick United States banks involved the use of certain pre-paid credit cards.  At various times alleged in this Amended Complaint, the Poker Companies, through, among others, Scheinberg, Bitar, Beckley, Burtnick, and Tate, and their co-

conspirators, developed so-called "stored value cards" – such as pre-paid debit cards or even pre-paid "phone" cards – that could be "loaded" with funds from a U.S. customer's credit card without using a gambling transaction code. Once "loaded" in this way, the stored value cards were used by gamblers almost exclusively to transfer funds to Poker Companies and other gambling companies. To avoid detection, Scheinberg, Bitar, Beckley, Burtnick, and Tate, and their co-conspirators, arranged for fake internet web sites and phony consumer "reviews" of the stored value cards so that it would appear that the stored value cards had some other legitimate purpose.

### Fraudulent E-Check Processing

39. Because Visa and MasterCard sought to identify and block attempts to circumvent their rules requiring internet gambling transactions to be correctly identified – so that banks could decline to accept them if they wished – the Poker Companies were unable to process credit card transactions consistently, even through their use of fraudulent means. Accordingly, Scheinberg, Bitar, Beckley, Burtnick, and Tate, and others, worked with and directed others to develop yet another method of deceiving United States banks and financial institutions into processing their respective Poker Companies' internet gambling transactions, through fraudulent e-check processing.

40.  At all times relevant to this Amended Complaint, the Automated Clearinghouse (or "ACH") system was an electronic network, administered by the Federal Reserve, that allowed for electronic fund transfers to and from United States bank accounts through "e-checks" or "electronic checks."  At various times relevant to this Amended Complaint, the Poker Companies, through among others Scheinberg, Bitar, Beckley, Burtnick, and Tate, increasingly focused their payment systems on e-checks.

41.  A principal difficulty for the Poker Companies in e-check processing was that the ACH system required the merchant to open a processing account at a United States-based Originating Depository Financial Institution (or "ODFI").  Because the Poker Companies were not legally able to offer gambling in the United States, the Poker Companies could not – and did not – seek to open bank accounts for e-check processing in the names of their businesses.  Instead, the Poker Companies found third parties – the Poker Processors – willing to open the bank accounts and process these e-check transactions on behalf of the Poker Companies using the names of phony companies.

42.  In furtherance of this aspect of the scheme, Scheinberg, Bitar, Beckley, Burtnick, and Tate, among others, relied on various middlemen, including Lang and Franzen, to connect their respective Poker Companies with payment processors willing to handle internet poker e-check transactions.  Following

22

these introductions, Scheinberg, Bitar, Beckley, Burtnick, and Tate entered into processing agreements with certain of the e-check processors.  The agreements provided the e-check processors with fees for processing each e-check transaction that were substantially higher than fees paid for standard e-check processing for legitimate, non-gambling merchants.  The Poker Companies, including through Scheinberg, Bitar, Beckley, Burtnick, and Tate, then worked with the e-check processors and other co-conspirators to disguise the Poker Companies' receipt of gambling payments so that the transactions would falsely appear to United States banks as non-gambling transactions.

43.  At all times relevant to this Amended Complaint, the Poker Companies, through Scheinberg, Bitar, Beckley, Burtnick, and Tate, and others, and the e-check processors, typically accomplished fraudulent e-check processing as follows:

a.  First, the e-check processors – sometimes directly, and sometimes through third parties – opened bank accounts at United States-based ODFI banks in order to process the Poker Companies' e-check transactions through the ACH system.  The e-check processors typically lied to the ODFI bank about the purpose of the account, falsely claiming that the account would be used to process e-checks for a wide variety of lawful e-commerce merchants without disclosing that, in fact, they would be used to process internet gambling transactions.  In some

cases, the e-check processors offered specific lies about the identity of these purported e-commerce merchants.  In several cases, for example, the e-check processors falsely told the banks that the transactions were for particular purported internet shopping sites, such as an online store selling watches, when, in reality, as the e-check processors well knew, the transactions were for the Poker Companies.

b.   Second, the e-check processors worked with the Poker Companies, including with Scheinberg, Bitar, Beckley, Burtnick, and Tate, in the creation of dozens of phony corporations and corresponding websites so that the money debited from U.S. customer's banks would falsely appear to United States banks to be consumer payments to non-gambling related businesses. For example, in or about mid-2008, Rubin, together with co-conspirators, created dozens of phony e-commerce websites purporting to sell everything from clothing to jewelry to golf clubs to bicycles which, in reality, and as Rubin and his co-conspirators well knew, would in fact be used to disguise PokerStars's gambling transactions.  In another example, in or around June 2009, Franzen, the defendant, working with multiple co-conspirators, created a phony business called "Green2YourGreen" to be used to disguise payments from U.S. gamblers destined for each of the Poker Companies.  Franzen's co-conspirators falsely told multiple United States banks insured by

24

the FDIC, including Citibank and Wells Fargo Bank, among others, that "Green2YourGreen" was a "direct sales" business that allowed consumers to buy environmentally friendly household products and sell them to other consumers in return for commissions.  Indeed, the phony Green2YourGreen website that Franzen's co-conspirators created to disguise the gambling transactions listed numerous products that were purportedly for sale and contained "testimonials" about the benefits of green living.

          c.  The development and selection of phony merchants and websites to serve as cover for the poker processing was conducted in close coordination with the Poker Companies themselves, including with Scheinberg, Bitar, Beckley, Burtnick, and Tate.  When a U.S. gambler entered his or her checking account information on one of the Poker Company's websites, the e-check transaction was submitted through the ACH system using the name of one of the phony businesses rather than the name of the Poker Company, and the charge appeared on the customer's bank account under this phony name.  The e-check processors' computer systems communicated with the computer systems of the Poker Companies so that when a gambler entered e-check information on one of the Poker Operator's websites, the gambler and Poker Operator received notice of the name of the phony merchant that would appear on the customer's bank account statement, in lieu of the name of the Poker Company, as having initiated the charge.

For example, for a time PokerStars used "oneshopcenter" and "mygolflocations" to appear as the party initiating the charges on gamblers' bank statements.  At the time, "oneshopcenter.com" and "mygolflocation.com" were purported internet merchants that falsely claimed to sell clothing and jewelry (for oneshopcenter.com) and golf clubs (for mygolflocation.com).

       d.    Similarly, the Poker Companies worked with the Poker Processors to coordinate responses to customer inquiries to the phony merchants, including the complaints of gamblers confused by the phony merchant name appearing on their checking account statement.  For example, in or around March 2009, Gambler 1 and Gambler 2 sent e-mails to purported customer service addresses listed by oneshopcenter.com and mygolflocation.com regarding attempts to purchase particular items.  Gambler 1 and Gambler 2 received responses not from these websites, but from individuals identifying themselves as customer service employees of PokerStars replying from e-mail addresses associated with PokerStars.

       e.    Tracking all of the phony merchants used to disguise gambling transactions created administrative and technical difficulties for the Poker Companies.  For example, a PokerStars document from in or about May 2009 provided as follows:

> It's not unusual for PokerStars to have their
> transactions identified by 30+ descriptors
> [the name of the merchant appearing on the
> consumer's credit card or checking account]
> at any point in time.  The purpose of a
> descriptor is to help the customer identify
> the source of the transaction, be it credit
> card or electronic funds transfer.
> Unfortunately PokerStars does not have this
> luxury; relying on whatever descriptor the
> processor can get approved by the bank.
> These descriptors are diverse, often vague
> and rarely reflect the nature of the
> transaction in any way.  In fact most
> descriptors strongly imply the transaction
> has nothing to do with PokerStars (i.e.
> BICYCLEBIGSHOP.COM, GOLFSHOPCENTER.COM,
> VENTURESHOPPING.COM etc). Whilst some players
> read confirmation emails and understand the
> process, many do not and it is all too easy
> for a player to say to their bank "I've never
> made a purchase at BICYCLEBIGSHOP.COM". As a
> result chargebacks (Not Auth & Stop Payments)
> are increasing which in turn jeopardizes the
> relationship with the processor and their
> banks.

To address the issue, PokerStars modified its software so, where possible, a consistent phony descriptor would appear on the bank statements of a given U.S. customer.

44.  Scheinberg, Bitar, Beckley, Burtnick, and Tate, worked with multiple e-check processors introduced to them by defendants Lang, Franzen, and others, many of which the Poker Companies used simultaneously.  These e-check providers included the following:

a.  Intabill.  In or around the spring of 2007, Lang introduced Scheinberg, Bitar, and Beckley to a method of e-

check processing offered by Intabill, an Australia-based payment processing company.  Because Intabill did not have direct access to United States ACH processing accounts, Intabill "sub-contracted" its processing to various United States-based e-check processors.  With the knowledge and approval of Scheinberg, Bitar, Beckley, Burtnick and Tate, Intabill disguised the gambling transactions as the transactions of dozens of phony financial services merchants.  Intabill processed at least $543,210,092 of transactions for the Poker Companies from mid-2007 through March 2009.  In or around March 2009, the Poker Companies ceased processing through Intabill, in part because Intabill owed them tens of millions of dollars for past processing.

b.   <u>Chad Elie</u>.  In 2008 and 2009, Elie had worked with Intabill to establish processing accounts for internet gambling that were disguised as accounts set up to process repayments of so-called "payday loans," which were high-interest, high-risk loans unrelated to gambling transactions.  In or about August and September 2009, working with Franzen, Elie processed transactions on behalf of Full Tilt Poker.  Also in or about August and September 2009, working with Beckley, Elie processed transactions on behalf of Absolute Poker through a bank account at Fifth Third Bank that Elie told the bank was an account to be used for internet marketing transactions.  Elie's deceptive

processing through Fifth Third Bank terminated in September 2009 when the bank froze the funds, which were subsequently seized by U.S. law enforcement through a judicial warrant.

        c.   <u>Intabill's U.S. Representative</u>.  In or around March 2009, Intabill's former U.S.-based representative, Andrew Thornhill, began seeking to process transactions for the Poker Companies himself, communicating at various times with Scheinberg, Tate, Franzen, and Elie, among others, about potential processing.  In or around June 2009, Thornhill and Franzen began processing e-checks for each of the Poker Companies disguised as payments to the phony "Green2YourGreen" environmentally friendly household products company described in paragraph 25(b) of this Amended Complaint.  The Green2YourGreen processing lasted only a few months, until approximately August 2009, when Citibank and Wells Fargo Bank, among others, discovered that the transactions were, in fact, for internet gambling and terminated the accounts.  At that time, the proceeds of these accounts were then seized by U.S. law enforcement pursuant to a judicial warrant.

        d.   <u>The Arizona Processor</u>.  In or around December 2008, after learning that Intabill was unlikely to continue processing, Scheinberg, Bitar, Beckley, Burtnick and Tate began processing payments through an Arizona payment processor (the "Arizona Processor"), which was assisted at times by a company

operated by Lang.  From in or about December 2008 through on or
about June 1, 2009, the Arizona Processor processed more than
$100 million in payments primarily from U.S. gamblers to each of
the Poker Companies; all of these transactions were processed
using the names of phony merchants so as falsely to appear
unrelated to internet gambling.  On or about June 1, 2009, the
Arizona Processor ceased processing transactions for the Poker
Companies following the seizure of its bank accounts by U.S. law
enforcement pursuant to a judicial warrant.

      e.    <u>Ira Rubin</u>.  At various times relevant to this
Amended Complaint, each of the Poker Companies employed Rubin,
his company E-Triton, and various of Rubin's associates,
including an e-check processor in California (the "California
Processor"), to process their internet gambling transactions
disguised as legitimate online merchant transactions, in order to
trick U.S. banks into authorizing the transactions.  For example,
in or about mid-2008, Scheinberg and Burtnick hired Rubin's
company E-Triton to process PokerStars transactions disguised as
payments to dozens of phony web stores, including
oneshopcenter.com and mygolflocation.com, which Rubin sub-
contracted to the Arizona Processor.  In another example, in or
about June 2009, following the Arizona Processor's termination of
its processing activities, Burtnick and Franzen arranged for two
of Rubin's associates to process payments for Full Tilt Poker

disguised as payments to a medical billing company, until
accounts related to that processing were seized by judicial order
in or about September 2009.  In a final example, at various times
from approximately 2008 up to and including in or about March
2011, Beckley hired Rubin to process e-checks for Absolute Poker
disguised as, among other things, payroll processing, affiliate
marketing, and online electronics merchants.

### "**Transparent Processing**"

45.  In or around late 2009, following the collapse of
multiple e-check processing operations used by the Poker
Companies and the judicially ordered seizure of funds, Scheinberg
and Bitar, begin exploring a new payment processing strategy –
so-called "transparent processing" – and directed the heads of
their payment processing departments, Tate and Burtnick, to find,
at least where possible, processing solutions that did not
involve lies to banks.  Despite their expressed desire for
"transparent" processing, PokerStars and Full Tilt Poker
continued to rely on processors who disguised the poker
transactions.

46.  In order to find "transparent" processors,
Scheinberg, Bitar, Burtnick and Tate, turned to processors who
had worked with the Poker Companies before, including defendants
Ryan Lang, Bradley Franzen, and Chad Elie.  The Poker Companies
had previously sued Elie for allegedly stealing $4 million of the

Poker Companies' money.  Elie was accepted as a source for
"transparent" processing following a conversation between Elie
and Scheinberg in or about the fall of 2009 in which Elie agree
to repay some of this money.

47.  Because it was illegal to process their internet
gambling transactions, the Poker Companies had difficulty in
identifying "transparent" processors.  Elie and his associates
were, however, able to persuade the principals of certain small,
local banks that were facing financial difficulties to engage in
such processing.  In exchange for this agreement to process
gambling transactions, the banks received sizeable fee income
from processing poker transactions as well as promises of multi-
million dollar investments in the banks from Elie and his
associates.  In at least one case, a payment to a bank official
who approved the processing was made as well.

48.  For example, in or around September 2009, Elie,
together with Andrew Thornhill and a partner of Elie's ("Elie's
Partner") approached Campos, the defendant, the Vice Chairman of
the Board and part-owner of SunFirst Bank, a small, private bank
based in Saint George, Utah.  Campos, while expressing
"trepidations" about gambling processing, proposed in a September
23, 2009 e-mail to accept such processing in return for a $10
million investment in SunFirst by Elie and Elie's Partner, which
would give Elie and Elie's Partner more than 30% ownership of the

bank.  Elie and Elie's Partner made an initial investment in SunFirst Bank of approximately $3.4 million in approximately December 2009.  On or about November 29, 2009, Andrew Thornhill told an associate "things are going well with the bank we purchased in Utah and my colleagues and I are looking to purchase another bank for the purpose of repeating our business plan.  We probably could do this for a grand total of 3 or 4 banks."

49.  On or about December 14, 2009, SunFirst Bank began processing payments for Pokerstars and FullTilt Poker.  On or about April 8, 2010, Campos, the defendant, sent an "invoice" to Elie's Partner requesting that $20,000 be paid to a corporate entity that Campos controlled as a "bonus" for "Check and Credit Card Processing Consulting."  SunFirst Bank processed over $200 million of payments for PokerStars and Full Tilt Poker through on or about November 9, 2010, when, at the direction of the FDIC, it ceased third party payment processing.  SunFirst Bank earned approximately $1.6 million in fees for this processing.

50.  In furtherance of the conspiracy described above and to effect the illegal object thereof, Scheinberg, Bitar, Tom, Beckley, Burtnick, Tate, Lang, Franzen, Rubin, Elie, and Campos, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.  On or about October 20, 2008, Lang sent an e-mail to principals of Intabill, reminding them that Burtnick would

33

soon leave PokerStars and that they had promised to "kick him back" 5 cents for every dollar on Intabill's processing revenue from PokerStars.

b.   On or about January 20, 2009, PokerStars, Full Tilt Poker, and Absolute Poker each received an electronic transfer of funds from a gambler located in the Southern District of New York.

c.   On or about February 11, 2009, Beckley sent an e-mail to a co-conspirator not named as a defendant herein requesting that the co-conspirator obtain e-check and credit card processing for Absolute Poker.

d.   On or about April 2, 2009, Scheinberg sent an e-mail to a co-conspirator not named as a defendant in the Indictment about a PokerStars processing account shut down by a United States bank.

e.   On or about April 3, 2009, Lang, Burtnick, and Bitar met in Nevada with a co-conspirator not named as a defendant in the Indictment about processing payments through tribal banks.

f.   On or about June 4, 2009, Franzen sent an e-mail to a co-conspirator not named as a defendant in the Indictment and asked for a "payout company ID" for Full Tilt Poker consisting of "something on the shelf with a basic web presence."

g.   On or about June 23, 2009, an unidentified individual at Full Tilt Poker sent an e-mail to Franzen that

34

included comments on a call center script used by a payment processor that discussed the importance of not mentioning online poker to anyone calling customer service about a charge on a bank statement.

       h.   On or about September 22, 2009, Elie forwarded to Beckley and Franzen an e-mail from a bank representative stating that funds in an account opened by Elie for processing internet marketing payments were being frozen by the bank as gambling funds.

       i.   On or about September 29, 2009, Campos sent an e-mail to an attorney in which Campos called the attorney a "wet blanket" for cautioning Campos about processing gambling payments.

       j.   On or about October 15, 2009, Rubin sent an e-mail to Tate about processing PokerStars transactions through a Bank of America account opened in the name of a supposed internet shop selling electronics and other items.

       k.   On or about July 20, 2010, Campos flew from New York to Ireland to a meeting regarding processing of poker transactions.

       l.   In or around August 2007, Full Tilt Poker processed credit card payments for gambling transactions under the name "PS3SHOP," using a non-gambling credit card code for the transactions, through a credit card network with headquarters in the Southern District of New York.

35

## **The Poker Company Domain Names**

51.  The Poker Companies utilized websites as on-line portals for players to deposit and withdraw money to play online poker, and to actually play online poker.  In relation to these websites, the Poker Companies utilized the following domains:

POKERSTARS.COM,

FULLTILTPOKER.COM,

ABSOLUTEPOKER.COM,

ULTIMATEBET.COM, and

UB.COM

(the "Subject Domain Names").

44.  Domain names operate as follows:

a.  A domain name is a simple, easy-to-remember way for people to identify computers on the Internet.  For example, "www.google.com" and "www.yahoo.com" are domain names.

b.  The Domain Name System ("DNS") is, among other things, a hierarchical convention for domain names.  Domain names are composed of one or more parts, or "labels," that are delimited by periods, such as "www.example.com."  The hierarchy of domains descends from right to left; each label to the left specifies a subdivision, or subdomain, of the domain on the right.  The right-most label conveys the "top-level" domain.  For example, the domain name "www.example.com" means that the computer assigned that name is in the ".com" top-level domain and the "example" second-level domain, and is a web server (denoted by the "www").

36

       c.   DNS servers are computers connected to the Internet that convert domain names that are easy for people to remember into Internet Protocol ("IP") addresses, which are unique machine-readable numeric addresses that computers use to identify each other on the Internet.  An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178).  Every computer connection to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination.  DNS servers can be said to "resolve" or "translate" domain names into IP addresses.

       d.   For each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address.  For example, the registry for the ".tv," ".net," and ".com" top-level domains is VeriSign, Inc.

       e.   If an individual or business wants to purchase a domain name, they buy it through a company called a "registrar." Network Solutions LLC ("Network Solutions") and GoDaddy.com Inc. ("GoDaddy") are two well-known examples of registrars, although there are hundreds of registrars on the Internet.  The registrar, in turn, communicates this purchase to the relevant registry.  The individual or business who purchases, or registers, a domain name is called a "registrant."

f.   Registrants control the IP address, and thus the computer, to which the domain name resolves.  Thus, a registrant may easily move a domain name to another computer anywhere in the world simply by changing the IP address at the registry.

g.   Registries and/or registrars maintain additional information about domain names, including the name and contact information of the registrant.

52.   On March 5, 2011, a federal law enforcement agent visited the sites affiliated with the Subject Domain Names and took numerous "screen shots" of the sites, capturing what the websites looked like to one visiting the site on the Internet at that time.  Additionally, during the course of this investigation, an individual cooperating with law enforcement (the "CW") visited three of the websites discussed herein.  As detailed below for each of these three websites, the CW, through the websites, deposited real money into accounts maintained by the Poker Companies for playing poker online with real-money bets and withdrew money as well.

### The Pokerstars.com Website

#### Content of the Pokerstars.com Website

53.   Pokerstars.com is an online platform for playing poker with real-money bets.  The site consists of numerous webpages that feature information relating to playing poker through the website, including for "Real Money."  As captured by

the March 5, 2011 screen shots, the homepage states:  "Welcome to the World's Largest Poker Site."  It states there is a $600 "First Deposit Bonus" available to visitors of the site.  The homepage includes tabs which can be pressed to link to other pages within the site, including links entitled "Real Money" and "Poker Tournaments."  There is also tab for downloading Poker software. Lower on the homepage, it states:  "Welcome to PokerStars, where you'll find more tournaments and games than any other poker site, with 24/7 support, secure deposits, fast cashouts and award-winning software.  This is where champions are born and you could be next.  Start playing for free now."  Under a section entitled "Pokerstars Blog News," it states that an individual with a particular username won "$671,093.81 & Lamborghini."

      54.  From this homepage, a visitor can link to another webpage within the site that contains general information "About PokerStars."  On that page, it states: "Making a deposit in to your PokerStars account is also quick and easy, with a range of payment options available."  You can also take advantage of fast cashouts if you decide to withdraw money from your bank roll." That page also contains a section entitled "Fully licensed and regulated."  Under that section, the page reads, in part: "PokerStars is a licensed and registered legal business located on the Isle of Man in the British Isles, and abides by all laws and regulations where it does business."

55.   From the homepage, a visitor can also link to another page within the site that deals with "Playing with Real Money."   This page states, in part:

> Ready to play poker with real money at
> PokerStars?   <u>Download</u> [indicating a link]
> our exciting online poker software and
> you'll be playing at our fast-paced
> tables in no time!

56.   This page also explains that "Real money deposits into your poker account are accepted in several ways," and provides a drop-down menu list of countries "to view a list of payment and cashout methods available."   The United States is included on that list.   This page states:

> PokerStars players' poker money and account
> balances are held in segregated accounts and
> not used for any of PokerStars' operational
> expenses.   These segregated accounts are
> managed by a leading European Bank.

57.   The page also lists a number of poker games and tournaments "available for real money play at PokerStars[.]" These include: Texas Holdem, Omaha High Low, Omaha High, Seven Card Stud High Low, Seven Card Stud, Razz, HORSE/HOSE, and a reference to Tournaments.

58.   This page also includes a section on "Cashing Out Your Poker Winnings."   That portion explains: "To cash out, click on the 'Cashier' button in the lobby and then select the 'Cash Out' button.   You will then be prompted for a cashout amount; please enter the amount and click 'Submit.'"   The page contains

information stating that a player can play without depositing real money at a "play money table."

59.  Screen shots were also taken of a page within the website that explains how to "Fund Your Account."  "Step 1" explains that a visitor should "Log into your PokerStars account and click the 'Cashier' button located at the bottom left hand corner of your game lobby."  "Step 2" then directs the visitor to "Click 'Buy Chips' and choose a funding option, and click 'Deposit.'"  The listed deposit options include Instant eChecks, and links to credit cards such as Visa and Diners Club International.

Gambling Deposits and Withdrawals on Pokerstars.com

60.  On or about the dates listed in the chart below, the CW made the following deposits to a PokerStars online gambling account through the pokerstars.com website from a bank account held in Manhattan, New York:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 06/10/10 | eCheck | $ 10.00 | $ 10.00 |
| 8/7/10 | Check21 | $150.00 | $150.00 |
| 9/13/10 | Check21 | $ 20.00 | $ 20.00 |
| 1/23/11 | ACH | $ 23.00 | Reversed/Not Processed |

61.  On or about the dates listed in the chart below, the CW requested withdrawals from a PokerStars online gambling account through the pokerstars.com website:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 8/4/2010 | Paper Check | $35.00 | $ 35.00 |
| 8/19/2010 | Paper Check | $100.00 | $100.00 |
| 11/29/2010 | Paper Check | $25.00 | $ 25.00 |

62.  Rather than being issued from accounts in the name of PokerStars, the checks were issued from accounts in the names of entities with no seeming connection to gambling.  For example, the checks issued on August 4, 2010 and August 19, 2010 came from an account in the name of TLC Global.  The November 29, 2011 check came from an account in the name of Lancore Merchant Services.

<u>The Pokerstars.com Domain</u>

63.  In regard to pokerstars.com, registration for this domain was most recently updated on or about March 14, 2011, reflecting the registrar Nom IQ LTD (D.B.A. Com Laude), located in the United Kingdom.  Approximately twenty-seven foreign language sites are affiliated with pokerstars.com.  Most of these are simply pages within the website affiliated with the pokerstars.com domain, such as "pokerstars.com/de/," "pokerstars.com/gr/," and "pokerstars.com/it/."  These pages are accessible to visitors in the United States.

64.   PokerStars also operates several foreign-language affiliate websites that are not part of the pokerstars.com domain, such as "pokerstars.ee," "pokerstars.es," and "pokerstars.si."

<u>The Fulltilt.com Website</u>

<u>Content of the Fulltilt.com Website</u>

65.   Similar to the pokerstars.com website, the fulltilt.com website is an online platform for playing poker with real-money bets.  It consists of numerous webpages that feature information relating to playing poker through the website, including for "Real Money."  At the time of the screen shot, the homepage indicated that 109,664 players were presently on line, with 34,255 active tables, and 4,619 tournaments.  The homepage also advertised a "100% First Deposit Bonus," explaining: "Make you first deposit at Full Tilt Poker and we'll automatically match your initial deposit with a 100% bonus up to $600!".  A link was also included to play free poker.  The homepage announced: "Online poker at the Fastest Growing Online Poker Room."  It stated:

> Full Tilt Poker offers the best in <u>online poker</u> [indicating link]: world famous pros, a huge bonus, real or play money.  <u>Play poker online</u> [indicating link] now, it's free to download.  Try our free online poker game 24 hours a day on state-of-the-art online poker software.  Play for real money or for free in tournaments or ring games.  Full Tilt Poker's online poker room was designed by world class poker professionals, and offers you the ability to learn, chat, and <u>play online poker</u> [indicating link] with the pros.

43

Full Tilt Poker offers a wide variety of
online poker games including No Limit Texas
Holdem, Pot Limit Texas Hold Em, and Fixed
Limit Texas Holdem [sic] as well as varieties
of Omaha, Stud, and Razz.  We have ring games,
Sit and Go tournaments, and multi-table
tournaments.  If you can find it in a poker
room, you can probably find it at Full Tilt
Poker.

66.  One of the pages within the Full Tilt website deals

with "Playing For Real Money[.]" This page states:

If you're looking to get the most out of your
online poker experience, Full Tilt Poker
offers a wide selection of real money ring
games and tournaments for your enjoyment.
What's more, Full Tilt Poker works hard to
ensure that playing for real money is easy,
safe and secure by:

•    Providing a variety of safe and secure
     <u>payment processors</u> [indicating link] to
     make depositing money fast and easy.

•    Ensuring any money you have on deposit
     with Full Tilt Poker is completely <u>safe</u>
     <u>and secure</u> [indicating link].

•    Protecting your <u>valuable personal</u>
     <u>information</u> [indicating link].

•    Processing <u>withdrawals</u> [indicating link]
     quickly and efficiently.

67.  This page also explains to visitors how to make

their first deposit.  This page goes on to state:

Every time you play for real money you'll
earn <u>Full Tilt Poker points</u> [indicating
link] that can be redeemed for tournament
entries and exclusive <u>Full Tilt Poker</u>
<u>gear</u> [indicating link].  You can earn
<u>Full Tilt Poker points</u> by playing in any
of our <u>raked</u> [indicating link] real money
ring games or tournaments . . . .

44

68.  Another page within the site deals with depositing "real money."  This page lists Quick Deposit, credit cards, and cash transfers as methods by which a visitor could deposit real money into their Full Tilt Poker account.

69.  On another page within the website, which deals with "Security," it states:

> Full Tilt Poker conducts their banking and financial affairs in accordance with generally accepted standards of internationally recognized banking institutions.  Full Tilt Poker follows and adheres to applicable laws pertaining to transaction reporting and anti-money laundering laws and regulations.

70.  The website also includes a page entitled End User License Agreement.  That page sets out Terms and Conditions pertaining to "persons situated in North America" in regard to the website accessible from the domain name "www.FullTiltPoker.com." It states that the terms and conditions on this page constitute a binding agreement between the website visitor and the corporate entity Vantage Limited, which is registered Alderney in the Channel Islands.  This page states that:

> Adult users of all skill levels who are situated in North America can download the proprietary gaming software needed to participate in poker tournaments and to play online interactive games of poker for real money at www.FullTiltPoker.com.

71.  The website also includes a page explaining to players how they can withdraw funds from their Full Tilt Poker accounts.  This page states that "[a]t Full Tilt Poker, we believe

45

our players should be able to withdraw funds from their accounts
as easily as they can make deposits."  It then lists the steps for
players to execute a withdrawal.  These steps consist generally of
logging on to the website, clicking the "Cashier" button, clicking
on the "Withdrawal" button, selecting a withdrawal method,
entering the amount you wish to withdrawal along with other
required account information, confirming that amount and account
information, and clicking the "Submit" button.  A player can also
choose withdrawal by check as a withdrawal option.

<u>Gambling Deposits and Withdrawals on Fulltilt.com</u>

72.  On or about the dates listed in the chart below,
the CW made deposits to a Full Tilt online gambling account
through the Fulltilt.com website, with the funds coming out of the
CW's bank account in Manhattan, New York:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 3/30/10 | eCheck | $ 30.00 | $ 30.00 |
| 3/31/10 | eCheck | $ 30.00 | $ 30.00 |
| 3/31/10 | Visa | $100.00 | $ 100.00 |
| 4/09/10 | Visa | $ 30.00 | $ 30.00 |
| 4/23/10 | eCheck | $ 30.00 | $ 30.00 |
| 4/27/10 | eCheck | $ 20.00 | $ 20.00 |
| 4/28/10 | eCheck | $ 20.00 | $ 20.00 |
| 5/6/10 | eCheck | $ 20.00 | $ 20.00 |
| 5/6/10 | eCheck | $ 30.00 | $ 30.00 |

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 5/7/10 | eCheck | $ 11.00 | $ 11.00 |
| 5/11/10 | visa | $ 12.00 | $ 12.00 |
| 5/12/10 | eCheck | $ 21.00 | $ 21.00 |
| 5/12/10 | eCheck | $ 25.00 | $ 25.00 |
| 5/13/10 | visa | $ 12.00 | $ 12.00 |
| 5/18/10 | eCheck | $ 18.00 | $ 18.00 |
| 5/26/10 | eCheck | $ 21.00 | $ 21.00 |
| 5/27/10 | eCheck | $ 14.00 | $ 14.00 |
| 5/27/10 | eCheck | $ 14.00 | $ 14.00 |
| 6/2/10 | eCheck | $ 11.00 | $ 11.00 |
| 6/2/10 | eCheck | $ 17.00 | $ 17.00 |
| 6/10/10 | eCheck | $ 20.00 | $ 20.00 |
| 6/11/10 | eCheck | $ 11.00 | $ 11.00 |
| 6/14/10 | eCheck | $ 10.00 | $ 10.00 |
| 6/16/10 | eCheck | $ 14.00 | $ 14.00 |
| 6/17/10 | eCheck | $ 50.00 | $ 50.00 |
| 6/24/10 | eCheck | $ 32.00 | $ 32.00 |
| 6/28/10 | eCheck | $ 28.00 | $ 28.00 |
| 6/29/10 | eCheck | $ 22.00 | $ 22.00 |
| 6/29/10 | eCheck | $ 34.00 | $ 34.00 |
| 6/30/10 | eCheck | $ 22.00 | $ 22.00 |
| 7/1/10 | eCheck | $ 47.00 | $ 47.00 |
| 7/2/10 | eCheck | $ 20.00 | $ 20.00 |
| 7/9/10 | eCheck | $ 11.00 | $ 11.00 |
| 7/13/10 | eCheck | $ 10.00 | $ 10.00 |
| 7/13/10 | eCheck | $ 12.00 | $ 12.00 |

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 7/19/10 | eCheck | $ 14.00 | $ 14.00 |
| 7/23/10 | eCheck | $ 22.00 | $ 22.00 |
| 7/26/10 | eCheck | $ 11.00 | $ 11.00 |
| 7/26/10 | eCheck | $ 14.00 | $ 14.00 |
| 7/27/10 | eCheck | $ 21.00 | $ 21.00 |
| 7/28/10 | eCheck | $ 75.00 | $ 75.00 |
| 7/30/10 | Western Union | $ 105.00 | $105.00 |
| 8/3/10 | eCheck | $ 50.00 | $ 50.00 |
| 8/16/10 | eCheck | $ 11.00 | $ 11.00 |
| 9/2/10 | eCheck | $ 12.00 | $ 12.00 |
| 9/15/10 | eCheck | $ 11.00 | $ 11.00 |
| 9/21/10 | eCheck | $ 12.00 | $ 12.00 |
| 9/30/10 | eCheck | $ 11.00 | $ 11.00 |
| 10/14/10 | eCheck | $ 90.00 | $ 89.00 |
| 11/3/10 | eCheck | $ 45.00 | $ 45.00 |
| 11/15/10 | eCheck | $ 12.00 | $ 12.00 |
| 1/14/11 | ACH | $ 14.00 | Not Processed |
| 1/15/11 | ACH | $ 16.00 | Not Processed |
| 1/21/11 | ACH | $ 48.00 | Not Processed |
| 1/24/11 | ACH | $ 51.00 | Not Processed |
| 1/27/11 | ACH | $ 11.00 | Not Processed |
| 1/29/11 | ACH | $ 46.00 | Not Processed |
| 2/1/11 | ACH | $ 43.00 | Not Processed |
| 2/2/11 | ACH | $ 53.00 | Not Processed |
| 2/4/11 | ACH | $ 24.00 | Not Processed |
| 2/8/11 | ACH | $ 52.40 | Not Processed |
| 2/9/11 | ACH | $ 32.00 | Not Processed |

| Date | Method of Payment | Amount Requested | Amount Reported |
|---|---|---|---|
| 2/10/11 | ACH | $ 32.00 | Not Processed |
| 2/14/11 | ACH | $ 59.00 | Not Processed |
| 2/15/11 | ACH | $ 81.00 | Not Processed |
| 2/16/11 | ACH | $ 53.00 | Not Processed |
| 2/20/11 | ACH | $ 12.00 | Not Processed |
| 2/22/11 | ACH | $ 57.00 | Not Processed |
| 2/22/11 | ACH | $ 89.00 | Not Processed |
| 2/23/11 | ACH | $ 87.00 | Not Processed |
| 2/24/11 | ACH | $ 56.00 | Not Processed |
| 2/25/11 | ACH | $ 61.00 | Not Processed |
| 3/2/11 | ACH | $ 45.00 | Not Processed |
| 3/2/11 | ACH | $ 71.00 | Not Processed |
| 3/7/11 | ACH | $ 33.00 | Not Processed |
| 3/7/11 | ACH | $ 81.00 | Not Processed |
| 3/8/11 | ACH | $ 57.00 | Not Processed |
| 3/9/11 | ACH | $ 53.00 | Not Processed |
| 3/10/11 | ACH | $ 76.00 | Not Processed |
| 3/10/11 | ACH | $ 34.00 | Not Processed |
| 3/11/11 | ACH | $ 78.00 | Not Processed |

73.   On or about the dates listed in the chart below, the CW requested withdrawals from a Full Tilt online gambling account through the fulltilt.com website.   Automated credits and wire transfers were credited to the CW's bank account in Manhattan, New York:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 3/30/10 | Automated Credit | $100.00 | $100.00 |
| 6/10/10 | Paper Check | $100.00 | $100.00 |
| 6/28/10 | Automated Credit | $120.00 | $120.00 |
| 7/28/10 | Automated Credit | $100.00 | $100.00 |
| 8/2/10 | Paper Check | $100.00 | $100.20 |
| 1/21/11 | Automated Credit; Converted to Wire Transfer | $100.00 | $ 72.08 |
| 2/3/11 | Paper Check | $100.00 | $100.17 |
| 2/15/11 | Paper Check | $101.00 | $101.22 |
| 2/22/11 | Paper Check | $107.00 | $107.29 |
| 2/25/11 | Paper Check | $102.00 | $102.16 |
| 3/12/11 | Paper Check | $101.00 | $101.15 |
| 3/12/11 | Automated Credit | $102.63 | Pending |

74.   Rather than being issued from accounts in the name of Full Tilt, the payments were issued from accounts in the names of entities with no seeming connection to gambling.  For example, the checks issued on June 10, 2010 came from an account in the name of Arrow Checks.  The check issued on August 2, 2010 came from an account in the name of TLC Global.  The check issued on February 3, 2011 came from an account in the name of Eastern Expressions Inc.  The checks issued on February 14, 18, 23, and 28, 2011 were all in the name of Shared Expressions, Inc.

The Fulltiltpoker.com Domain

75.   In regard to fulltiltpoker.com, registration for this domain was most recently updated on or about September 23, 2008, indicating the registrar Safenames Ltd., with an address in the United Kingdom.  Approximately twenty-one foreign lanaguage sites are affiliated with fulltiltpoker.com.  Most of these are simply pages within the website affiliated with the fulltiltpoker.com such as "fulltiltpoker.com/ar/," "fulltiltpoker.com/cn/," and "fulltiltpoker.com/cs/."  These pages are accessible to visitors in the United States.

76.   Full Tilt operates at least two foreign-language affiliate websites, such as "fulltiltpoker.fr," and "www5.fulltiltpokeritaly.co.it/it/," that are not part of the fulltiltpoker.com domain.

The Absolutepoker.com Website

Content of the Absolutepoker.com Website

77.   Similar to the Poker Stars and Full Tilt Poker websites, the absolutepoker.com website is an online platform for playing poker with real-money bets.  It consists of numerous webpages that feature information relating to playing poker through the website, including for real money.  The homepage for this site states: "PLAY POKER WITH A PAYOFF!"  It states that players can get, among other things, "Up to $500 for free," or a "Free Seat in a $1,000 Tournament."  At the time of the screen

shot, the homepage indicated that there were 15,454 players online

playing at 2,377 live tables.  The homepage also states:

> Over the past ten years, millions of people
> have taken to our tables, playing online poker
> games for free.  In fact, if there's one thing
> free online poker players and real money
> sharks agree on, it's that Absolute Poker is
> the best place to play poker online.  Take a
> seat at one of our free online poker games or
> real money poker tables and start enjoying
> poker at one of the world's leading sites.
>
> From free online poker games to real money
> poker tournaments, we'll always make playing
> poker online with us worth your while.  We
> offer a huge selection of online poker games
> with stakes to suit your budget.  Not to
> mention, we offer some of the best deposit
> bonuses and poker rewards in the business.  So
> what are you waiting for?  Download Absolute
> Poker's free software and start playing online
> with us.  You could soon be on your way to
> winning big games and huge tournament cash
> prizes.

78.  The site also has a page dealing with "Online

banking at Absolute Poker."  The page explains:

> With more real poker money payment options
> than any other poker room, it's no wonder
> players from across the globe deposit their
> poker money with Absolute Poker!  Our
> unrivaled selection of convenient deposit
> options and fast poker money withdrawal
> methods make it easy to fund your bankroll and
> take your winnings to the bank.  When it comes
> to online real money poker sites, Absolute
> Poker gives you the most options to manage
> your poker money!

79.  Another page within the site that deals with

depositing money into Absolute Poker account includes this

unattributed quote: "Nothing beats the thrill of a real money

game.  Fund your account today using any one of the following secure banking options."  The options listed on the page include utilizing credit cards, Fast Bank Transfer Service, and a variety of other methods.

80.  Another page within the site offers guidance to players for withdrawing their money from the site.  That page contains the following unattributed quote: "You took it down.  You owned the table.  You won the pot.  Now, it's time to collect.  We pride ourselves on superfast payouts at Absolute Poker.  If you've won it - and you want it - it's already on its way."  This page lists a number of withdrawal methods specifically for U.S. poker players, including, among others, bank transfers, checks by mail, and checks by courier.

Gambling Deposits and Withdrawals on Absolutepoker.com

81.  On or about the dates listed in the chart below, the CW made the following deposits to an Absolute Poker online gambling account through the absolutepoker.com website from the CW's bank account held in Manhattan, New York:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 3/25/10 | eCheck | $ 50.00 | $ 50.00 |
| 3/26/10 | Visa | $ 20.00 | $ 19.99 |
| 6/10/10 | Visa | $ 10.00 | $  9.94 |
| 6/14/10 | eCheck | $ 50.00 | $ 50.00 |
| 6/18/10 | Visa | $ 30.00 | $ 29.99 |
| 7/28/10 | eCheck | $100.00 | $100.00 |
| 10/14/10 | Visa | $ 10.00 | $  9.98 |
| 12/27/10 | Visa | $ 12.00 | $ 11.97 |
| 1/4/11 | eCheck | $ 50.00 | $ 49.97 |
| 2/17/11 | ACH | $ 77.00 | $ 76.96 |
| 3/28/11 | ACH | $ 51.00 | $ 50.99 |

82.   On or about the dates listed in the chart below, the CW requested withdrawals from an Absolute Poker online gambling account through the absolutepoker.com website, with the funds credited to the CW's bank account in Manhattan, New York:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 3/25/10 | Automated Credit | $  1.00 | $  0.01 |
| 3/25/10 | Automated Credit | $  1.00 | $  0.02 |
| 8/5/10 | Automated Credit | $100.00 | $100.00 |
| 3/28/11 | Automated Credit | $106.00 | $106.00 |

83.   Rather than being issued from accounts in the name of Absolute Poker, credits issued were through entities with no apparent connection to gambling.

<u>The Absolutepoker.com Domain</u>

84.  In regard to the absolutepoker.com domain, Registration for this domain was updated on March 3, 2009, indicating the registrar Nom IQ LTD (D.B.A. Com Laude), located in the United Kingdom.  Absolutepoker.com has approximately two third-level domain names affiliated with it, both of which are foreign language sites.  A "third-level domain name" is a domain name with subdomain labels to the left of the domain name "absolutepoker.com," such as "de.absolutepoker.com" and "sv.absolutepoker.com."  The web sites with these third-level domain names are accessible to visitors in the United States.

<u>The Ultimatebet.com Website</u>

<u>Content of the Ultimate Bet Website, UB.com</u>

85.  As explained in the Indictment, ultimatebet.com is owned and controlled by the same entity controlling absolutepoker.com.  (Ind. ¶ 6).  When attempting to visit ultimatebet.com, a federal law enforcement agent was instantly redirected to ub.com.  Like the absolutepoker.com site, the ub.com site indicates that it is controlled by "Mohawk Internet Technologies."  The homepage for ub.com contains statements such as "Raise.Stack.Own," "Feed Your Poker Passion," and "Play & Win. We're open to everyone including US players!".  At the time of the screenshot, the homepage noted that 15,414 players were online. The homepage states:

> If you enjoy playing poker, you'll love the
> incredible selection of online poker games
> offered at UB.  Formerly UltimateBet.com, UB
> offers the best free online poker games and
> real money poker games available on the web.
> So, whether you're an experienced online poker
> sites player or new to the game, you'll love
> the excitement of playing poker online at our
> tables.  The new UB also features a wide range
> of online poker stakes and a fantastic poker
> community.  Meet new people and play the best
> free online poker games at UB.  You'll soon
> see why so many people say we're the best of
> the poker sites.

86.  The homepage also provides information on making deposits at the ub.com site.  It explains:

> Loading your online poker account at UB is
> simple, safe and secure.  To protect your
> funds, we're proud to offer our customers top-
> of-the-line encryption on all transactions.
> Download UB's free online poker software and
> select from our wide variety of deposit
> options.  Note: For players in the United
> States, we recommend Visa card and bank
> transfer deposits . . . .

87.  Under a section on the homepage entitled "The Ultimate Trust," the homepage states "We've been offering poker online for over ten years and are licensed in North America."

88.  A page within the ub.com site deals with making deposits.  For players within the United States, the page recommends deposit by Visa or MasterCard.  The page states: "Poker: Real money deposits add up to big rewards at UB, one of the world's most popular online cardrooms."  The page goes on to explain:

UB offers you more ways to deposit real money
funds into your poker account than almost any
other online real money poker room.  As a new
player at UB, you'll receive an industry-
leading 111% poker deposit bonus when you set
up a free account for real money poker play
with UB.  What's more our regular reload
bonuses help take your poker winnings much
further.

89.  A page within the site also deals with the

withdrawal of funds from the ub.com poker platform.  For players

in the United States, the page lists bank transfers, checks by

mail, checks by courier, and premium bank wires as withdrawal

methods.

## The Ultimatebet.com Domain

90.  In regard to ultimatebet.com, registration for this

domain name was most recently updated on or about October 19,

2009, indicating the registrar GoDaddy.com, Inc., located in

Arizona.

## The UB.com Domain

91.  I regard to ub.com, registration information for

this domain name was updated on or about November 5, 2009,

indicating the registrar Nom IQ LTD (D.B.A. Com Laude), located in

the United Kingdom.  Approximately three third-level domain names

are affiliated with ub.com, which are foreign language sites.  The

sites are accessible to visitors in the United States.  It also

has at least one foreign language site, "ub.de," that is not part

of the ub.com domain.

## Prior Seizures of Poker Processing Accounts

92.  <u>G.I. Holdings</u>.  On or about August 25, 2009, United States Magistrate Judge Ronald L. Ellis, Southern District of New York, issued warrants to seize accounts held in the name of G.I. Holdings, a payment processor for the Poker Companies, based on probable cause to believe that the funds were subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 981(b), 984, and 1955, 09 Mag. 1932.  A true and correct copy of the Affidavit of FBI Special Agent Rebecca E. Vassilakos in support of the seizure warrants is annexed hereto as <u>Exhibit C</u> and incorporated by reference as if set forth fully herein.  Pursuant to the seizure warrants, approximately $3,029,711.94 was seized from account number 370117950 held at City National Bank in the name of G.I. Holdings; approximately $2,057,620.28 was seized from account number 5383346862 held at Wells Fargo Bank in the name of G.I. Holdings; approximately $3,055,108.21 was seized from account numbers 203023239 held at Citibank, N.A. in the name of G.I. Holdings; approximately $784,160.95 was seized from account number 203118542 held at Citibank, N.A. in the name of G.I. Holdings; approximately $1,000.00 was seized from account number 203118559 held at Citibank, N.A., in the name of G.I. Holdings; approximately $925.00 was seized from account number 203118575 held at Citibank, N.A., in the name of G.I. Holdings; approximately $124,178.72 was seized from account number 2020003792 held at Service 1st Bank of Nevada in the name of G.I.

Holdings; approximately $1,035,415.44 was seized from account number 0021002712 held at Nevada Commerce Bank in the name of G.I. Holdings; and approximately $122,308.78 was seized from account number 0021002795 held at Nevada Commerce Bank in the name of G.I. Holdings.

93.   On or about August 31, 2009, United States Magistrate Judge Michael H. Dolinger, Southern District of New York, issued a warrant to seize an account held in the name of G.I. Holdings based on probable cause to believe that the funds were subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 981(b), 984, and 1955, 09 Mag. 1932.  A true and correct copy of the Affidavit of FBI Special Agent Dana Conte in support of the seizure warrants is annexed hereto as Exhibit D and incorporated by reference as if set forth fully herein.  Pursuant to the seizure warrant, approximately $231,000 was seized from account number 80000373283 held at First Republic Bank in the name of G.I. Holdings.

94.   SNR, Inc.  On or about October 16, 2009, United States Magistrate Judge Douglass F. Eaton, Southern District of New York, issued warrants to seize accounts held in the names of SNR, Inc., a payment processor for the Poker Companies, based on probable cause to believe that the funds were subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 981(b), 984, and 1955, 09 Mag. 2317.  A true and correct copy of the Affidavit of FBI Special Agent Rebecca E. Vassilakos in

support of the warrants is annexed hereto as Exhibit E and incorporated by reference as if set forth fully herein.  Pursuant to the seizure warrants, approximately $30.27 was seized from account number 01662184444 held at Huntington National Bank in the name SNR, Inc.; approximately $1,057,797.29 was seized from account number 01662184457 held at Huntington National Bank in the name SNR, Inc.; approximately $649,261.20 was seized from account number 01662191343 held at Huntington National Bank in the name of SNR, Inc.; approximately $199,175.14 was seized from account number 658049382 held at the Bank of West in the name of SNR, Inc.; approximately $4,925.00 was seized from account number 0952071585 held at Bank of America in the name of SNR, Inc.; approximately $25.00 was seized from account number 0952071603 held at Bank of America in the name of SNR, Inc.; approximately $992,499.53 was seized from account number 203366638 held at Citibank, N.A., in the name of SNR, Inc.; and approximately $865,000.00 was seized from account number 0952071467 held at Bank of America, N.A., in the name of SNR, Inc.

95.  Viable.  On or about October 26, 2009, United States Magistrate Judge Frank Maas, Southern District of New York, issued warrants to seize accounts held in the names of Viable Marketing Corp. and EZO, LLC, payment processors for the Poker Companies, based on probable cause to believe that the funds were subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 981(b), 984, and 1955, 09 Mag. 2382.  A true

and correct copy of the Affidavit of FBI Special Agent Rebecca E. Vassilakos in support of the seizure warrants is annexed hereto as Exhibit F and incorporated by reference as if set forth fully herein.  Pursuant to the seizure warrants, approximately $8,168,168.89 was seized from account number 7431859508 held at Fifth Third Bank in the name of Viable Marketing Corp.; approximately $40,960.86 was seized from account number 7432618069 held at Fifth Third Bank in the name of Viable Marketing Corp.; approximately $376,706.19 was seized from account number 229006067857 held at Bank of America in the name of Viable Marketing Corp.; and approximately $33,743.75 was seized from account number 003678667131 held at Bank of America in the name of EZO, LLC.

96.  On or about February 19, 2010, United States Magistrate Judge Kevin Nathaniel Fox, Southern District of New York, issued a warrant to seize accounts held in the name of Viable Processing Solutions, a payment process for the Poker Companies, based on probable cause to believe that the funds were subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 981(b), 984, and 1955, 10 Mag. 354.  A true and correct copy of the Affidavit of FBI Special Agent Dana Conte in support of the seizure warrants is annexed hereto as Exhibit G and incorporated by reference as if set forth fully herein.

97.  LST Financial and Redfall.  On or about July 19, 2010, United States Magistrate Judge Kevin Nathaniel Fox, Southern

District of New York, issued warrants to seize accounts held in the names of LST Financial, ASP Consultants, LLC, Autoscribe Corporation, and Axiom Foreign Exchange Intl, based on probable cause to believe that the funds were subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 981(b), 984, and 1955, 10 Mag. 1562.  A true and correct copy of the Affidavit of FBI Special Agent Rosemary Karaka in support of the seizure warrants is annexed hereto as <u>Exhibit H</u> and incorporated by reference as if set forth fully herein.  Pursuant to the seizure warrants, approximately $447,196.79 was seized from account number 804815470 held at JPMorgan Chase Bank in the name of ASP Consultants, LLC; approximately $12,642.44 was seized from account number 804815488 held at JPMorgan Chase Bank in the name of ASP Consultants, LLC; approximately $4,472.58 was seized from account number 822823779 held at JPMorgan Chase Bank in the name of ASP Consultants, LLC; approximately $84.21 was seized from account number 822824025 held at JPMorgan Chase Bank in the name of ASP Consultants, LLC; approximately $6,047.84 was seized from account number 822824140 held at JPMorgan Chase Bank in the name of ASP Consultants, LLC; approximately $17,460.95 was seized from account number 1003245502 held at JPMorgan Chase Bank in the name of ASP Consultants, LLC; and approximately $8,018.04 was seized from account number 9105709543 held at Citibank, N.A. in the name of Autoscribe Corporation.

98.    <u>EPX and MAS, Inc.</u>  On or about December 1, 2010,
United States Magistrate Judge Ronald L. Ellis, Southern District
of New York, issued a warrant to seize $6,152,285.88 on deposit at
First Bank of Delaware in account numbered 9016139; all funds on
deposit at UMPQUA Bank in account number 972402309 held in the
name of Ultra Safe Pay and all property traceable thereto, and all
funds on deposit at Hawaii National Bank in account number
12008656 held in the name MAS Inc., and all property traceable
thereto based on probable cause to believe that the funds were
subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§
981(a)(1)(A) and (C), 981(b), 984, and 1955, 10 Mag. 2701.  A true
and correct copy of the Affidavit of FBI Special Agent Rosemary
Karaka in support of the seizure warrants is annexed hereto as
<u>Exhibit I</u> and incorporated by reference as if set forth fully
herein.

### V.    FULL TILT POKER'S AND THE FTP INSIDER DEFENDANTS' THEFT OF PLAYER FUNDS

99.  Full Tilt Poker not only operated an unlawful
gambling business and committed the bank fraud, wire fraud, and
money laundering as described above, but also defrauded its poker
players by paying out hundreds of millions of dollars of player
funds to Full Tilt Poker owners while misrepresenting to players
that funds credited to their online player accounts were secure
and segregated from operating funds.  In fact, Full Tilt Poker did
not segregate player funds from operating funds and did not keep

player funds secure and available for withdrawal.  Full Tilt Poker used player funds, among other things, to maintain a steady flow of payments to its owners, totaling more than $443 million over the last four years, despite the fact that Full Tilt Poker did not have sufficient funds to repay its players.  As a result of this fraud, by the end of March 2011, Full Tilt Poker owed approximately $390 million to players around the world but had less than $60 million in its bank accounts.

### Full Tilt Poker's Assurances To Players About the Security of Deposits Made to Online Gambling Accounts

100.  On numerous occasions, Full Tilt Poker's customer-players sought assurances from Full Tilt Poker that funds deposited with Full Tilt Poker were secure and questioned whether, for example, player funds were held in separate bank accounts and not utilized by Full Tilt Poker for other purposes, such as operating expenses.  In response to these inquires, in or about March of 2008, Bitar and Lederer advised a Full Tilt Poker employee that Full Tilt Poker could represent to players that Full Tilt Poker kept all of its player funds in segregated accounts and that funds would be available for withdrawal by players at all times.  Subsequently, and based in part on this information, Full Tilt Poker created several form e-mail templates to be used by Full Tilt Poker to respond to player inquiries about the security of their funds.  For example:

a.   On or about May 6, 2008, Full Tilt Poker
created a form e-mail which its staff then e-mailed to players,
including players in the United States, in response to inquires
from customers as to whether player funds were protected.  The
form e-mail stated, in relevant part:

> Thank you for contacting Full Tilt Poker
> Support.
>
> We do understand your concern about the safety
> of the funds in your Full Tilt Poker account.
> You raise a valid and commonly-asked question,
> and we would like to assure you that your
> funds are completely safe on Full Tilt
> Poker....
>
> Our players' funds are kept in several deposit
> accounts throughout the world, all of which
> are separate and distinct from our operating
> accounts. With every hand dealt on Full Tilt
> Poker, commission is accumulated in these
> deposit accounts and transferred from the
> players' deposit accounts to Full Tilt Poker's
> operating accounts only after we have earned
> them. This is not done each time we earn rake
> or even daily, but as our earnings accumulate
> we make periodic transfers of those earnings
> from the deposit accounts to our operating
> accounts, from which we then pay outside
> expenses, Full Tilt Poker employees, and
> ultimately the shareholders of the company.
>
> Full Tilt Poker is not in any financial
> difficulty whatsoever and does not anticipate
> any. In fact, we are doing quite well. We
> would also like to add that you are always
> welcome to withdraw some or all of your funds
> if you feel uncomfortable. Our business
> depends on ensuring that your funds are
> available to you 24 hours a day, 7 days a
> week, and 365 days a year.
>
> That said, we would like to assure you that
> your money is not at all at risk and there is

no poker site on the Internet where your money
would be any safer than at Full Tilt Poker.

b.   On or about May 23, 2008, Full Tilt Poker
created a second e-mail template that its staff then e-mailed to
players, including players in the United States, in response to
inquires as to whether player funds were protected.  This form e-
mail stated, in relevant part:

> Thank you for contacting Full Tilt Poker
> Support.
>
> It is important to us that your account funds
> are secure and available to you at all times.
>
> To protect both our players and business from
> financial problems, all player account funds
> are segregated and held separately from our
> operating accounts. Unlike some companies in
> our industry, we completely understand and
> accept that your account money belongs to you,
> not Full Tilt Poker.
>
> Your account funds are available to you 24
> hours a day, 7 days a week, 365 days a year.
> All withdrawals are processed upon completion
> of a review for fraudulent activity and
> usually within 48 hours.

101. Full Tilt Poker management also monitored and
responded to postings on a popular online discussion forum about
internet poker (the "Poker Forum"), and those responses included
representations from Full Tilt Poker that player funds were
secure.  For example:

a.   On or about July 18, 2008, an individual
("Poker Forum Poster 1") created a "thread" (the first in a series
of new postings on a subject, to which other users can then

respond) on the Poker Forum entitled "Fulltilt Management failing?"  Poker Forum Poster 1 offered the opinion that Full Tilt Poker's shareholders, who included various professional poker players, were not holding the company's management to account. Another individual ("Poker Forum Poster 2") replied that the "players/shareholders" of Full Tilt Poker don't have a problem with management "as long as those monthlies don't stop," apparently referring to monthly payments made by Full Tilt Poker to its owners.  Poker Forum Poster 2 went on to post that the "beauty" of a business like internet poker was "the sites can use the customer deposits interest free to invest in marketing efforts" and because there was "always money coming in" did not "need anywhere near 100% of customer's deposits available to payout, more like 10% from what I'm told."

        b.   Poker Forum Poster 2's posting, and its implication that player deposits were used by Full Tilt to run its operation, generated a concerned response.  On July 19, 2008, another individual ("Poker Forum Poster 3") wrote that he was "greatly disturbed by the insinuation that FTP uses players' money in any operational way.  That is just frightening beyond belief." Poker Forum Poster 3 advised "[s]eriously, every player should be worried about this sort of thing," and called it "incredibly sketchy."

c.   That same day, a representative of Full Tilt
Poker management, posting under the name "FTPDoug," responded to
the fears expressed by Poker Forum Poster 3 as follows:

> I'm not sure where most of the information in
> this thread is coming from, but I do want to
> clear up the most important piece of bad info.
> I didn't write the following, but hopefully it
> answers the operational funds question . . .
> "Players' funds at Full Tilt Poker are kept in
> several deposit accounts throughout the world,
> all of which are separate and distinct from
> our operating accounts. Funds are transferred
> from the players' deposit accounts to Full
> Tilt Poker's operating accounts only after we
> have earned them. This is not done each time
> we earn rake or even daily, but as our
> earnings accumulate, we make periodic
> transfers of those earnings from the deposit
> accounts to our operating accounts."

> Apologies for the factual intrusion . . . .

d.   Later that day, in response to further
expressed doubts and questions about whether funds could be held
in "trust" by Full Tilt Poker, "FTPDoug" wrote: "[Poker Forum
Poster 3] – I don't know enough about the specific legal terms for
all of this to speak with any authority.  I can say with
authority, though, that we do not mix deposits with operational
expenses, so the implications you mention were what I was trying
to clear up."

102. On various occasions from 2008 through 2010, Full
Tilt Poker suffered publicly reported problems with its payment
processors, prompting players to question whether their accounts
with Full Tilt Poker were safe.  Full Tilt Poker representatives

responded by posting statements on the Poker Forum assuring
players that their funds were secure.  For example, on June 9,
2009, in response to a thread on the Poker Forum entitled "Online
poker seizure made front page of Yahoo finance," in which users
expressed concern about their Full Tilt Poker accounts, "FTPDoug"
wrote the following post:

> Understandably, many of you have concerns
> regarding certain bank accounts with poker
> players' money being frozen in the US, and I'd
> just like to reassure everyone that your funds
> remain safe and secure at FTP, and the
> processing of withdrawal requests is
> proceeding as normal and is still available to
> all of our players. . . . We always make sure
> we can cash out any of our players at any
> time.  You should never have to worry that you
> won't get your money. . . . .

103. Full Tilt Poker also sought to assure the
regulatory authority through which it had acquired a license to
operate outside the U.S., the Alderney Gambling Control
Commission, in a document entitled "Principal Operating Provisions
Under the Internal Control System" ("the Provisions").  The
Provisions, which described Full Tilt Poker's internal controls
and operating procedures, stated that "[a]ll players have an
account that holds money that is available to them on the Full
Tilt Poker system," and that "[t]he player may withdraw funds up
to the current balance of their account at any time, subject to
any applicable bonus terms and conditions."  The Provisions
further assured that "[n]o play may commence unless the player has

69

credited his account with cleared funds and has adequate funds to participate in the selected game."

104. Full Tilt Poker continued to assure players that their funds were protected right up to -- and, in fact, after -- April 15, 2011, the day on which its domain name was seized and an indictment charging two of its executives and a forfeiture and civil money laundering action against the company were unsealed. In response to these events, Full Tilt Poker released a "Statement from Full Tilt Poker Regarding Recent Check Withdrawal Issues" which stated, in its entirety:

> In light of recent events involving the freezing of certain accounts, Full Tilt Poker would like to assure all players that their funds remain safe and secure.  Processing of both deposit and withdrawal requests is proceeding as normal and is still available to all of our players.
>
> All players who were affected by the current situation have had their funds returned to their accounts and all new withdrawal requests are processing normally.  We assure all players on Full Tilt Poker that your online playing experience will not change and that you will be able to deposit and withdraw funds as needed.  Your money remains safe, secure and accessible at all times.
>
> Full Tilt Poker remains committed to the protection of our players' security and legal rights, and will continue to provide the best and safest online poker room available worldwide.

## Full Tilt Poker's Insolvency As a Result of Paying Owners From Player Funds and Its Inability To Collect Deposits from U.S. Players

105. Full Tilt Poker's repeated representations that (1) player funds were held separately from operating accounts, (2) player funds were "safe" and "available," and (3) it did not allow play on credit but instead allowed play only with "cleared" funds were, in reality, lies.  In truth and in fact, Full Tilt Poker provided no protection whatsoever to deposits it received from players in the United States and other countries, and simply used the funds it claimed it was holding on account for its players to cover business expenses and to pay hundreds of millions of dollars in distributions to professional poker players affiliated with Full Tilt Poker and others who owned interests in Tiltware LLC.  As a result, according to a balance sheet prepared by Full Tilt Poker, as of March 31, 2011, Full Tilt Poker owed players from around the world over approximately $390,695,788 but had only approximately $59,579,413 in its bank accounts.  Full Tilt Poker relied on new deposits from players to ensure its ability to fund withdrawals to players' accounts.

106. Rather than protect player funds as promised, Full Tilt Poker distributed hundreds of millions of dollars to its owners.  Beginning in April 2007 and continuing through April 2011, Tiltware LLC's Board of Directors, to wit, the FTP Insider Defendants, authorized the distribution of approximately $443,860,530 to the owners of Tiltware LLC, including themselves.

Many of the distribution payments were transferred from Full Tilt Poker directly to bank accounts the professional poker players affiliated with Full Tilt Poker and other owners had established in Switzerland and other foreign countries.

107.  Defendant Bitar personally received at least approximately $41 million, including at least $34,454,781.53 in ownership distributions and at least an additional $6.5 million in "profit sharing" payments.  Full Tilt Poker records reflect that at least a portion of these payments were deposited into an account at NatWest Bank held in the name of Ray Bitar, numbered GB81 RBOS 6095 4234 0877 66.

108. Defendant Lederer personally received at least approximately $42 million, including approximately $37,856,010.92 in ownership distributions and at least $4 million in "profit sharing" payments.  Full Tilt Poker records reflect that at least a portion of these payments were deposited into an account at Wells Fargo Bank, N.A., held in the name of HH Lederer Consulting LLC, numbered 7655741861, and an account held at Lloyds TSB International in the Isle of Man, in the name of Howard Lederer, numbered GB56LOYD30166314010402.

109. Defendant Ferguson was allocated approximately $85,161,305.88 in distributions.  Tiltware records reflect that approximately $25 million of this sum was actually transferred to Ferguson's personal accounts, with the remaining balance characterized as "owed" to Ferguson.  Of the approximately $25

million transferred to Ferguson, Full Tilt Poker records reflect that at least a portion of these funds were deposited into an account held at Citibank, N.A., in the name of Chris Ferguson, numbered 40039049628.

110. Defendant Furst received at least $11,706,323.96 in distributions.  Full Tilt Poker records reflect that at least a portion of these funds were deposited into an account held at Pictet & Co. Bankers in Switzerland in the name of Telamonian Ajax Trust, numbered CH87 0875 5057 0684 0010 0.  The bank accounts referred to in Paragraphs 107-110 are referred to collectively as the "FTP Insider Accounts."

111. The other approximately 19 owners of Tiltware LLC received the remainder of the approximately $443,860,530 distributed.  For example, a professional poker player and Full Tilt Poker owner ("Player Owner 1") received at least approximately $40,078,646.64 in distributions, as well millions of dollars characterized as loans from Full Tilt Poker.  At least approximately $4.4 million of these loans have not been repaid.

112. These ownership distributions continued at a rate of approximately $10 million per month when, by at least the summer of 2010, Full Tilt Poker's management was aware that Full Tilt Poker was having difficulty collecting funds from U.S. player accounts.

113. Beginning in or around August 2010, Full Tilt Poker was often unable to find payment processors to withdraw funds from

the bank accounts of its United States players.  Instead of disclosing this fact, Full Tilt Poker secretly began to credit funds to players' online gambling accounts that Full Tilt Poker had never actually collected from players' bank accounts.  As players gambled, and lost, these phantom funds, Full Tilt Poker developed an undisclosed shortfall of approximately $130 million owed to players that Full Tilt Poker had never collected because, in reality, these funds were never withdrawn from players' bank accounts.  The management of Full Tilt Poker, including the FTP Insider Defendants, operated Full Tilt Poker with the hope that only a small number of players would try to withdraw funds at any one time, and that Full Tilt Poker would regularly receive additional deposits in amounts greater than any withdrawal requests.

114. This undisclosed backlog further exacerbated the already-existing discrepancy between the amount of "safe," "secure," and "available" player funds that Full Tilt Poker represented to have on deposit, and the far smaller amount of funds that it actually maintained.

115. Despite the fact that, by early 2011, Full Tilt Poker was severely insolvent, it continued making payments of approximately $10 million per month to its owners up to and including April 1, 2011.  Full Tilt Poker also continued making "loans" to its professional poker players who also owned an interest in the company, including loan payments totaling more

than $2,000,000 to Player Owner 1 between August 2010 and January 2011.

### Continuing Fraud Against Players After April 15, 2011

116.  Following the execution of the Arrest Warrant <u>In Rem</u> and the unsealing of the Indictment, Complaint, and Restraining Order on April 15, 2011, Full Tilt Poker terminated its United States operations.  Full Tilt Poker continued, however, to operate its online gambling business outside of the United States and continued to collect deposits from non-U.S. players. Full Tilt Poker continued accepting player funds despite the fact that it had liabilities to players around the world for over $300 million, yet held only a small fraction of that amount in its bank accounts.  Indeed, in early June 2011, Lederer reported to others at Full Tilt Poker that there was only approximately $6 million left.

117. Full Tilt Poker's CEO, Bitar, was well aware of the need for new deposits after April 15, 2011, and knew that even a few million dollars' of unexpected withdrawals could reveal Full Tilt Poker's true financial situation.  For example, in an internal Full Tilt Poker e-mail dated June 12, 2011, Bitar expressed concern that a company announcement regarding lay offs and the Board (including himself) being replaced would be seen as bad news, which would cause a "new run on the bank," adding that "it could be a huge run" and that "at this point we can't even take a five million run."

118. Full Tilt Poker never disclosed the fact that it had no ability to return funds to these new depositors if they requested the money back.  Instead, Full Tilt Poker allowed players to believe that its international business was separate from, and unaffected by, its now-defunct United States operations.

119. On or about June 29, 2011, the Alderney Gambling Control Commission -- which licensed Full Tilt Poker and controlled the computer servers allowing gameplay -- suspended the company's operations and halted Full Tilt Poker's ability to operate in any jurisdiction.  On information and belief, as of the date of this Amended Complaint, neither Full Tilt Poker nor the individual owners who received over $443 million in distributions have repaid any of the more than approximately $300 million the company owes to players around the world.

120. As of September 19, 2011, Full Tilt Poker's website stated that players' funds were "safe and secure."

### VI.  PROBABLE CAUSE FOR FORFEITURE

121. As set forth above, because internet gambling businesses such as those operated by the Poker Companies were illegal under United States law, internet gambling companies, including the Poker Companies, were not permitted by United States banks to open bank accounts in the United States to receive proceeds from United States gamblers.  Instead, the principals of the Poker Companies operated through various deceptive means designed to trick United States banks and financial institutions

76

into processing gambling transactions on the Poker Companies'
behalf.

122. Also as set forth above, Full Tilt Poker and its
board members, the FTP Insider Defendants, lied to and deceived
the general public and its player-customers regarding (1) its
maintenance and use of player-customer funds and (2) the solvency
of Full Tilt Poker in general and its ability to refund player
money at any given time.

### The Poker Companies

123. As alleged above and in the Indictment, the Poker
Companies are properties used in violation of Title 18, United
States Code, Section 1955.  The Poker Companies and all or their
assets are subject to forfeiture pursuant to Title 18, United
States Code, Section 1955(d).

### The Poker Company Domain Names

124. As alleged above and in the Indictment, the Poker
Company Domain Names (the Subject Domain Names described above)
are properties used in violation of Title 18, United States Code,
Section 1955 and are properties involved in money laundering
transactions.

### The Poker Company Accounts

125. As alleged above and in the Indictment and as
described in the Karaka Declaration, the Poker Company Accounts[2]

_____

[2]    Listed in Schedule A, incorporated by reference as if
fully set forth herein

are held in the names of the Defendants and corporate entities
controlled by the Defendants, and are used in violation of the
provisions of Title 18, United States Code, Section 1955.  (Ex. B
¶¶ 26-55).

126. Further, as alleged above and in the Indictment and
as described in the Karaka Declaration, the Poker Company Accounts
contain funds traceable to illegal gambling businesses, bank
fraud, wire fraud, and money laundering.  (Ex. B ¶¶ 26-55).

### The Poker Processor Accounts

127. As alleged above and in the Indictment and as
described in the exhibits attached hereto, the Poker Processor
Accounts[3] contain funds constituting or derived from proceeds
traceable to bank fraud and wire fraud, in violation of Title 18,
United States Code, Sections 1343 and 1344, and property involved
in transactions in violation of Title 18, United States Code,
Sections 1956 and 1957, and property traceable to such property.
(Ex. B ¶¶ 61-73).

### The FTP Insider Accounts

128. As alleged above, the FTP Insider Accounts[4] contain
funds constituting or derived from proceeds traceable to operating
illegal gambling businesses, in violation of Title 18, United

---

[3]    Listed in Schedule B, incorporated by reference as if
fully set forth herein.

[4]    Listed in Schedule C, incorporated by reference as if
fully set forth herein.

States Code, Section 1955, and bank fraud and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1344, and property involved in transactions in violation of Title 18, United States Code, Sections 1956 and 1957, and property traceable to such property.

129. In sum, there is probable cause to believe that the Defendant Properties constitute (a) property used in illegal gambling businesses, in violation of Title 18, United States Code, Section 1955, (b) the proceeds of illegal gambling businesses operated in violation of Title 18, United States Code, Section 1955; (c) the proceeds of a conspiracy to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Sections 1343, 1344, and 1349; and (d) property involved in a conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h).  The FTP Insider Accounts specifically also constitute the proceeds of wire fraud and a conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349.  Accordingly, the Defendant Properties are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), and 1955(d).

## VII. CLAIMS FOR FORFEITURE

### FIRST CLAIM FOR RELIEF

### Forfeiture Under 18 U.S.C. §§ 1955(d) and 981(a)(1)(C) – Illegal Gambling

130. Paragraphs 1 through 129 of this Amended Complaint are repeated and realleged as if fully set forth herein.

131. Pursuant to 18 U.S.C. § 1955(d), "Any property, including money, used in [an illegal gambling business] may be seized and forfeited to the United States."

132. Additionally, Title 18, United States Code, § 981(a)(1)(C) subjects to forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section . . . 1344 of this title or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

133. Title 18, United States Code, § 1956(c)(7) defines the term "specified unlawful activity" to mean, in relevant part, "any act or activity constituting an offense listed in section 1961(1) of this title. . . ." Among the specified unlawful activity set forth in 18 U.S.C. § 1961(1) is 18 U.S.C. § 1955.

134. The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 1955(d) because they were used in violation of the provisions of 18 U.S.C. § 1955.

135. The Defendant Properties are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property

constituting, or derived from, proceeds of conducting illegal gambling businesses.

## SECOND CLAIM FOR RELIEF

### Forfeiture Under 18 U.S.C. § 981(a)(1)(C) – Bank and Wire Fraud

136. Paragraphs 1 through 129 of this Amended Complaint are repeated and realleged as if fully set forth herein.

137. Title 18, United States Code, § 981(a)(1)(C) subjects to forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section . . . 1344 of this title or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

138. Title 18, United States Code, § 1956(c)(7) defines the term "specified unlawful activity" to mean, in relevant part, "any act or activity constituting an offense listed in section 1961(1) of this title. . . ."  Among the specified unlawful activity set forth in 18 U.S.C. § 1961(1) are 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1344 (relating to financial institution fraud).

139. Title 18, United States Code, § 1349, provides that

> Any person who attempts or conspires to commit any offense under this chapter [including Sections 1343 and 1344] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

140. Title 18, United States Code, § 1343, provides that

81

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice
>
> shall be guilty of a crime.

141. Title 18, United States Code, Section 1344 provides in relevant part that:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1)  to defraud a financial institution; or
>
> (2)  to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be guilty of a crime.

142. From at least in or about 2006, up to and including on or about March 2011, in the Southern District of New York and elsewhere, Scheinberg, Bitar, Beckley, Burtnick, Tate, Ryan Lang, Bradley Franzen, Ira Rubin, and Elie, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344, and wire fraud, in violation of Title 18, United States Code, Section 1343.

143. By reason of the above, the Defendant Properties are subject to forfeiture to the United States of America pursuant to 18 U.S.C. §§ 981, 1343, 1344 and 1349.

### THIRD CLAIM FOR RELIEF

### Forfeiture Under 18 U.S.C. § 981(a)(1)(A) - Money Laundering

144. Paragraphs 1 through 129 of this Amended Complaint are repeated and realleged as if fully set forth herein.

145. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1957 . . . of [Title 18, relating to money laundering offenses], or any property traceable to such property," is subject to forfeiture.

146. Pursuant to Title 18, United States Code, Section 1956, commonly known as the "money laundering" statute, a crime is committed by a person who:

> (a)(1) . . . knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

>> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or

>> (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

>> (B) knowing that the transaction is designed in whole or in part –

> (i) to conceal or disguise the nature,
> the location, the source, the ownership,
> or the control of the proceeds of
> specified unlawful activity; or
>
> (ii) to avoid a transaction
> reporting requirement under State or
> Federal law,

shall be guilty of a crime.

147. Title 18, United States Code, Section 1956 further

provides, in pertinent part, that

> (a)(2) Whoever transports, transmits, or
> transfers, or attempts to transport, transmit,
> or transfer a monetary instrument or funds
> from a place in the United States to or
> through a place outside the United States or
> to a place in the United States from or
> through a place outside the United States –
>
> > (A) with the intent to promote the
> > carrying on of specified unlawful
> > activity . . . .

shall be guilty of a crime.

148. Title 18, United States Code, Section 1957 provides

that:  "Whoever, [with such offense under this section taking

place in the United States] knowingly engages or attempts to

engage in a monetary transaction in criminally derived property of

a value greater than $10,000 and is derived from specified

unlawful activity," shall guilty of a crime.

149. Title 18, United States Code, Section 1956 further

provides that "[a]ny person who conspires to commit any offense

defined in this section or section 1957 shall be subject to the

same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

150. By reason of the above, the Defendant Properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF

### Forfeiture Under 18 U.S.C. § 981(a)(1)(C) – Wire Fraud

151. Paragraphs 1 through 129 of this Amended Complaint are repeated and realleged as if fully set forth herein.

152. Title 18, United States Code, § 981(a)(1)(C) subjects to forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section . . . 1344 of this title or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

153. Title 18, United States Code, § 1956(c)(7) defines the term "specified unlawful activity" to mean, in relevant part, "any act or activity constituting an offense listed in section 1961(1) of this title. . . ."  Among the specified unlawful activity set forth in 18 U.S.C. § 1961(1) is 18 U.S.C. § 1343 (relating to wire fraud).

154. Title 18, United States Code, § 1349, provides that

> Any person who attempts or conspires to commit any offense under this chapter [including Section 1343] shall be subject to the same penalties as those prescribed for the offense,

the commission of which was the object of the attempt or conspiracy.

155. Title 18, United States Code, § 1343, provides that

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice

shall be guilty of a crime.

156. From at least in or about 2007, up to and including on or about April 2011, in the Southern District of New York and elsewhere, the FTP Insider Defendants and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

157. By reason of the above, the FTP Insider Accounts are subject to forfeiture to the United States of America pursuant to 18 U.S.C. §§ 981, 1343, and 1349.

## VIII. CIVIL MONEY LAUNDERING PENALTIES

### 18 U.S.C. § 1956

158. Paragraphs 1 through 129 of this Amended Complaint are repeated and realleged as if fully set forth herein.

159. Pursuant to Title 18, United States Code, Section 1956(b), "[w]hoever conducts or attempts to conduct a transaction

described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of — (A) the value of the property, funds, or monetary instruments involved in the transaction; or (B) $10,000."

160. Accordingly, the Poker Company Defendants are liable to the Government for a sum of money representing the amount of property, funds, or monetary instruments involved in the money laundering offenses described above, in an amount that is no less than $1.5 billion for the PokerStars Entities; $1 billion for the Full Tilt Poker Entities; and $500 million for the Absolute Poker/Ultimate Bet Entities.

161. Accordingly, the FTP Insider Defendants are liable to the Government for a sum of money representing the amount of property, funds, or monetary instruments involved in the money laundering offenses described above, in an amount that is no less than $40,954,781.53 for Bitar; $41,856,010.92 million for Lederer; $25 million for Ferguson; and $11,706,323.96 million for Furst.

WHEREFORE plaintiff, the United States of America, prays:

A.    That process issue to enforce the forfeiture of the Defendant Properties and that all persons having an interest in the Defendant Properties be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree

forfeiture of the Defendant Properties to the United States of America for disposition according to the law;

B.   That a money judgment be entered against the PokerStars Entities in an amount not less than $1.5 billion;

C.   That a money judgment be entered against the Full Tilt Poker Entities in an amount not less than $1 billion;

D.   That a money judgment be entered against the Absolute Poker/Ultimate Bet Entities in an amount not less than $500 million;

E.   That a money judgment be entered against Raymond Bitar in an amount not less than $40,954,781.53;

F.   That a money judgment be entered against Howard Lederer in an amount not less than $41,856,010.92;

G.   That a money judgment be entered against Christopher Ferguson in an amount not less than $25 million;

H.   That a money judgment be entered against Rafael Furst in an amount not less than $11,706,323.96; and

I.   That this Court grant Plaintiff such further relief as this court may deem just and proper, together with the costs and disbursements of this action.

Dated: September 19, 2011
       New York, New York

                          PREET BHARARA
                          United States Attorney for the
                          Southern District of New York

                   By:   _____
                          SHARON COHEN LEVIN
                          MICHAEL D. LOCKARD
                          JASON H. COWLEY
                          Assistant United States Attorneys
                          One Saint Andrew's Plaza
                          New York, New York 10007
                          Tel.: (212) 637-1060
                          Facsimile: (212) 637-0421

## VERIFICATION

STATE OF NEW YORK                    )
COUNTY OF NEW YORK                   )
SOUTHERN DISTRICT OF NEW YORK        )

ROYAL POLLITT, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and, as such, has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information, and belief.

The sources of the deponent's information and the grounds for his belief are his personal knowledge and the official records and files of the United States Government.

Dated:   New York, New York
         September 19, 2011

_Royal Pollitt_

Royal Pollitt
Special Agent
Federal Bureau of Investigation

Sworn to before me this
19th day of September, 2011

_____
Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires May 8, 2014

SCHEDULE A

## The Defendant Entities

1.   PokerStars,

2.   Full Tilt Poker,

3.   Absolute Poker,

4.   Ultimate Bet,

5.   Oldford Group Ltd.,

6.   Rational Entertainment Enterprises Ltd.,

7.   Pyr Software Ltd.,

8.   Stelekram Ltd.,

9.   Sphene International Ltd.,

10.  Tiltware LLC,

11.  Kolyma Corporation A.V.V.,

12.  Pocket Kings Ltd.,

13.  Pocket Kings Consulting Ltd.,

14.  Filco Ltd.,

15.  Vantage Ltd.,

16.  Ranston Ltd.,

17.  Mail Media Ltd.,

18.  Full Tilt Poker Ltd.,

19.  SGS Systems Inc.,

20.  Trust Services Ltd,

21.  Fiducia Exchange Ltd.,

22.  Blue Water Services Ltd.,

23.  Absolute Entertainment, S.A., and

24.  Blanca Games, Inc. of Antigua

## The Defendant Domains

25.  Pokerstars.com

26.  Fulltiltpoker.com

27.  Absolutepoker.com

28.  Ultimatebet.com

29.  Ub.com

## Poker Company Accounts

### The PokerStars Accounts

#### The Sphene Accounts

1.  account numbered 27351910081015 held at Credit Agricole
    (Suisse) SA, Switzerland, in the name of Sphene
    International Limited, IBAN CH8908741014319300001, and all
    funds traceable thereto;

2.  account held at Credit Agricole (Suisse) SA, Switzerland, in
    the name of Sphene (International) Limited, IBAN
    CH6208741014319300002, and all funds traceable thereto;

3.  all accounts held at Bank Hapoalim (Suisse) SA, Luxembourg,
    in the name of Sphene International, and all funds traceable
    thereto;

#### The Oldford Group Account

4.  account held at Credit Agricole (Suisse) SA, Switzerland, in
    the name of the Oldford Group Limited, IBAN
    CH1508741014093800001, and all funds traceable thereto;

### The Full Tilt Accounts

#### The Tiltware Accounts

5.  account numbered  1892947126 held at Comerica Bank, Dallas,
    Texas, in the name of Tiltware, and all funds traceable
    thereto;

6.  account numbered 1892947134 held at Comerica Bank, Dallas,

Texas, in the name of Tiltware, and all funds traceable thereto;

## The Kolyma Corporation Accounts

7.  account numbered E34512308000000007283 held at Wirecard Bank AG, Germany, in the name of Kolyma Corporation, and all funds traceable thereto;

8.  account numbered E79512308000000007249 held at Wirecard Bank AG, Germany, in the name of Kolyma Corporation, and all funds traceable thereto;

## The Ranston Accounts

9.  account held at Basler Kantonal Bank, Switzerland, in the name of Ranston Ltd., IBAN CH4900770016542263375, and all funds traceable thereto;

10. account held at Basler Kantonal Bank, Switzerland, in the name of Ranston LTD, IBAN CH7000770016542254461, and all funds traceable thereto;

## The Mailmedia Account

11. account held at Basler Kantonal Bank, Switzerland, in the name of Mailmedia, numbered CH7300770252534932001, and all funds traceable thereto;

## The Vantage Accounts

12. account held at Banque Invik SA, Luxembourg, in the name of Vantage Limited, IBAN LU811944013080000USD, and all funds traceable thereto;

13. any account held at Basler Kantonal Bank, Switzerland, in the name of Vantage Ltd., and all funds traceable thereto;

## The Filco Accounts

14. account held at Allied Irish Bank in the name of Filco Ltd, IBAN IE85AIBK93006727971082, and all funds traceable thereto;

15. account held at WestLB AG, Germany, in the name of Filco Ltd, IBAN DE19512308000000007262, and all funds traceable thereto;

**The Absolute Poker Accounts**

<u>The Blue Water Account</u>

16.  account numbered MT23SBMT5550500000001108 held at Sparkasse
     Bank Malta in the name of Blue Water Services LTD, and all
     funds traceable thereto;

<u>The Towkiro Account</u>

17.  account numbered MT14SBMT55505000000011451GAEURO held at
     Sparkasse Bank Malta in the name of Tokwiro Enterprises
     ENRG, and all funds traceable thereto;

<u>The Disora Accounts</u>

18.  account numbered 61-12-9436-6 held at Banco Panameno De La
     Vivienda SA, Panama, in the name of Disora Investment, Inc.,
     and all funds traceable thereto;

19.  account numbered 0011271083 held at Citibank London,
     England, in the name of Mundial Valores, for the benefit of
     Disora Investment, Inc., MAM000804, and all funds traceable
     thereto;

<u>The Rintrade Account</u>

20.  account numbered CH4308755011432400000 held at Pictet and
     Co., Switzerland, in the name of Rintrade Finance SA and all
     funds traceable thereto;

<u>The Pocket Kings Accounts</u>

21.  account numbered 99045014801116 held at Bank of Scotland
     Ireland, Inc., Ireland, in the name of Pocket Kings
     Consulting LTD, and all funds traceable thereto;

22.  account numbered 99022000439546 held at National Irish Bank,
     Ireland, in the name of Pocket Kings Ltd, and all funds
     traceable thereto;

23.  account numbered 99022000440162 held at National Irish Bank,
     Ireland, in the name of Pocket Kings Ltd, and all funds
     traceable thereto;

24.  account numbered IE58IPBS9906291390203 held at Irish
     Permanent Treasury, PLC, in the name of Pocket Kings, and
     all funds traceable thereto;

25. account numbered IE07DABA95151340074209 held at National Irish Bank in the name of Pocket Kings Limited, and all funds traceable thereto;

26. account numbered IE38DABA95151340025151 held at National Irish Bank in the name of Pocket Kings Limited, and all funds traceable thereto;

27. account numbered IE42DABA95151340062618 held at National Irish Bank in the name of Pocket Kings Limited, and all funds traceable thereto;

28. account numbered IE58IPBS99062913190203 held at Irish Permanent Treasury in the name of Pocket Kings Limited, and all funds traceable thereto;

29. account numbered IE67AIBK93208626257031 held at Allied Irish Bank in the name of Pocket Kings, and all funds traceable thereto;

30. account numbered LU621944013130000USD held at Banque Invik, Luxemburg, held in the name of Pocket Kings Limited, and all funds traceable thereto;

31. account numbered IE07DABA95151340074209 held at Danske Bank A/S, Denmark, held in the name Pocket Kings Ltd., and all funds traceable thereto.

## SCHEDULE B

## Poker Processor Accounts

### The Sunfirst Bank Accounts and Related Accounts

1.   account numbered 121015408 held at Sunfirst Bank, St. George, Utah, in the name of Triple Seven LP d/b/a Netwebfunds.com, and all funds traceable thereto;

2.   account numbered 121015390 held at Sunfirst Bank, St. George, Utah, in the name of Triple Seven LP d/b/a A WEB DEBIT, and all funds traceable thereto;

3.   account numbered 27351910081015 held at Societé Generale Cyprus LTD, Cyprus, in the name of Golden Shores Properties Limited, and all funds traceable thereto;

4.   account numbered CY1211501001065983USDCACC002 held at FBME Bank LTD, Cyprus, in the name of Triple Seven Inc., and all funds traceable thereto;

5.   account numbered 5510045221 held at Wells Fargo, N.A., in the name of Triple Seven L.P., and all funds traceable thereto;

6.   account numbered 7478010312 held at Wells Fargo, N.A., in the name of Kombi Capital, and all funds traceable thereto;

7.   account numbered 12900584 held at Sunfirst Bank, St. George, Utah, formerly in the name of Sunfirst Bank ITF Powder Monkeys/Full Tilt, now in the name of Sunfirst Bank, and all funds traceable thereto;

8.   account numbered 129000576 on deposit at Sunfirst Bank, St. George, Utah, formerly in the name of Sunfirst Bank ITF Mastery Merchant/Psars, now in the name of Sunfirst Bank, and all funds traceable thereto;

### The Elie Accounts and Related Accounts

9.   account numbered 200003291 held at All American Bank, Des Plaines, Illinois, in the name of 21 Debit LLC, and all funds traceable thereto;

10.  account numbered 200003317 held at All American Bank, Des Plaines, Illinois, in the name of 21 Debit LLC, and all funds traceable thereto;

11. account numbered 200003325 held at All American Bank, Des Plaines, Illinois, in the name of 21 Debit LLC, and all funds traceable thereto;

12. Account numbered 200003309 held at All American Bank, Des Plaines, Illinois, in the name of 21 Debit LLC, and all funds traceable thereto;

13. account number 201002907 at Barclays Bank, UK in the name of Hotwire Financial LLC, and all funds traceable thereto;

14. account number GB26BARC20473563472044 at Barclays Bank, UK, in the name of Hotwire Financial LTD, and all funds traceable thereto;

15. account number 953500105 at Bank One Utah, in the name of 4 A Consulting, and all funds traceable thereto;

16. account number 730666271, at Whitney National Bank, New Orleans, Louisiana in the name of Ndeka LLC, and all funds traceable thereto;

17. account number 2919208124 at Bank of America, N.A. in the name of Credit Capital Funding, and all funds traceable thereto;

18. account numbered 32433 at New City Bank in the name of 21Debit LLC dba PS Payments, and all funds traceable thereto;

19. account numbered 32441 at New City Bank in the name of 21Debit LLC dba FLT Payments, and all funds traceable thereto;

20. account number 32506 at New City Bank in the name of 21Debit LLC, and all funds traceable thereto;

<u>The Griting Account and Related Account</u>

21. account numbered 972402309 held at UMPQUA Bank, Roseburg, Oregon, in the name of "ULTRA SAFE PAY," and all property traceable thereto;

22. account numbered 004-411-346034-838 held at Hong Kong and Shanghai Banking Corporation, Hong Kong, in the name of Griting Investments LTD, and all funds traceable thereto;

<u>The Vensure/Trinity Global Accounts</u>

23. account numbered 1093 held at Vensure Federal Credit Union, Mesa, Arizona, in the name of Trinity Global Commerce Corp.

24. account numbered 1200402039 held at Banca Privada D'Andorra, Andorra, in the name of Trinity Global Commerce Corp., and all funds traceable thereto;

25. account numbered MT54SBMT55505000000016782GAUSD0 held at Sparkasse Bank Malta PLC, Malta, in the name of Trinity Global Commerce Corp., and all funds traceable thereto;

<u>The Terricorp Inc. d/b/a/ TLC Global Accounts and Related Accounts</u>

26. account numbered 27554003786 held at Royal Bank of Canada, Canada, in the in the name of Terricorp Inc. d/b/a TLC Global, and all funds traceable thereto;

27. account numbered 27554003760 held at Royal Bank of Canada, Canada, in the in the name of Terricorp Inc. d/b/a TLC Global, and all funds traceable thereto;

28. account numbered 27554001038 held at Royal Bank of Canada, Canada, in the in the name of Terricorp Inc. d/b/a TLC Global, and all funds traceable thereto;

29. account numbered 27551017789 held at Royal Bank of Canada, Canada, in the in the name of Terricorp Inc. d/b/a TLC Global, and all funds traceable thereto;

30. account numbered 4800198399 held at Harris Bank, Palatine, Illinois, and all funds traceable thereto;

31. account numbered GB81RBOS16630000368036 held at the Royal Bank of Scotland in the name of Voltrex Ltd., and all funds traceable thereto;

32. account numbered 2000059819596 held at Wachovia Bank, a division of Wells Fargo Bank, N.A., in the name "Eastern Expressions," and all funds traceable thereto;

33. account numbered 104773862842 held at Bendix Foreign Exchange, Toronto, Ontario, and all funds traceable thereto.

## The G.I. Holdings Accounts

34. $231,000.00 formerly on deposit at First Republic Bank in Account numbered 80000373283, held in the name of G.I. Holdings and all property traceable thereto;

35. $124,178.72 formerly on deposit at Service 1st Bank of Nevada in Account numbered 2020003792 held in the name of G.I. Holdings and all property traceable thereto;

36. $2,057,620.28 formerly on deposit at Wells Fargo Bank in Account numbered 5383346862 held in the name of G.I. Holdings and all property traceable thereto;

37. $3,055,108.21 formerly on deposit at Citibank in account numbered 203023239 held in the name of G.I. Holdings and all property traceable thereto;

38. $784,160.95 formerly on deposit at Citibank in account numbered 203118542 held in the name of G.I. Holdings and all property traceable thereto;

39. $1,000.00 formerly on deposit at Citibank in account numbered 203118559 held in the name of G.I. Holdings and all property traceable thereto;

40. $925.00 formerly on deposit at Citibank in account numbered 203118575 held in the name of G.I. Holdings and all property traceable thereto;

41. $1,035,415.44 formerly on deposit at Nevada  Commerce Bank in account numbered 0021002712 held in the name of G.I. Holdings and all property traceable thereto;

42. $122,308.78 formerly on deposit at Nevada Commerce Bank in account numbered 0021002795 held in the name of G.I. Holdings and all property traceable thereto;

43. $3,029,711.94 formerly on deposit at City National Bank in Account Number 3701177950, held in the name of G.I. and all property traceable thereto;

## The SNR Inc. Accounts

44. $30.27 formerly on deposit at Huntington National Bank in Account numbered 01662184444. held in the name of SNR, Inc. and all property traceable thereto;

4

45. $1,057,797.29 formerly on deposit at Huntington National Bank in account numbered 01662184457 held in the name of SNR, Inc. and all property traceable thereto;

46. $649,261.20 formerly on deposit at Huntington National Bank in Account numbered 01662191343 held in the name of SNR, Inc. and all property traceable thereto;

47. $199,175.14 formerly on deposit at Bank of West in account numbered 658049382 held in the name of SNR, Inc. and all property traceable thereto;

48. $4,925.00 formerly on deposit at Bank of America in account numbered 0952071585 held in the name of SNR, Inc. and all property traceable thereto;

49. $25.00 formerly on deposit at Bank of America account numbered 0952071603, held in the name of SNR, Inc. and all property traceable thereto;

50. $992,499.53 formerly on deposit at Citibank in Account numbered 203366638 held in the name of  SNR, Inc. and all property traceable thereto;

51. $865,000.00 formerly on deposit at Bank of America in account numbered 0952071467, held in the name of SNR, Inc. and all property traceable thereto;

<u>The Viable Marketing Accounts</u>

52. $410,449.93 formerly on deposit at Bank of America Account numbered 229006067857 held in the name of Viable Marketing Corp. and all property traceable thereto;

53. $8,168,168.89 formerly on deposit at Fifth Third Bank in Account numbered 7431859508, held in the name of Viable Marketing Corp. and all property traceable thereto;

54. $40,960.86 formerly on deposit at Fifth Third Bank in Account numbered 7432618069, held in the name of Viable Marketing Corp. and all property traceable thereto;

<u>The Viable Processing Solutions Accounts</u>

55. All funds formerly on deposit at National Bank of California in account numbered 2547716 in the name of Viable Processing Solutions, and all property traceable thereto;

5

56.  All funds formerly on deposit at National Bank of California in Account Number 2778815 held in the name of Viable Processing Solutions, and all property traceable thereto;

### The ASP Consultants, LLC Accounts

57.  $447,196.79 from account numbered 804815470 in the name of ASP Consultants, LLC at JPMorgan and all property traceable thereto;

58.  $12,642.44 from account numbered 804815488 in the name of ASP Consultants, LLC at JPMorgan and all property traceable thereto;

59.  $4,472.58 from account numbered 822823779 in the name of ASP Consultants, LLC at JPMorgan and all property traceable thereto;

60.  $84.21 from account numbered 822824025 in the name of ASP Consultants, LLC at JPMorgan and all property traceable thereto;

61.  $6,047.84 from account numbered 822824140 in the name of ASP Consultants, LLC at JPMorgan and all property traceable thereto;

62.  $17,460.95 from account numbered 1003245502 in the name of ASP Consultants, LLC at JPMorgan and all property traceable thereto;

### The LST Financial Accounts

63.  All funds formerly on deposit at Four Oaks Bank and Trust Company, Four Oaks, North Carolina, in account numbered 520055501, held in the name of LST Financial, and all property traceable thereto;

64.  All funds formerly on deposit at Four Oaks Bank and Trust Company, Four Oaks, North Carolina, in account numbered 520057101, held in the name of LST Financial, and all property traceable thereto;

65.  All funds formerly on deposit at Four Oaks Bank and Trust Company, Four Oaks, North Carolina, in account numbered 520064401, held in the name of LST Financial, and all property traceable thereto;

66.  All funds formerly on deposit at Four Oaks Bank and Trust Company, Four Oaks, North Carolina, in account numbered

520065201, held in the name of LST Financial, and all
property traceable thereto;

67.  All funds formerly on deposit at Four Oaks Bank and Trust
     Company, Four Oaks, North Carolina, in account numbered
     520069501, held in the name of LST Financial, and all
     property traceable thereto;

<u>The EZO Account</u>

68.  $33,743.75 formerly on deposit at Bank of America Account
     numbered 003678667131 held in the name of EZO, LLC and all
     property traceable thereto;

<u>The Autoscribe Account</u>

69.  $8,018.04 from Bank Account numbered 9105709543 in the name
     of Autoscribe Corporation at Citibank, N.A. and all property
     traceable thereto;

<u>The MAS Inc. Account</u>

70.  All funds formerly on deposit at Hawaii National Bank,
     Honolulu, Hawaii, in account numbered 12008656, held in the
     name of "MAS Inc.", and all property traceable thereto.

**SCHEDULE C**

**FTP Insider Accounts**

1.  Account numbered GB81 RBOS 6095 4234 0877 66 held at
    NatWest, in the name of Raymond Bitar, and all funds
    traceable thereto;

2.  Account numbered 7655741861 held at Wells Fargo Bank, N.A.,
    in the name of HH Lederer Consulting LLC, and all funds
    traceable thereto;

3.  Account numbered GB56LOYD30166314010402 held at Lloyds TSB
    International, Isle of Mann, in the name of Howard Lederer,
    and all funds traceable thereto;

4.  Account numbered 40039049628 held at Citibank, N.A., in the
    name of Chris Ferguson, and all funds traceable thereto; and

5.  Account numbered CH87 0875 5057 0684 0010 0 held at Pictet &
    Co Bankers, Switzerland, in the name of Telamonian Ajax
    Trust, and all funds traceable thereto.