UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

| | |
|---|---|
| UNITED STATES OF AMERICA, | : **11 Civ. 2564 (LBS)** |
| Plaintiff, | : **DECLARATION OF** |
| | : **CYRUS SANAI, ESQ.** |
| v. | : |
| POKERSTARS, et al., | : |
| Defendants, | : |
| ALL RIGHTS, TITLE AND INTEREST IN THE ASSETS OF POKERSTARS, et al., | : |
| Defendants-in-rem. | : |

------------------------------------------------------------X

CYRUS SANAI, being duly sworn, deposes and says:

1.      I am an attorney qualified to practice in California.  I am the general counsel of claimant Cardroom International, LLC.  I was an attorney for BH Development, LLC.  I am also the attorney of record for Cardroom in its action Cardroom International LLC v. Scheinberg, LA Sup. Ct. Case No. SC114330.  I therefore make this declaration from personal knowledge, except for matters I have cited as being learned from other persons or documents.  Most of the statements made below are without the benefit of review of any documents.  Accordingly, my citation of dates may not be accurate.

2.  The Full Tilt Poker business originated with the establishment of BH Development LLC in Delaware on or about October 15, 2001.  This entity was established at my direction when I was an associate at the now dissolved Thelen Reid & Priest law firm. Thelen had been engaged to provide certain legal and corporate advice to the founder of BH Development.  I handled the corporate creation of the entity and provided corporate advice.

3.      BH Development had offices in Los Angeles and developed one of the first peer to peer on-line poker software systems.  It was initially financed by its founder.

4.      Subsequently, the founder of BH Development recruited Defendant Chris Ferguson as an investor.  Mr. Ferguson in turn introduced Defendants Ray Bitar, Howard Lederer and others to the company, and they became members and investors.  A different group of investors associated with a Santa Barbara, CA company called Westerland also invested in BH Development.

5.      At the time Westerland was to make its investment in or about 2003, Ferguson and the investors he recruited allied themselves with an employee of BH Development, Perry Friedman, and as the self-proclaimed "Jesus Coalition" sought to take over the company or acquire its software and its trade name, "Full Tilt Poker".  This spawned a short-lived lawsuit and a settlement agreement (the "BH Development Settlement Agreement").  The Settlement Agreement was negotiated on behalf of BH Development by Westerland's counsel at the law firm of Straddling Yocca. It provided that:

i       The Jesus Coalition relinquished their respective membership interests in BH Development without refund of their invested funds.

ii.     The Jesus Coalition and BH Development released all claims against each other arising prior to the date of the Agreement.

iii.    The Jesus Coalition received the right to use the name "Full Tilt Poker" as well as relevant URLS.

iv.     The Jesus Coalition received a joint copyright interest in the software developed by BH Development, excluding certain graphics elements, and neither BH

2

Development nor the Jesus Coalition could transfer the copyright to unaffiliated persons or entities without permission of the other side.

6.     Both the Full Tilt Poker group and BH Development further developed the software. The fully developed software constituted a combination of original and derivative works of the jointly owned software. I know that Full Tilt Poker continued to use elements of the original software created by BH Development from periodically playing on the free portion of fulltiltpoker.com and watching the behavior of the software.

7.     BH Development entered Chapter 11 bankruptcy in 2006. *See In Re BH Development LLC*, CDCA BK Docket No. LA 06-10031 EC. By 2007 the Chapter 11 case had been transformed into a Chapter 7 case and Rosendio Gonzales was appointed Chapter 7 trustee, with John Melissinos hired as attorney for the trustee.

8.     I was required to hand over his copy of the BH Development Settlement Agreement to the attorney for the Chapter 7 trustee of BH Development, John Melissinos, after the company entered Chapter 7 bankruptcy. I have spoken to Mr. Melissinos, who has agreed to arrange for production of the BH Development Settlement Agreement. However, Mr. Melissinos has some complex issues to resolve involving ownership of the files. At the time Mr. Melissinos began work on the case in 2007, he was a partner at the Los Angeles office of Andrews & Kurth. He moved to Rutter Hobbs & Davidoff in 2009, taking the case with him to that firm. In 2011 the Rutter Hobbs firms was hit with a $10 million malpractice verdict, and it soon shut its doors. *See* D. Weiss, "Boutique Hit with Malpractice Verdict Loses 19 Lawyers; Closing Is Imminent, Ex-MP Says," ABA Journal, January 12, 2012 at www.abajournal.com/news/article/boutique_hit_with_malpractice_verdict_loses_19_lawyers_cl osing_is_imminent_/. Mr. Melissinos and a group from Rutter Hobbs created a new short-lived

3

law firm which merged two months ago with the Los Angeles law firm of Greenberg Glusker. *See* Greenberg Glusker, "Greenberg Glusker Brings Brian Davidoff and Bankruptcy, Corporate Group on Board" June 20, 2012 at http://eon.businesswire.com/news/eon/20120620005076/en. The files are technically in the possession of the short-lived law firm, Davidoff Gold, and Mr. Melissinos needs some time to sort through the appropriate permissions.

9.      The Chapter 7 trustee sold all right title and interest of the bankruptcy estate in BH Development's software, which comprised, inter alia, the joint ownership in the original code software, to Lilemco LLC in 2007. At about that time, I was hired as general counsel of Cardroom (which is an affiliate of Lilemco) and Cardroom acquired the software assets in 2008 from Lilemco. The Full Tilt Poker defendants made no objection to these transfers. A true and correct copy of the October 17, 2007 Letter Agreement which transferred the software is attached hereto as Exhibit A.

10.     The software was in 2008 made operable and made available to the public for free play on www.cardroom.com. Cardroom sought to license its software for free and promotional play in the United States. However, it was repeatedly stymied by the efforts of the Full Tilt Poker and Pokerstars groups to monopolize all on-line play of poker in the United States, as set forth in the complaint filed in the Los Angeles County Superior Court attached to the answer.

11.     Cardroom filed its complaint in Los Angeles County Superior Court at about the time it filed its claim in this proceeding. The action in California was improperly removed to federal court and recently remanded to the Superior Court.

12.     On or about June 19, 2012, Jason Cowley of the United States Attorney's Office and I, as general counsel of Cardroom, reached an agreement, memorialized in an email, in which Mr. Cowley agreed that the United States would reserve $30 million from a proposed

settlement if Cardroom waived its claims to property being transferred, and such property would be treated as if it had all of the characteristics of property transferred. At that time Mr. Cowley refused to give me any further information about the settlement. My client and I were therefore shocked when the motion to strike was filed. Mr. Cowley and I agreed that Cardroom could have an extension of time to respond.

13.     Prior to the extended deadline for responding, Mr. Cowley contacted Cardroom's attorneys and informed them that the settlement agreement was on again. The United States Attorney provided a written agreement to Cardroom to sign. I proposed some comments based on certain assumptions I had about the settlement which Mr. Cowley stated were erroneous, but again, the United States Attorney refused to provide a copy of the settlement agreement to me or counsel of record. Cardroom therefore authorized its attorneys to sign the Substitution Agreement, attached hereto as Exhibit B, without any effective ability to negotiate its terms.

14.     In a telephone conversation with Mr. Cowley and a colleague of his that occurred on or about July 31, 2012, I was told that the U.S. Attorney believes that Pokerstars earned US$1.5 billion from its illegal activities in the United States.

15.     Attached hereto as Exhibit C is a true and correct copy of the reuters.com story regarding the settlement by Joseph Menn, who has been covering this story for many years.

16.     I declare under penalty of perjury that the foregoing is true and correct.


August 20, 2012

Cyrus Sanai
in Beverly Hill, CA.

# EXHIBIT A


ANDREWS
ATTORNEYS
KURTH LLP

601 South Figueroa, Suite 3700
Los Angeles, California 90017
213.896.3100 Phone
213.896.3137 Fax
andrewskurth.com

C. John M. Melissinos
213.896.3181 Phone
Jmelissinos@andrewskurth.com

October 17, 2007

**VIA FEDERAL EXPRESS**

Gary Miller, President
LILEMCO, Inc.
c/o Merrill Bookstein
2385 Executive Center Drive, Suite 100
Boca Raton, FL 33431

       Re:    *In re BH Development, LLC*
                <u>Bankruptcy Case No. LA 06-10031-EC</u>

Dear Mr. Miller:

       This letter ("Letter Agreement") will, upon your execution and return, set forth the terms of the agreement between LILEMCO, Inc., as buyer ("Buyer"), and Rosendo Gonzalez, as Chapter 7 Trustee ("Trustee") for the bankruptcy estate ("Bankruptcy Estate") of BH Development, LLC ("BH Development" or "Debtor"), Debtor in the above-described case under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* ("Bankruptcy Code"), presently pending before the United States Bankruptcy Court for the Central District of California, Los Angeles Division ("Bankruptcy Court") as Case No. LA 06-10031-EC. The Buyer and the Trustee are sometimes collectively referred to herein as the "Parties". The offer embodied in this Letter Agreement will expire and will be deemed for all purposes to have terminated in the event that this Letter Agreement is not executed by the Parties on or before 5:00 p.m. on the fifth business day after the date set forth above.

      1.    <u>Definitions.</u>

       "<u>Qualified Bidder</u>" shall mean any person that has satisfied the requirements of Paragraph 9(b)(i), below.

       "<u>Successful Bid</u>" shall be the Successful Bidder's bid.

       "<u>Successful Bidder</u>" shall mean the Buyer or a Qualified Bidder, as the case may be, whose bid has been accepted by the Trustee and confirmed by the Bankruptcy Court as the best bid for the Transferred Assets.

       "<u>Transferred Assets</u>" shall mean all of the right, title and interest of the Bankruptcy Estate pursuant to Section 541 of the Bankruptcy Code in and to the software developed by the Debtor to operate a peer-to-peer internet poker gaming website, and the computer equipment identified on Schedule "1" hereto (the "Servers"), which constitute all of the Servers of the Debtor to the best of the Trustee's current knowledge.

Gary Miller, President
LILEMCO, Inc.
October 17, 2007
Page 2

    2.    <u>Sale of Transferred Assets</u>.  Subject to the terms and conditions hereinafter set forth, the Trustee agrees to transfer, sell and assign the Transferred Assets to Buyer free and clear of all liens, claims, rights and interests.

    3.    <u>Assets Sold As Is and Without Warranty</u>.  THE TRANSFERRED ASSETS ARE SOLD HEREUNDER ON AN "AS IS, WHERE IS, WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES OF ANY KIND, CHARACTER OR NATURE, EXPRESS, IMPLIED OR OTHERWISE.  WITHOUT LIMITATION ON THE FOREGOING, BY EXECUTION OF THIS LETTER AGREEMENT BUYER ACKNOWLEDGES AND AGREES THAT THE TRUSTEE HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTEES OF ANY KIND, CHARACTER OR NATURE WHATSOEVER, WHETHER EXPRESS, IMPLIED OR OTHERWISE, ORAL OR WRITTEN WITH RESPECT TO THE TRANSFERRED ASSETS.

    4.    <u>Books and Records</u>.  The Trustee shall have the right at his option to make a copy of any information on the Servers prior to the delivery of them for purposes of retaining any information related to the Debtor that he requires for the administration of the estate.  The Trustee has been informed by the principal of the Debtor that there are no books and records related to the Transferred Assets.  All of the Debtors' books and records shall be retained by the Trustee and shall be deemed excluded from the Transferred Assets conveyed to Buyer pursuant to this Letter Agreement, subject to Buyer's rights:

    (i)    to have access, during normal business hours and upon written request and reasonable notice to the Trustee to any original document or electronic file retained by the Trustee that may later be determined to constitute documentation of, or be related to the operation of, the Transferred Assets; and

    (ii)    to receive notice of the Trustee's proposed abandonment or sale of any such original document or electronic file at the address listed on page 1 of this Letter Agreement.

    5.    <u>Consideration</u>.  As consideration for the Transferred Assets, Buyer will pay an aggregate amount equal to the greater of (a) $15,000.00 and (b) the amount of any Successful Bid that may be submitted by Buyer (the "Purchase Price").

    6.    <u>Deposit</u>.

    (a)    Within two (2) business days of  execution of this Letter Agreement, Buyer shall deliver to the Trustee a cashier's check in the amount of $1,500.00 as a good faith deposit ("Deposit"), such Deposit to be credited against the Purchase Price in the event that Buyer is the Successful Bidder.  The Deposit need not be, and will not be, held at interest for the benefit of Buyer.

    (b)    The Deposit shall be promptly refunded to Buyer (i) in the event that the sale contemplated herein does not close for any reason not attributable to Buyer, or (ii) in the event of a Competing Transaction (as hereinafter defined), in accordance with Paragraph 6(c), below.  The

Gary Miller, President
LILEMCO, Inc.
October 17, 2007
Page 3

Trustee's rights in the event of a breach by Buyer of this Letter Agreement shall not be limited by this paragraph, and all such rights are hereby reserved.

        (c)    In the event that all or any portion of the Transferred Assets is sold to any person other than Buyer (such sale being herein referred to as a "Competing Transaction"), then, promptly upon the closing of such Competing Transaction, the Trustee shall refund the Deposit to Buyer.

       7.    <u>Closing and Consummation of Transaction.</u>

        (a)    Closing shall be conditioned upon, and shall take place as soon as practical after, (i) delivery to the Trustee of a cashier's check or wire transfer of funds in an amount equal to the Purchase Price (less the amount of the Deposit), and (ii) the entry of the Approval Order, as defined in Paragraph 8, below, providing that no stay of enforcement of the Approval Order has been ordered. The Parties agree to use their best efforts in closing the sale as rapidly as possible.

        (b)    The Trustee agrees to execute any documents reasonably necessary to consummate the sale, but Buyer shall be solely responsible for the preparation of any documentation it requires.

        (c)    Buyer must take delivery of and remove the Transferred Assets within five (5) business days following the time of closing (hereinafter, the "Closing Date"). Buyer shall be responsible for the actual costs of removal of the Transferred Assets.

       8.    <u>Bankruptcy Court Approval Required.</u>

        (a)    As provided by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules, this Letter Agreement and the transaction contemplated hereby must be approved by the Bankruptcy Court, after notice to creditors and a hearing, by the entry of an order approving the terms of this Letter Agreement and authorizing the Trustee to consummate the sale contemplated herein (the "Approval Order").

        (b)    The Trustee agrees to cause to be prepared and filed with the Bankruptcy Court, motion(s), in form and content satisfactory to Buyer, (i) requesting approval of this Letter Agreement, the sale procedures set forth in Paragraph 9, below, and the transactions contemplated herein ("Sale Motion"), and (ii) requesting that the Bankruptcy Court set a hearing to approve the sale of assets contemplated herein ("Sale Hearing"). The Trustee shall provide notice of such Sale Motion and Sale Hearing in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Federal Rules") and the Local Bankruptcy Rules of the Bankruptcy Court.

       9.    <u>Right of Overbid and Proposed Sale Procedures.</u>

        (a)    Buyer acknowledges that under the Bankruptcy Code, the Federal Rules and the Local Bankruptcy Rules, the proposed sale of the Transferred Assets to Buyer is subject to overbid on terms such as the Bankruptcy Court may approve.

Gary Miller, President
LILEMCO, Inc.
October 17, 2007
Page 4

(b)    In the Trustee's Sale Motion, the Trustee agrees to propose the Bankruptcy Court approve the following sale procedures:

(i)    that, no later than two (2) business days prior to the Sale Hearing, any proposed bidder, other than Buyer, deliver to the Trustee a cashier's check in an amount equal to the Deposit and demonstrate to the Trustee, in the exercise of the Trustee's sole discretion, its ability to close any sale of the Transferred Assets in the event that such proposed bidder were to become the Successful Bidder;

(ii)    that any initial overbid shall be in amount equal to at least $2,500.00 and each successive overbid thereafter shall be in increments of not less than $500.00.

10.    <u>Trustee Free to Provide Information to and/or Solicit Additional Purchasers</u>. Buyer acknowledges and understands that pursuant to his duty under the Bankruptcy Code, the Trustee remains free to negotiate with and solicit additional potential purchasers of the Transferred Assets and/or any other assets of the Bankruptcy Estate and to provide information to any additional potential purchasers of the Transferred Assets who request such information after the execution of this Letter Agreement.

11.    <u>Termination</u>. This Letter Agreement, except for Paragraphs 6 and 11 through 15 of this Letter Agreement, will terminate and be of no further force or effect upon the earliest to occur of (i) the closing of a Competing Transaction, and (ii) 5:00 p.m. on the 75th day after the date of execution and delivery of this Letter Agreement by the Parties, if the Closing has not occurred before that time. The Parties may extend such deadline in accordance with Paragraph 16(a).

12.    <u>Governing Law and Resolution of Disputes</u>. The Parties agree that this Letter Agreement shall be governed by and interpreted under the laws of the State of California and, where appropriate, the Bankruptcy Code. Any disputes arising out of this Letter Agreement shall be resolved in the Bankruptcy Court and the Parties hereby agree to the jurisdiction of the Bankruptcy Court with respect to any such disputes.

13.    <u>Attorneys Fees</u>. Each of the Parties shall bear its own costs and expenses arising out of the negotiation, execution, delivery and performance of this Letter Agreement and the consummation of the sale. Should any of the Parties hereto institute any action or proceeding to enforce any provision hereof, or for damages by reason of any alleged breach of any provision of this Letter Agreement, the prevailing party shall be entitled to receive such amount as the Bankruptcy Court may determine to be reasonable attorneys' fees and costs for the services rendered to the prevailing party in such action or proceeding.

14.    <u>Trustee Incurs No Personal Liability</u>. The Trustee undertakes no obligations or responsibilities for this Letter Agreement other than in his capacity as Chapter 7 trustee of the Bankruptcy Estate. No personal liability of any kind may attach to the Trustee individually or to any professional employed by the Trustee on account of this Letter Agreement or the negotiations, actions or non-actions which led to this Letter Agreement.

LOS:110424.3

Exh. 1 - Page 19

Gary Miller, President
LILEMCO, Inc.
October 17, 2007
Page 5

15.   Miscellaneous.

(a)   This Letter Agreement is the full and complete agreement of the Parties hereto with respect to proposed transaction and shall not be modified or amended in any respect except by written instrument expressing such amendment or modification signed by each of the Parties and approved by the Bankruptcy Court if required by the Bankruptcy Code, the Federal Rules or the Local Bankruptcy Rules.

(b)   The various headings in this Letter Agreement are inserted for convenience only and shall not affect this Letter Agreement or any provisions hereof.

(c)   This Letter Agreement may be signed in counterparts by the Parties hereto and shall be valid and binding on each party as if fully executed in a single document.

(d)   This Letter Agreement is the product of the efforts of each of the Parties, and, as a result, it will not be construed, and no presumption will arise, based upon who drafted the Letter Agreement.

I look forward to working with you to complete this deal as soon as possible. Please do not hesitate to call me if you have any questions about this.

Very truly yours,

C. John M. Melissinos
Attorneys for Rosendo Gonzalez,
Chapter 7 Trustee

AGREED AND ACCEPTED THIS 19th DAY OF OCTOBER, 2007

LILEMCO, Inc.

By: _____
Name: Gary Miller
Its: President
EIN: 26-1138357

AGREED AND ACCEPTED THIS ____ DAY OF OCTOBER, 2007

_____
Rosendo Gonzalez, Trustee

Gary Miller, President
LILEMCO, Inc.
October 17, 2007
Page 5

     15.    <u>Miscellaneous</u>.

    (a)    This Letter Agreement is the full and complete agreement of the Parties hereto with respect to proposed transaction and shall not be modified or amended in any respect except by written instrument expressing such amendment or modification signed by each of the Parties and approved by the Bankruptcy Court if required by the Bankruptcy Code, the Federal Rules or the Local Bankruptcy Rules.

    (b)    The various headings in this Letter Agreement are inserted for convenience only and shall not affect this Letter Agreement or any provisions hereof.

    (c)    This Letter Agreement may be signed in counterparts by the Parties hereto and shall be valid and binding on each party as if fully executed in a single document.

    (d)    This Letter Agreement is the product of the efforts of each of the Parties, and, as a result, it will not be construed, and no presumption will arise, based upon who drafted the Letter Agreement.

    I look forward to working with you to complete this deal as soon as possible.  Please do not hesitate to call me if you have any questions about this.

Very truly yours,

C. John M. Melissinos
Attorneys for Rosendo Gonzalez,
Chapter 7 Trustee

AGREED AND ACCEPTED THIS ____ DAY
OF OCTOBER, 2007

LILEMCO, Inc.


By: _____
Name:_____
Its: _____
EIN: _____

AGREED AND ACCEPTED THIS _18__ DAY
OF OCTOBER, 2007



_____
Rosendo Gonzalez, Trustee

LOS:110424.3

Exh. 1 - Page 21

## SCHEDULE "1"

### Servers

BHSMDC01 - GB45X
BHSQLSM01 - 5KTH771
BHSQLSM02 - 78T3G61
BHSQLSM03 - SERIAL - 40349826
BHDEVSM01 - C87PX21
BHSQLSM04 - 4KTH771
BHWEBSM01 - WHITE BOX - NO LABEL NO SERIAL
POWEREDGE 1800 NO LABEL - JXCMQ91

*Gary Miller*

President

**CERTIFICATE OF SERVICE**

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 601 South Figueroa Street, Suite 3700, Los Angeles, California 90017-5742.  On November 9, 2007, I served the document described as follows:

> **MOTION BY TRUSTEE FOR APPROVAL OF SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS OF SOFTWARE AND SERVERS TO LILEMCO, INC. AND FOR APPROVAL OF CERTAIN BIDDING PROCEDURES IN RELATION THERETO; DECLARATIONS OF ROSENDO GONZALEZ AND GARY MILLER IN SUPPORT THEREOF**

by placing ☒ a true copy ☐ the original thereof enclosed in sealed envelopes addressed as follows:

SEE ATTACHED SERVICE LIST

☒   BY MAIL:  I placed true copies in a sealed envelope addressed as indicated above, on the above-mentioned date.  I am familiar with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service with postage thereon fully prepaid on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐   BY MESSENGER:  I provided ☒ a true copy ☐ the original of the above-referenced document to a messenger, with an envelope addressed to each person named at the address shown, and gave that document to the messenger for personal delivery before 5:00 p.m. on the above-mentioned date.

☐   BY FACSIMILE:  On November __, 2007, starting at approximately __:__ _.m., from Los Angeles, California, I caused the aforementioned document to be transmitted by facsimile machine to the parties and numbers indicated above.  The transmission was reported as complete, and no error was reported by the facsimile machine.  A copy of the transmission record is maintained by our office.

☐   BY ELECTRONIC MAIL:  I caused to be served the above-described document by means of electronic transmission to the e-mail address noted on the attached list.

☐   BY OVERNIGHT DELIVERY:  On the above-mentioned date, I placed a true copy of the above-mentioned document in an envelope or package designated by the specified overnight delivery service with delivery fees paid or provided for, addressed to the person as indicated above and caused such envelope or package to be deposited in a box or other facility regularly maintained by that overnight delivery service or delivered same to an authorized courier or driver authorized by the overnight delivery service to receive documents.

☐   STATE:       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☒   FEDERAL:    I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 9, 2007 at Los Angeles, California.

_Fay Brown_
Fay Brown

ANDREWS KURTH LLP
601 SOUTH FIGUEROA STREET, SUITE 3700
LOS ANGELES, CALIFORNIA 90017-5742
(213) 896-3100

0746.1

### SERVICE LIST

*In re BH Development, LLC*
Chapter 7 Case No. LA 06-10031 EC

**Debtor**
BH Development, LLC
11013 Strathmore Drive
Los Angeles, CA  90024

**Debtor's Attorney**
Ovsanna Takvoryan
10250 Constellation Blvd.
Los Angeles, CA  90067

**Creditor/Request for Special Notice**
Brett Scharf
11013 Strathmore Drive
Los Angeles, CA  90024

**Creditor**
Franchise Tax Board
Attn:  Bankruptcy
P.O. Box 2952
Sacramento, CA  95812-2952

**Creditor**
Securities & Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA  90036

**Creditor**
Full Tilt Partners, LLC
c/o William J. Wall, Esq.
Best, Best & Krieger LLP
3750 University Ave., Suite 400
Riverside, CA  92502

**Creditor**
Thramo Services Ltd.
Attn:  Brett Scharf
Suite 252 14th Margaret Street
Silema  SLM04, MALTA

~~**Creditor/Request for Special Notice**~~
~~Eric C. Peus~~
~~Westerland Partners LLC~~
~~The Granada Building~~
~~1216 State. Street, Suite 500~~
~~Santa Barbara, CA  93101~~

**Chapter 7 Trustee**
Rosendo Gonzalez, Trustee
Gonzalez & Associates
515 S. Figueroa Street, Suite 1970
Los Angeles, CA  90071

**United States Trustee**
Office of the United States Trustee
725 South Figueroa Street, 26th Floor
Los Angeles, CA  90017

**Creditor/Request for Special Notice**
Cyrus Mark Sanai
1021 Lincoln Blvd., #219
Santa Monica, CA  90403

**Creditor**
L.A. County Tax Collector
Bankruptcy Unit
2615 South Grand Ave.
Los Angeles, CA  90007-2668

**Creditor**
Franchise Tax Board
Special Procedures
P.O. Box 2952
Sacramento, CA  95812-2952

**Creditor**
Los Angeles County Treasurer and
    Tax Collector Revenue
P.O. Box 54110
Los Angeles, CA  90054-0110

**Creditor**
JSP Multimedia Ltd.
Attn:  Brett Scharf
3970 Armory Building, Victoria Road
**Bassetere ST. KITTS
ST. CHRIST/NEVIS**

**Creditor/Request for Special Notice**
Eric C. Peus
Westerland Partners LLC
812 Anacapa Street, Suite A
Santa Barbara, CA  93101-2287

**Request for Special Notice**
Pamela A. Kohlman Webster
BuchalterNemer, APC
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA  90017

**Creditor**
City of Los Angeles
Office of Finance, Tax/Permit Division
201 N. Main St., Room 101
Los Angeles, CA  90012-4108

**Creditor**
Los Angeles Division
255 East Temple Street
Los Angeles, CA  90012

**Creditor**
Los Angeles City Clerk
P.O. Box 53200
Los Angeles, CA  90053-0200

**Creditor/Request for Special Notice**
Westerland Partners, LLC
c/o William J. Wall, Esq.
Best, Best & Krieger LLP
3750 University Ave., Suite 400
Riverside, CA  92502
**Creditor**
IRS, Office of Chief Counsel
Attn:  Gavin L. Greene, Attorney
300 N. Los Angeles St.
Room 3018 – Mail Stop 9900
Los Angeles, CA  90012

**Creditor**
Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 21126
Philadelphia, PA  19114-0326

**Creditor**
Full Tilt Partners LLC
Corporation Service Company, Agent
2711 Centerville Road, Suite 400
Wilmington, DE  19808

Request for Special Notice
Marc J. Winthrop, Esq.
Winthrop Couchot, Professional Corp.
660 Newport Center Dr., Suite 400
Newport Beach, CA  92660

David Kaufman
4628 E. Sanna St.
Phoenix, AZ  85028

~~Gralitzer & Wong, CPAs, APC~~
~~Richard Gralitzer, CPA~~
~~250 N. Westlake Blvd., Suite 200~~
~~Westlake Village, CA  91362~~

Richard Gralitzer
850 Hampshire Road, Suite C
Westlake Village, CA  91361-2851

Racaar Circuit Industries, Inc.
Julia Serup, Trustee
9225 Alabama Ave., #F
Chatsworth, CA  91311

Stradling Yocca Carlson & Rauth
660 Newport Center Drive, Suite 1600
Newport Beach, CA  92660

L.A. County Tax Collector
P.O. Box 54088
Los Angeles, CA  90054

State Board of Equalization
P.O. Box 942879
Sacramento, CA  94279

Scott Howard, CPA
Howard & Howard
16255 Ventura Blvd., Suite 700
Encino, CA  91436

Creditor/Request for Special Notice
Cyrus Mark Sanai
280 S. Beverly Drive, Suite 504
Beverly Hills, CA  90212-3908

Sandra R. Brown
300 N. Los Angeles Street, Suite 7516
Los Angeles, CA  90012-3341

Creditor
JSP Entertainment, Ltd.
Vincenti Buildings, Suite 299
14/19 Strait Street,
**Valletta  VLT08  MALTA**

Proposed Field Agent for Trustee
Tony H. Shokrai
Interco Management Corporation
2118 Wilshire Blvd., Suite 717
Santa Monica, CA  90403

Creditor
Employment Development Department
Lien Group MIC 92E
P.O. Box 826880
Sacramento, CA  94280-0001

Timothy Kincaid
Leslie, Wallace & Associates, LLP
6310 San Vicente Blvd., Suite 320
Los Angeles, CA  90048

LOS:110280.1

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,          :

                 Plaintiff,        :      <u>STIPULATION</u>

           - v. -                  :

POKERSTARS, et al.,                :      11 Civ. 2564 (LBS)

                 Defendants;       :

ALL RIGHT, TITLE AND INTEREST IN   :
THE ASSETS OF POKERSTARS, et al.,
                                   :
                 Defendants-in-rem.
                                   :
- - - - - - - - - - - - - - - - -x

WHEREAS, on or about April 14, 2011, a verified
complaint, 11 Civ. 2564 (LBS) (the "Complaint") was filed under
seal in the United States District Court for the Southern
District of New York seeking the forfeiture of, among other
things, all assets of PokerStars, the Oldford Group Ltd.,
Rational Entertainment Enterprises Ltd., PYR Software Ltd.,
Stelekram Ltd., and Sphene International Ltd. (collectively the
"PokerStars Companies," their assets collectively the "PokerStars
Defendant Property") and all assets of Full Tilt Poker, Tiltware
LLC, Kolyma Corporation A.V.V., Pocket Kings Ltd., Pocket Kings
Consulting Ltd., Filco, Ltd., Vantage Ltd., Ranston, Ltd., and
Full Tilt Poker Ltd. (collectively the "Named Full Tilt
Companies," their assets collectively the "Full Tilt Defendant
Property") pursuant to Title 18, United States Code, Sections
1955(d), 981(a)(1)(A), and 981(a)(1)(C), and seeking civil money

laundering penalties pursuant to Title 18, United States Code,
Section 1956 against the PokerStars Companies and against the
Named Full Tilt Companies;

WHEREAS, on or about September 21, 2011, a verified
amended complaint (the "Amended Complaint") was filed;

WHEREAS, on or about September 30, 2011, Cardroom
International LLC ("Cardroom") filed a claim pursuant to 18
U.S.C. § 983(a)(4) and Rule G(5)(a), asserting an interest in the
following property identified in the above-captioned case in the
amount of thirty million dollars, which is comprised of the
following:

a) All funds and other property on deposit nad/or
formerly on deposit in accountnumbered GB81 RBOS
6095 4234 0877 66 held at NatWest, in the name of
Raymond Bitar, and all funds traceable thereto;

b) All funds and other property on deposit and/or
formerly on deposit in account numbered 7655741861
held at Wells Fargo Bank N.A. in the name of HH
Lederer Consulting LLC, and all funds traceable
thereto;

c) All funds and other property on deposit and/or
formerly on deposit in account numbered
GB56LOYD30166314010402 held at Loyds TSB
International, Isle of Mann, in the name of Howard
Lederer, and all funds traceable thereto;

d) All funds and other property on deposit and/or
formerly on deposit in account numbered
40039049628 held at Citibank N.A., in the name of
Chris Ferguson, and all funds traceable thereto;

e) All funds and other property on deposit and/or
formerly on deposit in account numbered CH87 0875
5057 0684 0010 0 held at Pictet & Co Bankers,
Switzerland, in the name of Telamonian Ajax Trust,

2

and all funds traceable thereto;

f)   All other property that has been seized or will be
     seized in this proceeding at any time, directly
     from and/or related to, a) defendant Pokerstars
     and any related defendant(s) and, b) defendant
     Full Tilt Poker and any related defendant(s),
     pursuant to the Complaint filed in this matter, 11
     Civ. 2564 (LBS) on April 20, 2011 and the First
     Amended Complaint filed in this matter, 11 Civ.
     2564 (LBS) on September 21, 2011; and

g)   All funds identified in the original forfeiture
     complaint in this action unsealed on April 15,
     2011 to the extent such funds are traceable to the
     activities of the pokerstars.com and
     fulltiltpoker.com internet cardroom, but no claim
     is made to the extent the funds are traceable to
     the absolutepoker.com internet cardroom;

WHEREAS, the United States has entered into a

Stipulation and Order of Settlement Regarding Full Tilt Poker

(the "Full Tilt Settlement") and a Stipulation and Order of

Settlement Regarding PokerStars (the "PokerStars Settlement"),

which provide for, inter alia, the forfeiture of certain assets

of the Full Tilt Group (defined in the Full Tilt Settlement) and

the transfer of those assets to the PokerStars Companies (defined

in the PokerStars Settlement) or their designees;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by

and between the United States of America, by its attorney Preet

Bharara, United States Attorney for the Southern District of New

York, Sharon Cohen Levin, Michael D. Lockard, and Jason H. Cowley

Assistant United States Attorneys, of counsel, and Cardroom

International LLC, by their attorneys, Cyrus Sanai, Esq. and

Robert J Hantman, Hantman & Associates, that:

3

1.     Cardroom International LLC ("Cardroom") consents to the forfeiture of certain assets of the Full Tilt Group (the "Forfeited Full Tilt Assets") as part of the settlement reached between the United States and Fulltilt Poker and PokerStars in United States v. PokerStars, et al., 11 Civ. 2564 (LBS) (the "SDNY Action"), on the terms and conditions herein stated.

2.     The U.S. Attorney's Office for the Southern District of New York (the "Office") agrees to hold $30,000,000 in funds received by the United States in connection with the settlement with the Full Tilt Group and the PokerStars Companies (the "Substitute Res") as substitute res for the Forfeited Full Tilt Assets subject to Cardroom's claim.

3.     The Substitute Res shall be treated in this action as a substitute res for the Forfeited Full Tilt Assets, without prejudice to any rights, remedies, claims, defenses, or arguments of either party in this action.

4.   The signature pages of this stipulation may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.  Signature pages by fax or by .pdf shall be treated as originals.

AGREED AND CONSENTED TO:

PREET BHARARA
United States Attorney
Southern District of New York

By:  _____ (For)

Sharon Cohen Levin
Michael D. Lockard
Jason H. Cowley
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1060/2193/2479

DATE  7/27/12

Counsel for Cardroom International LLC

By:  _____

Cyrus Sanai, Esq.
Sanais Law Firm
433 North Camden Drive, Suite 600
Beverly Hills, CA 90210
(310) 717-9840
Counsel for Cardroom International LLC

DATE  July 27, 2012

By:  _____

Robert J Hantman
Hantman & Associates
1515 Broadway, 11th Floor
New York, NY 10036
(212) 684-3933
Counsel for Cardroom International LLC

DATE  7/27/12

5

# EXHIBIT C

Online poker companies settle with U.S., two to combine | Reuters                                    8/20/12 4:21 AM

  EDITION: U.S.                    Register | Sign in        Search News & Quotes

| Home | Business | Markets | World | Politics | Tech | Opinion | Money | Life | Pictures | Video |

TAP INTO WESTLAW NEXT   **LEARN MORE »**
WestlawNext™ iPad® App.
Access the world's most advanced legal research system via your iPad.
**WestlawNext™**

ARTICLE



# Online poker companies settle with U.S., two to combine

Recommend   41 people recommend this. Be the first of your friends.

By Joseph Menn and Basil Katz
Tue Jul 31, 2012 8:59pm EDT

(Reuters) - U.S. authorities settled a massive fraud complaint against PokerStars, the world's most popular online poker company, and allowed it to take control of a rival brand, setting the stage for the company to re-enter the burgeoning U.S. market.

Isle of Man-based PokerStars agreed to forfeit $731 million, including $547 million that will be available to reimburse U.S. customers of the rival, Full Tilt Poker. Full Tilt also agreed to settle and will cease independent operations.

PokerStars and Full Tilt became the dominant sites for Web gamblers in the United States after Congress explicitly banned real-money gambling on online card games in 2006 and other companies withdrew from the market.

While Full Tilt claimed to be based in the Channel Islands, many of its owners were in the United States, including poker pro Chris "Jesus" Ferguson, who authorities said owned 19 percent of the company. The Full Tilt player-owners were prominent figures in the poker world, sporting "Full Tilt" hats as they competed in televised tournaments after networks rejected poker commercials.

That all came to an abrupt halt on April 15 of last year -- a day known as Black Friday in the industry -- when federal prosecutors in Manhattan filed a civil bank fraud and money-laundering suit against Full Tilt and PokerStars and brought criminal charges against their founders.

Prosecutors said both companies had used false billing codes to deceive banks that would not process gambling transactions, and they said Full Tilt had devolved into a "global Ponzi scheme," with the big-name players and other owners pocketing hundreds of millions of dollars that were owed to players.

**Follow Reuters**



Facebook    Twitter    RSS    YouTube

RECOMMENDED VIDEO

  Aircraft on U.S.-Russia flight in emergency landing...
VIDEO

  China-Japan island dispute gets ugly (2:55)
VIDEO

  South African police open fire on striking Lonmin...
VIDEO

  Microbes Make Methane from Waste Wind Power
(ecomagination)

Disney's 'Physical Face Cloning' produces the ultimate...
(Digital Trends)                    [?]



Tweet   11

Share

Share this

2

Email

Print

**Related News**

Online poker companies settle with U.S., two to combine
Tue, Jul 31 2012

Zynga takes axe to outlook, spooks Facebook investors
Wed, Jul 25 2012

Insight: Italian gaming liberalization: a bet that did not pay off
Tue, Jul 17 2012

**Analysis & Opinion**

Britain's shaken reputation

Sarbanes-Oxley's lost promise: Why CEOs haven't been prosecuted

**Related Topics**

Tech »

Online poker companies settle with U.S., two to combine | Reuters

8/20/12 4:21 AM

**READ**

1  China's Gu Kailai gets suspended death
   sentence
   5:28am EDT

2  British-born filmmaker Tony Scott jumps to
   death
   4:24am EDT

3  India: Text message threats, rumors came
   from Pakistan
   ▶ VIDEO|
   18 Aug 2012

4  Assange berates United States from Ecuador
   Embassy balcony
   ▶ VIDEO|
   19 Aug 2012

5  Sightseeing vessel runs aground in Alaskan
   bay, 76 rescued
   1:04am EDT

**DISCUSSED**

138  Obama's lead over Romney grows
     despite voters' pessimism

122  Romney to announce vice
     presidential choice Saturday

94   Analysis: Are Israelis tough enough
     for a long war with Iran?

**SPONSORED LINKS**


**Critical Warning Number Six**
Something Very Big Will Happen in America
in the Next 180 Days. Click Here.


**WisdomTree DTN Ex-Financial Dividend
ETF**
American Dividend ETF w/o Financial
Stocks. Read The Case For Ex Financials
Now.


**Double Discount promotion**
Get interest rate discounts on select new
personal loans from Wells Fargo.

Ads by Marchex

Prosecutors accused Full Tilt of lying when it told customers that their accounts were "segregated and held separately" from the company's operating funds. In the end, it owed more than it could repay without a sale.

Prosecutors said the amount of money being forfeited would more than cover the amount that Full Tilt had owed its players. An attorney for the company, Jeff Ifrah, said it only owed $330 million worldwide.

Neither PokerStars nor Full Tilt admitted wrongdoing in the settlement.

PokerStars will be barred from employing Full Tilt Chief Executive Raymond Bitar, who faces criminal fraud charges and is now out on bail, as well as part-owners and famous players Ferguson and Howard "The Professor" Lederer, who remain defendants in the civil case.

PokerStars also agreed that its founder Isai Scheinberg, who also faces criminal gambling, fraud and money laundering charges, would no longer serve as an executive or director. Scheinberg remains at large, according to prosecutors.

WIRE ACT

The settlement sets the stage for PokerStars to re-enter the online card games market in the United States. The Justice Department in Washington decided last year that the Wire Act, one of the key laws used in prosecuting gambling operations, should not apply to state-approved games -- opening the door to the legalization of online poker.

Four weeks ago, Delaware joined Nevada in legalizing online poker among state residents, and California and several other states are considering similar measures as they seek new tax revenue and technology jobs.

Mark Scheinberg, PokerStars' chairman and the son of its founder, said in a statement that the company was "delighted" to resolve the case and that the it hoped to join its rivals in seeking state licenses.

"The agreement explicitly permits PokerStars to apply to relevant U.S. gaming authorities, under both PokerStars and Full Tilt Poker brands, to offer real money online poker when state or federal governments introduce a framework to regulate such activity," Scheinberg said.

Nevada has already begun reviewing applications from some of the online sites that pulled out in 2006, including Bwin.Party Digital Entertainment and 888 Holdings Plc.

Those two companies declined to comment on the long-expected PokerStars settlement, but people close to both companies previously told Reuters that executives were angry that PokerStars was set to cash in on the customer loyalty built up in violation of the law.

888 and Bwin.Party, owner of the former top U.S. site PartyPoker, "left the country and lost their business, and now they may be the ones that are really hurt out of this," said Robert "Chipburner" Turner, a poker champion who advises other casinos.

Several companies besides PokerStars considered making bids for Full Tilt, including San Francisco-based social gaming company Zynga Inc, Bwin.Party and land-based casinos, according to a person involved in the process. The asset sale includes software, patents and 10,000 Web addresses. Zynga had no comment.

"For PokerStars, it's smart business to try to remove a number of the clouds which obviously were preventing them from operating in the U.S.," said Jon Richmond, chief executive of U.S. Digital Gaming, which is also seeking online licenses.

PokerStars is likely to pursue deals with traditional casinos before applying for online licenses. Bwin.Party has teamed with MGM Resorts, while 888 has a contract with Caesars Entertainment Corp.

Online poker companies settle with U.S., two to combine | Reuters                              8/20/12 4:21 AM



"IT HELPS ME ADDRESS MY CLIENTS' ISSUES ANYTIME, ANYWHERE."

TIM JOHNSON, PRINCIPAL ATTORNEY
MATTHEWS, LAWSON & JOHNSON, P.L.L.C.
HOUSTON

WestlawNext™
See what the WestlawNext
iPad app can do for you ►



THOMSON REUTERS™

The big casinos have greater clout and more trust built up with local regulators, but they lack the expertise, software and brand recognition of the offshore firms.

Even with two powerful brands, PokerStars does not have a lock on any state's approval, others in the industry said.

Each state has its own rules and standards for determining the "suitability" of gambling industry applicants, and legal histories are a common concern given the historic role of organized crime, the potential for cheating, and the need to keep out minors.

"You can be exonerated in court and still face issues with regulators," said Michael Pollock, a former adviser to the New Jersey Casino Control Commission chairman, who is now managing director of consulting firm Spectrum Gaming Group. "These will be among the toughest decisions in the history of regulated gaming."

(Reporting by Joseph Menn in San Francisco and Basil Katz and Jonathan Stempel in New York; Editing by Martha Graybow, Jonathan Weber, Maureen Bavdek, Tim Dobbyn, Leslie Gevirtz and Ryan Woo)

TECH

## Related Quotes and News

| COMPANY | PRICE | RELATED NEWS |
|---|---|---|
| **888 Holdings PLC**<br>888.L | **77.50p**<br>-0.25    -0.32% | UPDATE 1-Casino and poker pushes 888's revenue up 25 pct<br><br>UPDATE 1-Online gamer 888's earnings nearly double<br><br>**More 888.L News ▸** |
| **Bwin.Party Digital Entertainment PLC**<br>BPTY.L | **97.50p**<br>-1.00    -1.02% | |
| **Caesars Entertainment Corp**<br>CZR.O | **$8.15**<br>+0.04    +0.49% | TEXT-S&P revises Caesars Entertainment Corp rating outlook<br><br>**More CZR.O News ▸** |

Recommend    41 people recommend this. Be the first of your friends.

Tweet this      Link this      Share this      Digg this      Email                              Reprints

## More From Reuters

F-35 fighter drops first bomb, marking new test phase

Top six myths about Medicare

Troubled green carmaker Fisker seeks to raise more cash

Two northeast Indians dead after being thrown from moving train:…

Assange berates United States from Ecuador Embassy balcony

## From Around the Web

What We've Come to: About Half of Retired People in the U.S. Die with… *(Profit Confidential)*

Coyote Attacks Pitbull - Newport Beach-Corona del Mar, CA Patch *(Patch - Newport Beach, CA)*

Alibaba: Will it be the new Facebook? *(Business Without Borders)*

Ryan Seacrest considers Joel McHale's Offer *(Random Acts Of Fusion)*

The 5% Money Management Rule *(DailyFX)*